**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.: 04-60910-CIV-MARTINEZ

| | |
|---|---|
| STEVENS WEISS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ATLANTIC RECORDING CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MOTION FOR PARTIAL SUMMARY JUDGMENT**
**WITH INCORPORATED MEMORANDUM OF LAW**

Defendant Atlantic Recording Corporation ("Atlantic"), by and through its undersigned attorneys, pursuant to Fed. R. Civ. P. 56, files its Motion for Partial Summary Judgment, and in support thereof, submits the following Memorandum of Law:

## I. INTRODUCTION

Atlantic, which owns rights to recorded music made by the group Led Zeppelin, moves for partial summary judgment dismissing those claims brought by Led Zeppelin's prior attorney, plaintiff Stevens Weiss ("Weiss"), that he is contractually entitled to payments from the sales and licensing of certain Led Zeppelin recordings. Atlantic moves to dismiss those of Weiss's claims that can only succeed if this Court ignores the clear language of the agreements at issue. Specifically,

- Atlantic moves for summary judgment dismissing that portion of Count I of Weiss's Amended Complaint ("Am. Compl.," Ex. 1) in which he claims that he is entitled to royalties on a DVD embodying live video and audio recordings by Led Zeppelin.

Weiss's claim that he is entitled to royalties because the DVD is a "Catalog" recording under a 1991 agreement ignores the fact that "The Catalog" is expressly defined as master recordings "recorded by, delivered to or made for Atlantic for release or potential release as *phonograph records*." The DVD is not a phonograph record. Accordingly, it is not part of The Catalog.

- Atlantic moves for summary judgment dismissing Count II of Weiss's Amended Complaint in which he claims that he is entitled under a 1995 agreement to a bonus tied to sales of "royalty bearing copies of an album entitled 'BBC Sessions.'" There is no dispute that sales have not reached the target levels. Weiss's claim that the sales should be doubled as *BBC Sessions* contains two compact discs requires a tortured interpretation of the 1995 agreement.

- Atlantic moves for summary judgment dismissing Count III of Weiss's Amended Complaint in which he claims that he is entitled to royalties based on the licensing of Led Zeppelin recordings for use in General Motors television commercials and a movie by DreamWorks. The 1991 agreement makes clear that Weiss is not entitled to payments for such licensing, and Weiss's proposed interpretation of a provision of that agreement as retaining his right to such payments would require this Court to ignore the plain meaning of that provision and negate the key terms of the remainder of the agreement.

2

## II. FACTS

### A.   Background

Atlantic, a Delaware corporation with its principal place of business in New York, New York, is a record label that records, promotes and sells recorded music. (Accompanying Declaration of Michael Kushner[1] at Paragraph 2)

At all relevant times since 1968, Atlantic has had the exclusive right to exploit the recordings of Led Zeppelin, one of the most acclaimed rock bands in history. Atlantic's rights are spelled out in a 1968 agreement (the "1968 Agreement") between Superhype Tapes, Ltd. ("Superhype"), which furnished the services of Led Zeppelin, and Atlantic. (Kushner Decl. ¶ 3; Ex. 2)

From its inception until sometime in the late 1980s, Led Zeppelin was represented by plaintiff Weiss, an attorney who represented many of the top artists of the time, including Jimi Hendrix and The Rascals. Weiss negotiated the 1968 Agreement on behalf of Led Zeppelin. (Weiss Dep. Tr. at 7:18-8:5; 11:25-12:1; 19:11-23; 26:14-15)[2]

In exchange for the services Weiss rendered, Led Zeppelin assigned to Weiss an amount equal to six and eighty-two one-hundredths (6.82%) of all payments due to Led Zeppelin pursuant to the 1968 Agreement. This assignment was confirmed on December 4, 1969, May 8, 1974 and March 15, 1978 (collectively, the "Weiss Assignments"). (Am. Cmpl. ¶ 19; Ex. 4)

Weiss has received at least $7 million in payments over time from the exploitation of Led Zeppelin master recordings. (Weiss Dep. Tr. at 18:16-23; Kushner July 26, 2004 Decl. ¶ 3)

---

[1]   Declarations in support of Atlantic's Motion for Partial Summary Judgment will be cited using the declarant's last name followed by the paragraph number. All references to the declarations of Michael Kushner are to his August 8, 2005 declaration unless otherwise indicated.

[2]   Relevant portions of the Weiss deposition transcript ("Weiss Dep. Tr.") are included as Exhibit 3.

In 1980, John Bonham, Led Zeppelin's drummer, died, and Led Zeppelin stopped performing and recording as a band.  (Kushner Decl. ¶ 5)

B.     The 1991 Agreement

Pursuant to an agreement with Superhype dated May 29, 1990 (the "Box Set Agreement"), Atlantic released two box sets of multiple compact discs (the "Box Set"), which embodied previously-released Led Zeppelin master recordings.  Weiss did not represent Led Zeppelin in connection with the Box Set Agreement.  (Kushner Decl. ¶ 6; Ex. 5; Weiss Dep. Tr. at 26:14-15; 27:1-16)

A dispute arose between Superhype and Weiss as to whether Weiss was entitled to royalties on the Box Set.  At the same time, Weiss was also involved in a dispute with Atlantic and Superhype concerning "the meaning and operative effect of certain documents heretofore executed between the parties."  (Kushner Decl. ¶ 7; Ex. 6 at 2 (first Whereas clause))

In an agreement dated April 18, 1991 (the "1991 Agreement"), Weiss, Superhype and Atlantic "settle[d] their respective conflicting claims and ... establish[ed] a formula that will both determine Weiss's entitlement to payments based on sales of the Box Set ... and will resolve ... any issues as to the amount of royalties payable to Weiss from Atlantic's continuing sale of the Catalog."  (Ex. 6 at 3 (final Whereas clause))

The 1991 Agreement restates Atlantic's and Superhype's obligations to Weiss, as is clear from the preamble quoted above as well as from the integration clause found in Paragraph XII of the 1991 Agreement:

> This Agreement is complete and supersedes any and all prior representations and understandings between and among the parties, oral or written, unless expressly recited herein.

(Ex. 6 at 6, ¶ XII).

A thorough understanding of the 1991 Agreement is required as Weiss claims that in this settlement he preserved his right to receive payments for the licensing of Led Zeppelin recordings for use in commercials, TV broadcast, motion pictures and videos (collectively "Ancillary Uses"). (Weiss Dep. Tr. at 37:9-38:18; 50:8-13)

1.    "The Catalog" and "Non-Catalog Recordings"

Under the 1991 Agreement, the parties agreed that Weiss would be entitled to payments from the sale of recordings that fall within "The Catalog," but not on sales of "Non-Catalog Recordings." "The Catalog" is defined as:

> The previously released recordings of Led Zeppelin owned and controlled by Atlantic as provided in various agreements between [Superhype] ... and Atlantic prior to May 29, 1990, and any other master recordings heretofore recorded by, delivered to or made for Atlantic for release or potential release as phonograph records by Atlantic. For the purposes of this agreement the definition of the Catalog does not include the master recordings in the album "The Song Remains the Same" or which were recorded for the motion picture of the same name.

"Non-Catalog Recordings" are:

> Recordings of the audio portion of any Led Zeppelin performance made for television, radio, reference or copyright purposes and not heretofore delivered to, made for, or intended for delivery to Atlantic Records for inclusion in the Catalog or for release or potential release as phonograph records by Atlantic.

(Ex. 6 at 2)

2.    Payments to Weiss

As a compromise, the parties agreed that Weiss would receive three and one-half percent (3½ %) of the payments to Superhype on sales of the Box Set and on sales of future "Compilation Albums"[3] (defined as embodying "Catalog" recordings) and future "Compilation-

---

[3]    A Compilation Album is defined as: "An Album consisting wholly of Led Zeppelin recordings from the Catalog (as defined below), including any so-called 'Best Of' or 'Greatest Hits' Albums." (Ex. 6 at 1)

123264.00601/6409390v10

Plus Albums,"[4] (which embody Catalog and Non-Catalog Recordings). The royalties on Compilation-Plus Albums are to be pro-rated so that Weiss is paid on Catalog Recordings only and not on Non-Catalog Recordings. (Ex. 6 at 4, ¶ III)

The parties also agreed to amend the Weiss Assignments to increase "Weiss's aggregate entitlement to royalties on Atlantic's continuing distribution of The Catalog by twenty (20%) percent" (the "20% Increase"). (Ex. 6 at 5, ¶ VII)

3.     Clarification of Weiss's Rights to Payments

To insure that there was no misunderstanding as to Weiss's rights, the parties clarified Weiss's rights as follows: first, they clarified that Weiss is not to receive payments relating to (A) Atlantic's release of Non-Catalog Recordings or (B) Atlantic's licensing of Led Zeppelin recordings for Ancillary Uses:

> For the avoidance of misunderstanding, should Atlantic ever (A) release any Led Zeppelin recordings derived from Non-Catalog masters, or (B) license any Led Zeppelin master recordings for commercials, TV broadcast, Motion Pictures or Videos, provided that no such release or licensing shall be presently permitted in any recording agreement between Atlantic and either [Superhype or Swan Song, Inc.[5]], Weiss shall have no right to royalties or any other interest therein.

(Ex. 6 at 5, ¶ VII) The foregoing provision of the 1991 Agreement will be referred to as the "Avoidance of Misunderstanding Sentence."

Second, the parties clarified that Weiss's entitlement to royalties from Atlantic applied to sales of The Catalog:

> For the avoidance of misunderstanding, Weiss's entitlement to royalties from Atlantic ... on continuing sales of the Catalog under

---

[4]     A "Compilation-Plus Album" is defined as: "An Album consisting primarily of Led Zeppelin recordings from the Catalog (as defined below) with one or more non-Catalog records (as defined below)." (Ex. 6 at 1)

[5]     Swan Song, Inc. ("SSI") was a record label owned by the former members of Led Zeppelin and others. (Kushner Decl. ¶ 4)

6

the Weiss Assignments will be, commencing as of September 1, 1990, in the aggregate, 120% of Weiss's former entitlement thereunder.

(Ex. 6 at 5, ¶ VII)

C.    The 1995 Agreement

Jimmy Page and Robert Plant, two former members of Led Zeppelin, released an album in 1994 entitled *No Quarter*. (Kushner Decl. ¶ 8) Although Page and Plant were not recording as Led Zeppelin, Weiss claimed that he was entitled to royalties on sales of *No Quarter* under the Weiss Assignments. (Kushner Decl. ¶ 9) As a means of settling Weiss's claim, in August 1995, Atlantic and Weiss entered into an agreement whereby Atlantic made certain payments tied to the next Led Zeppelin album released by Atlantic (the "1995 Agreement"). (Kushner Decl. ¶ 10; Ex. 7) In addition, Atlantic agreed to give Weiss a bonus:

> (i) In the event the [next album] shall have net sales through normal retailer channels in the United States in excess of 1,500,000 royalty-bearing copies, for which [Atlantic] pay a royalty … [Atlantic] shall pay [Weiss] a further additional payment of Fifty Thousand ($50,000.00) Dollars.

(Ex. 7 at 5, ¶ 3(c)(i)) An additional $50,000.00 bonus would be achieved if 2,000,000 royalty-bearing copies were sold. (Ex. 7 at 5, ¶ 3(c)(ii))

The bonus provision contained in the 1995 Agreement was the result of a negotiation between Weiss and Atlantic's Chief Financial Officer, Mel Lewinter. (Weiss Dep. Tr. at 68:3-69:6) Weiss and Lewinter did not discuss how many discs would be contained in the next release, though Weiss now testifies that he assumed it would be a one-album set. Weiss admits that he had no idea how many albums Atlantic intended to include in the next release and that he could have asked Atlantic to have the bonus triggered at one half the number of units if the next release contained two albums. (Weiss Dep. Tr. at 64:21-65:8; 68:17-69:6; 69:21-70:1)

123264.00601/6409390v10

The next album released by Atlantic, in 1997, was *BBC Sessions*, a two-disc album embodying recordings made by Led Zeppelin for the British Broadcasting Corporation. As of July 1, 2005, there were approximately 1,030,000 royalty bearing copies of the *BBC Sessions* sold in the United States. Each copy of *BBC Sessions* is considered a single unit for the purposes of paying royalties to Led Zeppelin. (Nolan Decl. ¶ 2)

D.     The Licenses at Issue

In 2000, Warner Special Projects Inc., as the agent for Atlantic, granted a license to DreamWorks Productions L.L.C. ("DreamWorks") for recordings made by Led Zeppelin to be used in the movie *Almost Famous*. And in 2001, Warner Special Projects Inc., as the agent for Atlantic, granted General Motors Corp. ("General Motors") a license to use Led Zeppelin's recording entitled "Rock and Roll" in television commercials. The licenses were entered into with Led Zeppelin's consent. (Kushner Decl. ¶ 12)

E.     The Recordings at Issue

In 2004, Atlantic released a CD entitled *How the West Was Won* that embodied previously unreleased live recordings of Led Zeppelin performing in Los Angeles and Long Beach, California in 1972 as well as a separate DVD entitled *Led Zeppelin* containing audiovisual footage of Led Zeppelin live performances from 1969 to 1979 (the "*Led Zeppelin DVD*"). (Kushner Decl. ¶ 13)

F.     The Complaint

In the present action, Weiss claims:

(1)     that he is entitled to royalties on *How the West was Won* and the *Led Zeppelin DVD* as the recordings embodied thereon are "Catalog" as defined in the 1991

8

Agreement;[6]

      (2)    that he is entitled to a $100,000 bonus on sales of *BBC Sessions* as it is a double album and should be counted twice in determining his entitlement to a bonus; and

      (3)    that he is entitled to royalties on the amounts received from licensing Led Zeppelin recordings to General Motors and DreamWorks.

## G.    Atlantic's Motion for Partial Summary Judgment

Atlantic moves for partial summary judgment only as to those of Weiss's claims that can be dismissed by looking to the clear language of the agreements at issue.  As shown below, Weiss's claims cannot succeed without applying a tortured construction to the agreements that would defeat the overall intent of the agreements.

## III. ARGUMENT

## A.    Standards of Law

### 1.    Summary Judgment Standard

A motion for summary judgment may be granted where the court determines that there is no genuine issue of material fact and that the undisputed facts warrant judgment for the moving party as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Int'l Bhd. of Boilermakers v. Local D111, Int'l Bhd. of Boilermakers,* 858 F.2d 1559, 1561 (11th Cir. 1988).  "When the interpretation of a contract is at issue, summary judgment is proper where the language of the contract is unambiguous, lending itself to only one reasonable interpretation."  *Hanson v. McCaw Cellular Communications,* 77 F.3d 663, 667 (2d Cir. 1996).  Ambiguity is not created, and summary judgment not barred, merely because a party disputes a contract term,

---

[6]    Weiss is only claiming that twenty-nine of the forty recordings on the DVD are part of The Catalog. (*See* Plaintiff's Supplemental Answers to Defendant's Interrogatory number 9, attached to the Appendix as Ex. 8). Atlantic admits that the recordings entitled "We're Gonna Groove", I Can't Quit You Babe", and "Over the Hills and far Away" are Catalog recordings as they were originally delivered to Atlantic for release as phonograph records.

123264.00601/6409390v10

particularly if that party's interpretation is unreasonable. *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996); *Int'l Bhd. of Boilermakers*, 858 F.2d at 1561. Once the movant makes a threshold showing that there are no material issues of fact, the burden shifts to the non-movant to make an evidentiary showing that material issues of fact exist. *Celotex Corp.*, 477 U.S. at 324; *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993). This burden cannot be met by mere conclusory allegations. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); *Post*, 7 F.3d at 1557. New York law applies to the interpretation of the Agreements at issue.[7]

**B.     Application of Law to Weiss' Claims**

1.     Weiss is Not Entitled to Royalties on the *Led Zeppelin DVD*

Weiss claims that he is entitled to royalties on the *Led Zeppelin DVD* because it is a "Catalog" Recording within the 1991 Agreement. (Am. Compl. ¶¶ 9-10) As applicable to this claim, The Catalog means:

> ... other master recordings heretofore recorded by, delivered to or made for Atlantic for release or potential release *as phonograph records* by Atlantic.

(Ex. 6 at 2 (emphasis added))

The 1991 Agreement makes clear that a phonograph record contains sound only. The definition of "Non-Catalog Recording" is the "audio portion of any Led Zeppelin performance.... made for, or intended for delivery to Atlantic ... for release or potential release as a phonograph record..." (Ex. 6 at 2).

---

[7]     A federal court sitting in diversity must apply the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Florida law provides that where parties have executed a contractual choice of law provision, that provision controls, barring circumstances not present here. *See* Fla. Stat. Ann. § 671.105 (2004); *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995). The 1968 and 1991 Agreements are explicitly subject to New York Law and it is believed that the parties executed the 1995 Agreement in New York. (Kushner Decl. ¶ 11) Accordingly, New York law applies to the interpretation and enforcement of the agreements at issue.

10

A DVD contains video images and most often, though not always, also includes audio recordings. *See Zomax Optical Media, Inc., v. United States*, 366 F. Supp. 2d 1326, 1337 (Ct. Int'l Trade 2005). A "phonograph record" is "an object in which sounds, other than those accompanying a motion picture or audiovisual work, are fixed ..." 17 U.S.C. § 101; s*ee also Buck v. Jewell-La Salle Realty Co.*, 283 U.S. 191, 200 (1931); *Agee v. Paramount Communications, Inc.*, 59 F.3d 317. 322 (2d. Cir. 1995) (identifying phonograph records as "sound recordings"); H.R. Rep. No. 92-487, at 1 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1566, 1567 (reporting on copyright protection extended to sound recordings such as phonograph records). (Kushner Decl. ¶ 14)

A DVD simply is not a phonograph record. (Kushner Decl. ¶ 15) Accordingly, under the plain meaning of the 1991 Agreement, Weiss is not entitled to royalties on the *Led Zeppelin DVD. See, e.g., Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.").

2.      Weiss is Not Entitled to a Bonus on sale of *BBC Sessions*

Weiss claims that he is entitled to bonuses under the 1995 Agreement for the sales of *BBC Sessions*, as if two million copies were sold. According to Weiss, because the album contains two discs, each sale should be counted twice for determining whether sales levels were achieved and a bonus due. (Weiss Dep. Tr. at 62:12-63:6)

The 1995 Agreement is clear: Weiss is to receive a bonus upon the sale of a defined number of "royalty bearing copies." The plain meaning of a "royalty bearing copy" is each unit upon which Atlantic calculates and pays a royalty. There is simply no basis for construing "royalty bearing copy" as varying depending upon the number of discs contained in an album. *Greenfield*, 780 N.E.2d at 170.

11

The plain meaning of the bonus provision in the 1995 Agreement is consistent with Atlantic's practice. Atlantic calculates and pays royalties based on each copy (or unit) sold regardless of whether there are one or multiple discs in the album. For example, a single-disc album such as Led Zeppelin's *Early Days* is a royalty bearing copy, as is the single-disc album *Later Days*. When Atlantic combined the two albums into one and sold it under the title *Early Days and Later Days*, each double-disc set was considered one copy for the purposes of calculating royalties. Atlantic counts other boxed set releases as single royalty bearing unit for sale, including Rush's *Different Stages*, a 3-CD set, and Yes's *Box Set*, a 5-CD set. The royalty for each is based on the price for the box set, not individual units contained within. (Nolan Decl. ¶ 3) There is simply no basis for Weiss to claim that a "royalty bearing copy" is anything else.

Weiss's claim that he understood that the next album would contain a single disc is irrelevant. First, the language is clear on its face and parol evidence is inadmissible. *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). Second, Weiss and Lewinter never even discussed what the next album would be and Weiss's self-serving testimony of what he understood does not help help Weiss. (Weiss Dep. Tr. at 64:21-65:8) *Wells v. Shearson Lehman/Am. Express, Inc.,* 526 N.E.2d 8, 15 (N.Y. 1988) ("Uncommunicated subjective intent alone cannot create an issue of fact where otherwise there is none.").

Accordingly, Count II of Weiss's Amended Complaint should be dismissed.

3.    <u>Weiss is not Entitled to Payments for Licensing of Led Zeppelin Recordings</u>

Weiss claims that he is entitled to payments for the licensing of Led Zeppelin recordings to General Motors and DreamWorks because he preserved his rights to receive payments from licensing in the italicized portion of the Avoidance of Misunderstanding Sentence:

> For the avoidance of misunderstanding, should Atlantic ever (A) release any Led Zeppelin recordings derived from Non-Catalog masters, or (B) license any Led Zeppelin master recordings for

> commercials, TV broadcast, Motion Pictures or Videos, *provided that no such release or licensing shall be presently permitted in any recording agreement between Atlantic and either [Superhype or Swan Song, Inc.]*, Weiss shall have no right to royalties or any other interest therein.

(Ex. 6 at 5, ¶ VII (emphasis added); Weiss Dep. Tr. at 49:15-17)

The italicized proviso (the "1991 Proviso") was drafted by Weiss (Weiss Dep. Tr. at 49:11-14), and any ambiguities must be construed against him. *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 161 (2d Cir. 2003); *Barash v. State*, 154 N.Y.S.2d 317, 321 (N.Y. Ct. Cl. 1956); *Fleischman v. Furgueson*, 119 N.E. 400, 402 (N.Y. 1918).

According to Weiss, the 1991 Proviso should be interpreted as qualifying the Avoidance of Misunderstanding Sentence such that the stated restrictions will not apply if any recording agreement between Atlantic and Superhype or Swan Song permitted Atlantic to (A) release Led Zeppelin master recordings derived from Non-Catalog Recordings, or (B) license Led Zeppelin master recordings for Ancillary Uses. Weiss claims that the 1968 Agreement gives Atlantic the right to exploit Non-Catalog recordings and to license Led Zeppelin masters. (Weiss Dep. Tr. at 54:14-19) Therefore, Weiss contends, the 1991 Proviso retains his right to receive payments for the sale of Non-Catalog Recordings and the licensing of Led Zeppelin recordings for Ancillary Uses. (Weiss Dep. Tr. at 49:15-18)

Weiss acknowledges that if not for his construction of the 1991 Proviso, "he would not have been entitled to receive any payments from (A) releases of Led Zeppelin recordings derived from Non-Catalog masters or (B) licensing of Led Zeppelin master recordings for [Ancillary Uses]." (Weiss Dep. Tr. at 52:8-12)

The 1991 Proviso cannot be interpreted as Weiss claims for three reasons: First, the 1991 Agreement, including the 1991 Proviso, is clear on its face. Second, construing the 1991 Proviso as Atlantic suggests is consistent with the remainder of the 1991 Agreement and Atlantic's rights

13

123264.00601/6409390v10

to exploit Led Zeppelin recordings.  Third, Weiss's interpretation of the 1991 Proviso would conflict with the plain meaning of the 1991 Agreement.

        a.       <u>The Avoidance of Misunderstanding Sentence is Clear on its Face</u>

Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc.*, 566 N.E.2d at 642; *see also Refinemet Int'l Co. v. Eastbourne N.V.*, 25 F.3d 105, 108 (2d Cir. 1994) (quoting *W.W.W. Assocs., Inc.*).  "[W]here the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law and no trial is necessary to determine the legal effect of the contract." *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957); *see also Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985); *Nucci v. Warshaw Constr. Corp.*, 186 N.E.2d 401, 403 (N.Y. 1962).

The 1991 Proviso clarifies the first portion of the Avoidance of Misunderstanding Sentence, which states "should Atlantic ever" release Non-Catalog Recordings or license Led Zeppelin recordings for Ancillary Uses, by making clear that Atlantic does not presently have such rights.  This is made clear by looking to the secondary definition of "provided that," which according to *Black's Law Dictionary* 1261 (8th ed. 2004) means "except that" or "but."  This definition clarifies the 1991 Proviso and the Avoidance of Misunderstanding Sentence and is consistent with the relationship between Atlantic and Superhype as well as the overall intent of the 1991 Agreement:

> For the avoidance of misunderstanding, should Atlantic ever (A) release any Led Zeppelin recordings derived from Non-Catalog masters, or (B) license any Led Zeppelin master recordings for commercials, TV broadcast, Motion Pictures or Videos, *except that/but* no such release or licensing shall be presently permitted in any recording agreement between Atlantic and either [Superhype

14

123264.00601/6409390v10

or Swan Song, Inc.], Weiss shall have no right to royalties or any other interest therein.[8]

The use of the secondary definition of a word is appropriate where, as here, such definition is more apt in light of the overall agreement. *Becker v. Peter A. Frasse & Co.*, 173 N.E. 905, 906 (N.Y. 1931) (Cardozo, J.). *See also Eighth Ave. Coach Corp. v. City of New York*, 35 N.E.2d 907, 909 (N.Y. 1941) ("In a written document the word obtains its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document, all based upon the situation and circumstances existing at its creation.").

This construction of the 1991 Proviso is consistent with Atlantic's rights to exploit Led Zeppelin recordings. Atlantic does not have the right to release Non-Catalog Recordings and cannot license Led Zeppelin recordings for Ancillary Uses without obtaining Superhype's consent. (Kushner Decl. ¶ 16) Due to Atlantic's limited rights, Atlantic and Superhype have entered into separate agreements each time Atlantic sought to release Non-Catalog Recordings, including *How the West Was Won* and the *Led Zeppelin DVD*, and Atlantic has not licensed any Led Zeppelin recordings for Ancillary Uses without obtaining Superhype's agreement. (Kushner Decl. ¶ 17) *See, e.g., Arnold Prods., Inc. v. Favorite Films Corp.*, 298 F.2d 540, 543 (2d Cir. 1962) (requiring contracts to be interpreted in light of "general understanding and course of dealings" of the parties); *William C. Atwater & Co. v. Panama R. Co.*, 159 N.E. 418, 419 (N.Y. 1927) (same).

        b.    Atlantic's Construction is Consistent with the
              <u>Remainder of the 1991 Agreement and Course of Conduct</u>

The 1991 Agreement is an integrated agreement[9] that "supersedes any and all prior representations and understandings ... unless expressly recited herein." (Ex. 6 at 6, ¶ XII).

---

[8] Using the primary definition, "on the condition that," leads to a construction that does not make sense and is inconsistent with the overall intent of the parties in entering the 1991 Agreement as gleaned from the Agreement itself. *See* Section 3.b., *infra*.

15

Under the 1991 Agreement, Weiss is granted payments based on sales of Led Zeppelin recordings that are part of The Catalog and receives no payments for Non-Catalog Recordings. Construing the 1991 Proviso as suggested by Atlantic is consistent with this overall intent and purpose. *Columbus Park Corp. v. Dep't of Hous. Preservation & Dev.*, 598 N.E.2d 702, 706 (N.Y. 1992).

        c.      The 1991 Proviso Cannot Be Interpreted as Weiss Suggests

As noted in the 1991 Agreement, Weiss is not entitled to any payments relating to Non-Catalog Recordings and is not granted any payments for licensing Led Zeppelin recordings for Ancillary Uses. Interpreting the 1991 Proviso in the manner suggested by Weiss would entitle him to payments for the sale of Non-Catalog Recordings as well as the licensing of Led Zeppelin recordings for Ancillary Uses. Weiss's interpretation would not only negate the remainder of the Avoidance of Misunderstanding Sentence, which clearly states that he is not entitled to such payments, but would also conflict with the entire payment structure set out in the 1991 Agreement. According to Weiss:

> Q.    So was it your understanding that by adding that parenthetical that starts with no such release, that you would therefore be entitled to payments if Atlantic would release any Led Zeppelin recordings derived from non-catalogue masters?
>
> A.    Provided that I was like – if I was entitled to be paid under any existing agreement, yes.

(Weiss Dep. Tr. at 54:7-13) Weiss claims that he was entitled to receive such royalties prior to 1991. (Weiss Dep. Tr. at 54:14-19) Accordingly, under his interpretation of the 1991 Proviso,

---

[9] Where, as here, "the parties to a contract enter into a new agreement that expressly supersedes the previous agreement, the previous agreement is extinguished." *Health-Chem Corp. v. Baker*, 915 F.2d 805, 811 (2d Cir. 1990); *Mercury W. A.G., Inc. v. R.J. Reynolds Tobacco Co.*, 03 Civ. 5262 (JFK), 2004 WL 421793, *7 (S.D.N.Y. Mar. 5, 2004) ("[I]f one agreement expressly supersedes others, any prior agreements relating to the same subject matter are, by definition, extinguished.")

123264.00601/6409390v10

he is entitled to payments on the sale of Non-Catalog Recordings.[10]

Applying Weiss's construction of the 1991 Proviso would also violate basic rules of contractual construction, which require a court to (i) interpret ambiguity against the drafter (*Photopaint Techs., LLC*, 335 F.3d at 161); (ii) interpret apparently conflicting contract terms in light of the contract's overall purpose, as gleaned from the four corners of the document itself (*Mir v. Mir*, 522 N.Y.S.2d 590, 591 (N.Y. App. Div. 1987)); (iii) adopt a construction that is consistent with the overall purpose and intent of the contract (*Columbus Park Corp.*, 598 N.E.2d at 706); (iv) avoid a construction that renders another provision meaningless (*Id.*; *Mir*, 522 N.Y.S.2d at 591)); and (v) steer clear of an interpretation that creates an irrational conflict between two otherwise reconcilable provisions. *See G&B Photography v. Greenberg*, 619 N.Y.S.2d 294, 296 (N.Y. App. Div. 1994).

This court should not consider Weiss's claim as to his intention in drafting the 1991 Proviso, as the "[m]ere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact." *Bethlehem Steel Co.*, 141 N.E.2d 590, 593. Indeed, where, as here, a court may resolve an ambiguity by considering the agreement as a whole, it is improper for the court to consider extrinsic evidence such as Weiss's testimony. *Readco, Inc.*, 81 F.3d at 300; *Hudson-Port Ewen Assocs., L.P. v. Chien Kuo*, 578 N.E.2d 435, 435 (N.Y. 1991).

Finally, in the event that the Court finds that the 1991 Proviso does have the meaning Weiss claims, then the Court should strike the 1991 Proviso as it is "repugnant" to the remainder of the agreement. *See Harper v. Hochstim*, 278 F. 102, 104 (2d Cir. 1921) ("It cannot be

---

[10]   "Non-Catalog masters" as referred to in the Avoidance of Misunderstanding Sentence is the same as "Non-Catalog Recordings" as defined in the 1991 Agreement. (Weiss Dep. Tr. at 57:13-21)

123264.00601/6409390v10

doubted that it is only when parts of a written agreement are so radically repugnant that 'there is no rational interpretation that will render them effective and accordant that any part must perish.'") (quoting *Rushing v. Manhattan Life Ins. Co. of N.Y.*, 224 F. 74, 76 (8th Cir. 1915))); 22 *N.Y. Jur. 2d Contracts* § 253 (1996).

4.    Weiss's Own Interpretation of the 1991 Proviso
Does Not Entitle Him to Royalties from Licensing

Even if the 1991 Proviso is construed as Weiss advocates, *i.e.*, that he is entitled to be paid a portion of licensing income if Atlantic had the right to license Led Zeppelin recordings for Ancillary Uses in the 1968 Agreement, Weiss would not be entitled to such payments because Atlantic undeniably was not entitled to license Led Zeppelin master recordings for Ancillary Uses absent consent from Led Zeppelin.

Section 5(a) of the 1968 Agreement limits Atlantic's use of Led Zeppelin master recordings: "no use or disposition may be made of such master recording that is not generally applicable to Atlantic's other top recording artists."

This "favored nations clause" was intended by Weiss on behalf of Superhype to prevent Atlantic from treating Led Zeppelin "in that area in a way that was not applicable to their other leading artists." (Weiss Dep. Tr. at 23:2-6) According to Weiss, "[1968] was like the Dark Ages of recording agreements as far as artists are concerned and that record companies habitually got very, very broad rights to use recordings which probably today they would not get." (Weiss Dep. Tr. at 23:9-14)

The long-standing policy of Atlantic in 1991 (and now) is that it will not license recordings by its top artists (and even artists who do not qualify as "top") for Ancillary Uses without their consent. (Bishop Decl. ¶ 4; Leviton Decl. ¶¶ 3-5) Weiss knows this, and has for years, as he negotiated a 1982 solo recording agreement between Atlantic and Robert Plant, a

18

former member of Led Zeppelin, in which Atlantic expressly agreed that it would be required to obtain "written consent" for any license of a recording to a third party. (Kushner Decl. ¶ 19; Ex. 9 at 10, ¶ 8(R)) And Plant and Atlantic entered into a new agreement in 1991 that also required Plant's consent for such licenses. (Kushner Decl. ¶ 20; Ex. 10 at 11, ¶ 10(k)). The Bishop Declaration provides a review of licenses for Ancillary Uses entered into by Atlantic in 1991 and confirms Atlantic's policy of seeking consent from artists for such use.

According to Mark Leviton, who from 1979 to 2004 worked for Warner Strategic Marketing ("WSM"), which is responsible for licensing master recordings controlled by Atlantic for Ancillary Uses:

> During my entire employment by WSM, it was WSM's policy to seek artist approval before licensing their recordings for Ancillary Uses, for all currently-signed artists, all artists considered "legacy artists" as designated by Atlantic or other WMG labels, and all catalog artists where we were informed by Atlantic that it was required or prudent.
>
> Pursuant to this policy, we always sought consent for those categories of artist, and most often did not even look to the underlying recording agreement to determine whether consent was required. Absent artist approval, WSM would not license the recording.
>
> This policy applied to all current artists as well as Atlantic's top catalog artists, which included Led Zeppelin, who were specifically designated a "legacy artist".
>
> During my time with the company, we never licensed a Led Zeppelin recording for any purpose without the artists' consent.

(Leviton Decl. ¶¶ 3-6)

Atlantic's inability to license Led Zeppelin masters absent consent is borne out by its conduct over the past 37 years: Atlantic never sought to enter into any such license absent consent. (Kushner Decl. ¶ 21) *New Line Cinema Corp. v. Atlantic Releasing Corp.*, 1985 WL 1622, *4 (S.D.N.Y. 1985) ("New York courts have treated the parties' behavior 'as a course of

performance and [have] given it weight in contract interpretation.'"); *Webster's Red Seal Publ'ns, Inc. v. Gilberton World-Wide Publ'ns, Inc.*, 415 N.Y.S.2d 229, 230 (N.Y. App. Div. 1979) ("We think the most persuasive evidence of the agreed intention of the parties in those circumstances is what the parties did when the circumstances arose.), *aff'd*, 421 N.E.2d 118 (N.Y. 1981).

Accordingly, even if the 1991 Proviso is construed as Weiss suggests, he is not entitled to payment on licensing of Led Zeppelin master recordings, since such licensing is not "presently permitted" under the 1968 Agreement.

## IV. CONCLUSION

It is clear that Weiss is seeking to attribute a construction of the agreements at issue that will result in his receiving payments when the clear language and intent of those agreements provide for no such payments. Accordingly, Atlantic respectfully requests that the Court grant this motion for partial summary judgment.

Dated: August 9, 2005

Respectfully submitted,

BLANK ROME LLP
Attorneys for Defendant
1200 N. Federal Highway, Suite 417
Boca Raton, Florida 33432
(561) 417-8100

The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 885-5000

Kenneth L. Bressler
Admitted *pro hac vice*

Of Counsel:

Steven A. Lessne
Hans H. Chen

20

123264.00601/6409390v10