**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.: 04-60910-CIV-MARTINEZ



| | |
|---|---|
| STEVENS WEISS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ATLANTIC RECORDING CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**ATLANTIC RECORDING CORPORATION'S**
**DECLARATIONS AND EXHIBITS IN SUPPORT OF**
**ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

123264.00601/6420055v1

**Kushner Declaration**

Case 0:04-cv-60910-JEM   Document 40   Entered on FLSD Docket 08/11/2005   Page 2 of 194

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 04-60910-CIV-MARTINEZ

| | |
|---|---|
| STEVENS WEISS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ATLANTIC RECORDING CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

DECLARATION OF MICHAEL KUSHNER IN SUPPORT OF
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Michael Kushner declares:

1.      I am Senior Vice President, Business & Legal Affairs for Atlantic Recording Corporation ("Atlantic"). I am responsible for overseeing the negotiation and drafting of various agreements as well as assisting in the coordination of litigation matters. Since 2001, when I joined Atlantic, I have been involved in numerous issues relating to Led Zeppelin and have reviewed the files as pertaining to the issues raised in the case by Stevens Weiss ("Weiss"), as well as those that relate to Led Zeppelin in general.

2.      Atlantic is a Delaware corporation with its principal place of business in New York, New York. Atlantic is a record label that records, promotes and sells recorded music.

3.      At all relevant times since 1968, Atlantic has had the exclusive right to exploit the recordings of Led Zeppelin, one of the most acclaimed rock bands in history. Atlantic's rights are spelled out in a 1968 agreement (the "1968 Agreement") between Superhype Tapes, Ltd. ("Superhype"), which furnished the services of Led Zeppelin and Atlantic.

123264.00601/6417684v2

4.      Swan Song, Inc. was a record label owned by the former members of Led Zeppelin and others.

5.      In 1980, John Bonham, Led Zeppelin's drummer, died, and Led Zeppelin stopped performing and recording as a band.

6.      Pursuant to an agreement with Superhype dated May 29, 1990 (the "Box Set Agreement"), Atlantic released two box sets of multiple compact discs ("the "Box Set"), which embodied previously-released Led Zeppelin master recordings. I am informed that Weiss did not represent Led Zeppelin in connection with the Box Set Agreement.

7.      I understand that a dispute arose between Superhype and Weiss as to whether Weiss was entitled to royalties on the Box Set. I also understand that at the same time, Weiss was also involved in a dispute with Atlantic and Superhype concerning his rights to payment from the exploitation of the Led Zeppelin recordings. The dispute was settled in an agreement dated April 18, 1991 (the "1991 Agreement").

8.      Jimmy Page and Robert Plant, two former members of Led Zeppelin, released an album in 1994 entitled *No Quarter*.

9.      Although Page and Plant were not recording as Led Zeppelin, I understand that Weiss claimed that he was entitled to royalties on sales of *No Quarter* under the Weiss Assignments.

10.     As a means of settling Weiss's claim, in August 1995, Atlantic and Weiss entered into an agreement whereby Atlantic made certain payments tied to the next Led Zeppelin album released by Atlantic (the "1995 Agreement").

11.     The 1968 Agreement and 1991 Agreement are explicitly subject to New York Law, and it is believed that the parties executed the 1995 Agreement in New York. This belief is confirmed by Weiss's August 11, 2004 Affidavit in opposition to Atlantic's motion to transfer in which he does not contest that the 1995 Agreement was executed in New York.

12.     In 2000, Warner Special Projects Inc., as the agent for Atlantic, granted a license to DreamWorks Productions L.L.C. ("DreamWorks") for recordings made by Led Zeppelin to be used in the movie *Almost Famous*. And in 2001, Warner Special Projects Inc., as the agent for

Atlantic, granted General Motors Corp. ("General Motors") a license to use Led Zeppelin's recording entitled "Rock and Roll" in television commercials. The licenses were entered into with Led Zeppelin's consent.

13.     In 2004, Atlantic released a CD entitled *How the West Was Won* that embodied unreleased live recordings of Led Zeppelin performing in Los Angeles and Long Beach, California in 1972 as well as a DVD, *Led Zeppelin*, containing audiovisual footage of Led Zeppelin live performances from 1969 to 1979 (the *"Led Zeppelin DVD"*).

14.     A DVD contains video images and most often, though not always, also includes audio recordings. A "phonograph record" contains only audio recordings.

15.     A DVD simply is not a phonograph record.

16.     Atlantic does not have the right to release Non-Catalog Recordings (as defined in the 1991 Agreement) and cannot license the recordings for commercials, television, movies or videos ("Ancillary Uses") without obtaining Superhype's consent.

17.     Due to Atlantic's limited rights, Atlantic and Superhype have entered into separate agreements each time Atlantic sought to release Non-Catalog Recordings, including *How the West Was Won* and the *Led Zeppelin DVD*, and Atlantic has not licensed any Led Zeppelin recordings for Ancillary Uses without obtaining Superhype's agreement.

18.     The policy of Atlantic is that it will not license recordings by its top artists (and even artists who do not qualify as "top") for Ancillary Uses without their consent.

19.     Weiss knows this, and has for years, as I understand that he negotiated a 1982 recording agreement between Robert Plant of Led Zeppelin as a solo artist, in which Atlantic expressly agreed that it would be required to obtain "written consent" for an license of a recording to a third party.

20.     Plant and Atlantic entered into a new agreement in 1991 that also required Plant's consent for such licenses.

21.     Atlantic's inability to license Led Zeppelin masters absent consent is borne out by its conduct over the past 37 years:  Atlantic never sought to enter into any such license absent consent.

I declare under perjury that the foregoing is true and correct.

Dated: August ___, 2005

_____

Michael Kushner

**Kushner 7/26/04 Declaration**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
---------------------------------------------------------------------- x
                                                                      :
STEVENS WEISS,                                                        : No. 04-60910
                                                                      :
                                                    Plaintiff,        :
                                                                      :
                        - against -                                   :
                                                                      :
                                                                      :
ATLANTIC RECORDING CORPORATION,                                       :
                                                                      :
                                                    Defendant.        :
                                                                      x
---------------------------------------------------------------------

## DECLARATION OF MICHAEL KUSHNER

Michael Kushner, declares under penalty of perjury that the following is true and correct:

1.  I am Senior Vice President, Business & Legal Affairs for Atlantic Recording Corporation ("Atlantic"). I am responsible for overseeing the negotiation and drafting of various agreements as well as assisting in the coordination of litigation matters. Since 2001, when I joined Atlantic, I have been involved in numerous issues relating to Led Zeppelin and have reviewed the files as pertain to the issues raised in the case by Stevens Weiss ("Weiss"), as well as those that relate to Led Zeppelin in general.

2.  In the last twelve months or so, I have met with Weiss on two occasions in New York to discuss the issues in this case. Each of the meetings was at Weiss' request. At no time did Weiss, who I understand to be semi-retired but still doing business in New York, indicate that traveling to New York was in any way a burden.

3.  I understand that Weiss represented Led Zeppelin in 1968 when the band (through its furnishing company, Superhype Tapes Ltd.) entered into a recording agreement with Atlantic (the "1968 Agreement"). At the time of the 1968 Agreement, Led Zeppelin assigned to Weiss certain of it is earnings. Atlantic's current computerized royalty system dates from 1982 and indicates that since the institution of the system Weiss

N216558.1

earned at least $3.5 million. In light of the amount of sales of Led Zeppelin albums prior to 1982, I believe Weiss would have been paid at least another $3.5 million from Atlantic before the computer system was put into place. The overwhelming majority of these payments were made to Weiss in New York, until 2000, when he moved to Florida.

4. In March 1978, Atlantic and Led Zeppelin entered into an agreement altering the royalty payments Atlantic made to Led Zeppelin. At the same time, Atlantic and Weiss entered into an agreement pursuant to which Atlantic assumed certain obligations to Weiss in relation to Led Zeppelin albums (the "1978 Agreement"). The 1978 Agreement was signed by Sheldon Vogel, then Executive Vice President for Atlantic Records. Mr. Vogel currently works for S.V. Capital Management in New York, New York. His testimony will be required to interpret the 1978 Agreement and the parties' intentions in entering into it.

5. Although Led Zeppelin stopped recording as a band in 1980, its recordings are still popular and Atlantic has released several albums of Led Zeppelin's greatest hits and previously unreleased live recordings. These new releases have been a source of continuing issues with Weiss.

6. In 1991, Weiss, Atlantic and Led Zeppelin settled a dispute concerning payments to Weiss on the release of albums containing certain previously recorded materials (the "1991 Agreement"). The 1991 Agreement was signed by Mel Lewinter, Atlantic's CFO at the time. Weiss claims that the compact disc *How the West Was Won,* which embodies live performances recorded in 1972, and a DVD entitled *Led Zeppelin* embodying live performances from 1969 to 1979, are "catalog recordings" as defined by the 1991 Agreement. Mr. Lewinter will be a witness concerning the 1991 Agreement and its interpretation. Mr. Lewinter is currently employed as Chairman of Universal/Motown Records Group, which is not related to Atlantic, and works and resides in New York, New York.

7. In 1995, Weiss and Atlantic entered into an agreement whereby Weiss assigned certain of his rights in exchange, among other things, for payments on what turned out to be a box set of previously unreleased live recordings by Led Zeppelin (the "Box Set"). Weiss now

claims that he is entitled to a bonus under the 1995 Agreement based on the level of sales of the Box Set. I understand that Weiss has indicated that Phil Wild, who signed the 1995 Agreement on behalf of Atlantic, made certain representations to him regarding payments in the Box Set that form the basis for Weiss' claim in this case. Mr. Wild will be a witness concerning the interpretation of the 1995 Agreement. Mr. Wild works in New York, New York, for Virgin Records, which is not related to Atlantic. In addition, I am informed that Mr. Lewinter and/or Ina Meibach, who worked for Atlantic at the time, were responsible for the negotiation of the 1995 Agreement. As noted above, Mr. Lewinter is in New York. Ms. Meibach works for herself in New York, New York as well.

8. Weiss also claims that he is entitled to payments for the use of certain Led Zeppelin recordings in a television commercial and feature film. According to Weiss, the determination of this claim will require the Court to examine the 1968 Agreement. Other than Weiss, the witnesses who will testify about the intent and meaning of the 1968 Agreement all reside in New York. Ahmet Ertegun is the Founding Chairman of Atlantic and was primarily responsible in the negotiation of the 1968 Agreement. Mike Mayer was an attorney at the firm of Mayer, Katz, Baker, Leibowitz & Roberts PC ("Mayer Katz") and participated in the negotiations and drafting of the 1968 Agreement. Mr. Mayer has an office in Manhattan and lives in Upper Montclair, New Jersey, which is less than twenty miles from the United States District Court for the Southern District of New York Courthouse. In addition, the paragraph of the 1968 Agreement that Weiss relies upon and quotes in part, provides that Atlantic has "[t]the right to ...use... [recordings subject to the Agreement] upon such terms and conditions as Atlantic may determine *but no use or disposition may be made or such master recordings that is not generally applicable to Atlantic's other top recording artists.*" Amended Complaint ¶ 18. See 1968 Agreement attached to the Amended Complaint as Exhibit B at ¶ 5(a). As the most senior executive in Atlantic's Legal & Business department at Atlantic, I will testify as to agreements with other Atlantic's top recording artists at the time.

9. In addition, Carrie Nolan of Atlantic's royalty department in New York, New York will be required to testify as to the amount of royalties paid by Atlantic to Led Zeppelin and

Weiss, and I will be required to testify as to the existence or non-existence of other agreements for the exploitation of Led Zeppelin recordings for commercials, movies and soundtracks, all of which Weiss claims to be issues in this case as is apparent from his Request to Produce, which is attached as Exhibit A.

10. As the most senior executive in Atlantic's Legal & Business department at Atlantic, I would likely attend this trial. It would impose a great burden on me if I were required to attend the trial in Florida. I generally work from 9:30 a.m. until 9:30 p.m. or 10:00 p.m. every work day. After 5:00 p.m., I have my most important meetings within Atlantic. Being absent from work for trial in New York, while not desirable, would have much less effect then being absent for trial in Florida -- in New York I can return to my office each evening. The burden would be equally great on Mr. Ertegun and Ms. Nolan, Atlantic's two other employees who would be required to testify. Other than Mr. Vogel, I know each of the witnesses who do not work for Atlantic and do not believe that they would voluntarily travel to Florida to testify at trial in this case.

11. All of the documents responsive to Weiss' Request to produce are located in New York. These include royalty statements, agreements, and sales information. In addition, whatever files exist from third party are located in New York, including files belonging to Atlantic's counsel Mayer, Katz who drafted the 1968 Agreement and the 1995 Agreement.

12. While I was not present when each of the Agreements at issue were negotiated, it is reasonable to believe they were negotiated and signed in New York, where Atlantic's corporate offices are located and where Weiss worked and resided until 2000. Atlantic performed all of its obligations under the Agreements at issue in New York, where Atlantic has kept its records and paid Weiss pursuant to each of the Agreements.

N216558.1                                          4

13. Atlantic is subject to personal jurisdiction in New York and is amenable to service of process issued by a New York court since it does business and maintains its principal place of business in New York.

July 26, 2004
New York, New York

_____
Michael Kushner

**Nolan Declaration**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 04-60910-CIV-MARTINEZ

STEVENS WEISS,                          )
                                        )
                    Plaintiff,          )
                                        )
vs.                                     )
                                        )
ATLANTIC RECORDING CORPORATION,  )
                                        )
                    Defendant.          )
_____   )

DECLARATION OF CARRIE NOLAN IN SUPPORT OF
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Carrie Nolan declares:

1.      I am Vice President, East Coast Label Royalties, for Warner Music Group ("Warner"). Atlantic Recording Corporation ("Atlantic") is a division of Warner. I oversee royalty administration involving artists who have signed recording agreements with Atlantic. In that capacity, I have and continue to oversee royalties Atlantic has paid to Led Zeppelin.

2.      In 1997, Atlantic released *BBC Sessions*, a two-disc album embodying recordings made by Led Zeppelin for the British Broadcasting Corporation. As of the July 1, 2005, there were approximately 1,030,000 royalty bearing copies of the *BBC Sessions* sold in the United States. Each copy of *BBC Sessions* is considered a single unit for the purposes of paying royalties to Led Zeppelin.

3.      Atlantic calculates and pays royalties based on each copy (or unit) sold regardless of whether there are one or multiple discs in the album. For example, a single-disc album such as Led Zeppelin's *Early Days* is a royalty bearing copy, as is the single-disc album *Latter Days*. When Atlantic combined the two albums into one and sold it under the title *Early Days and Latter Days*, each double-disc set was considered one copy for the purposes of calculating royalties. Atlantic counts other boxed set releases as single royalty bearing unit for sale,

123264.00601/6417685v2

including Rush's *Different Stages*, a 3-CD set; and Yes's *Box Set*, a 5-CD set. The royalty for each is based on the price for the box set, not individual units contained within.

I declare under perjury that the foregoing is true and correct.

Dated: August ___, 2005

Carrie Nolan

**Leviton Declaration**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

STEVENS WEISS,                                    Case No. 04-60910-CIV-MARTINEZ

      Plaintiff,

vs.

ATLANTIC RECORDING CORPORATION,

      Defendant.

_____/

DECLARATION OF MARK LEVITON IN SUPPORT OF
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Mark Leviton declares:

1.     I am currently a consultant in the music and entertainment industry, doing business under the name "Pet Sounds". From 1979 to 2004, I was employed by Warner Strategic Marketing ("WSM") (originally known as Warner Special Products) as Senior Vice President A&R. WSM is a part of the Warner Music Group and an affiliate of Atlantic Recording Corporation ("Atlantic") and is responsible for licensing master recordings controlled by Atlantic for commercials, television, movies and videos ("Ancillary Uses"). My responsibilities at WSM included developing new businesses, supervising a staff of licensors, coordinating rights and legal issues with Atlantic and the other Warner Music Group labels, and developing licensing contract forms with the business affairs department at WSM.

2.     I was involved in the licensing of thousands of Atlantic master recordings for Ancillary Uses.

3.     During my entire employment by WSM, it was WSM's policy to seek artist approval before licensing their recordings for Ancillary Uses, for all currently-signed artists, all artists considered "legacy artists" as designated by Atlantic or other WMG labels, and all catalog artists where we were informed by Atlantic that it was required or prudent.

123264.00601/6418517v1

4.      Pursuant to this policy, we always sought consent for those categories of artist, and most often did not even look to the underlying recording agreement to determine whether consent was required.  Absent artist approval, WSM would not license the recording.

5.      This policy applied to all current artists as well as Atlantic's top catalog artists, which included Led Zeppelin, who were specifically designated a "legacy artist".

6.      During my time with the company, we never licensed a Led Zeppelin recording for any purpose without the artists' consent.

I declare under perjury that the foregoing is true and correct.

Dated: August _2_, 2005

_____
Mark Leviton

123264.00601/6418517v1                                   2

**Bishop Declaration**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.: 04-60910-CIV-MARTINEZ

| | |
|---|---|
| STEVENS WEISS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ATLANTIC RECORDING CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DECLARATION OF BILL BISHOP IN SUPPORT OF**
**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Bill Bishop declares:

1.      I am Vice President for Warner Strategic Marketing ("WSM").  WSM is a part of the Warner Music Group, an affiliate of Atlantic Recording Corporation ("Atlantic"), and is responsible for licensing master recordings controlled by Atlantic for commercials, television, movies and videos ("Ancillary Uses").  Since February 1991, when I joined WSM, my responsibilities have included overseeing the licensing of master recordings controlled by the Warner Music Group for Ancillary Uses.

2.      I have reviewed the correspondence, recording agreements, and agreements to license recordings for Ancillary Uses that Atlantic maintains for artists that Atlantic considered in 1991 to be its top artists.  Atlantic considered top artists those individuals or groups that sold at least 500,000 copies of a recording in 1991, had released several hit recordings in the past several years, or were former recording artists whose prior catalogue sales caused Atlantic to deem them legacy artists and to treat them as top artists.

3.      I have also reviewed the correspondence, recording agreements, and license agreements for Ancillary Uses of any additional Atlantic artists whose recordings were the subjects of

123264.00601/6419394v2

licensing agreements for Ancillary Uses in 1991, all of which I understand were provided to plaintiff Stevens Weiss in this case.

4.      The documents I reviewed confirm that it was Atlantic's practice in the time period surrounding 1991, and remains so today, to seek permission from artists before Atlantic licensed their recordings for Ancillary Uses, regardless of whether the artists' recording agreements required Atlantic to do so, and regardless of whether or not the artists were considered top artists. My findings follow:

5.      In 1991, Phil Collins had a Gold album (at least 500,000 copies sold) and a Multi-Platinum album (at least 2 million copies sold), and was one of Atlantic's top artists. His recording agreements with Atlantic, signed January 1, 1981 and November 5, 1990, did not require Atlantic to obtain his consent for any licenses for Ancillary Uses. Nevertheless, Atlantic sought and obtained consent from him to license his recordings "In the Air Tonight" for Ancillary Uses in 1987 and "One More Night" and "Do You Remember" in 1991.

6.      In 1991, Foreigner, which for a decade had produced hits for Atlantic, was one of Atlantic's top artists. Though their recording agreements cannot presently be located, Atlantic sought and obtained consent from the group to license its recording "I Want to Know What Love Is" for Ancillary Uses in 1991.

7.      In 1991, AC/DC had two Multi-Platinum albums and was one of Atlantic's top artists. AC/DC's recording agreement, signed in March 1, 1980, did not require Atlantic to obtain the group's consent for any licenses for Ancillary Uses. No records of requests for licenses for Ancillary Uses could be found, but I recall that Atlantic sought consent from the group for licenses for Ancillary Uses in 1991.

8.      In 1991, Roger Daltrey, a member of The Who, one of the most popular rock bands of the 1960s and 1970s, was a top artist with Atlantic. His solo recording agreement, signed June 3, 1985, required Atlantic to obtain his consent for any licenses for Ancillary Uses. Atlantic sought and obtained consent from him to license his recording "After the Fire" for Ancillary Uses in 1991.

123264.00601/6419394v2

2

9.      In 1991, Pete Townshend, another member of The Who, was a top artist with Atlantic. His solo recording agreement, signed April 30, 1979, required Atlantic to obtain his consent for any licenses for Ancillary Uses. No records of requests for licenses for Ancillary Uses could be found, but I recall that Atlantic sought consent from him for licenses for Ancillary Uses in 1991.

10.     In 1991, INXS, whose last two albums had gone Platinum and Multi-Platinum, was a top artist with Atlantic. Its recording agreement, signed January 17, 1983, did not require Atlantic to obtain the group's consent for any licenses for Ancillary Uses. Nevertheless, Atlantic sought and obtained consent from the group to license its recordings "Disappear," "On My Way," and "Suicide Blond" for Ancillary Uses in 1991.

11.     In 1991, Stevie Nicks, a member of the enduringly popular group Fleetwood Mac, was a top artist with Atlantic whose solo album had gone Multi-Platinum the year before. Her recording agreement, signed December 4, 1978, did not require Atlantic to obtain her consent for any licenses for Ancillary Uses. No records of requests for licenses for Ancillary Uses could be found, but I recall that Atlantic sought consent from her for licenses for Ancillary Uses in 1991.

12.     In 1991, Mike + Mechanics, founded by a bandmate of Phil Collins in Genesis, was a top artist with Atlantic. Though its recording agreements cannot presently be located, Atlantic sought and obtained consent from the group to license its recordings "All I Need Is a Miracle," and "Par Avion" for Ancillary Uses in 1986.

13.     In 1991, Tori Amos was a current artist with Atlantic. Her recording agreement, signed July 1, 1987, did not require Atlantic to obtain her consent for any licenses for Ancillary Uses. While no records of requests for licenses for Ancillary Uses could be found, I nevertheless recall that Atlantic sought consent from her for licenses for Ancillary Uses in 1991.

14.     In 1991, Chic was a current artist with Atlantic. Its recording agreement, signed November 26, 1977, did not require Atlantic to obtain the group's consent for any licenses for Ancillary Uses. Nevertheless, Atlantic sought and obtained consent from the group to license its recording "Chic Mystique" for Ancillary Uses in 1991.

15.     In 1991, En Vogue was a current artist with Atlantic. Its most recent recording agreement, signed July 20, 1996, required the group's consent for any licenses for Ancillary

Uses. Atlantic sought and obtained consent from the group to license its recording "Hold On," for Ancillary Uses in 1991.

16.     In 1991, Kwame was a current artist with Atlantic. His most recent recording agreement, signed November 7, 2004, did not require his consent for any licenses for Ancillary Uses. Nevertheless, Atlantic sought and obtained his consent to license his recording "On Lee Ewe," for Ancillary Uses in 1990.

17.     In 1991, The D.O.C. was a current artist with Atlantic. Its recording agreement, signed March 27, 1989, did not require Atlantic to obtain the group's consent for any licenses for Ancillary Uses. Nevertheless, Atlantic sought and obtained consent from the group to license its recording "It's Funky Enough," for Ancillary Uses in 1991.

I declare under perjury that the foregoing is true and correct.

Dated: August ___, 2005

_____
Bil Bishop

123264.00601/6419394v2                                               4

**Chen Declaration**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

CASE NO.: 04-60910-CIV-MARTINEZ

STEVENS WEISS,                                    )
                                                 )
                    Plaintiff,                   )
                                                 )
vs.                                              )
                                                 )
ATLANTIC RECORDING CORPORATION,                  )
                                                 )
                    Defendant.                   )
_____ )

**DECLARATION OF HANS H. CHEN IN SUPPORT OF
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Hans H. Chen declares:

1.      Attached are true and complete copies of the following:

    a.      the Amended Complaint filed by Plaintiff Stevens Weiss ("Weiss") in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, Case No. 04-008115 (25) ("Am. Compl.");

    b.      the transcript of the deposition of Stevens Weiss taken on March 21, 2005 (relevant portions only) ("Weiss Dep. Tr.");

    c.      agreements executed November 1, 1968; December 4, 1969; May 8, 1974; and March 15, 1978 by Weiss and Superhype Tapes, Ltd. (collectively, the "Weiss Assignments");

    d.      Weiss's Supplemental Answer to Defendant Atlantic Recording Corporation's Interrogatory number 9, Case No. 04-60910-CIV-MARTINEZ.

I declare under perjury that the foregoing is true and correct.

Dated: August 9, 2005

_____
Hans H. Chen, Esq.

123264.00601/6419889v1

**Exhibit 1**

COPY

IN THE CIRCUIT COURT·OF THE
17TH JUDICIAL CIRCUIT IN AND
FOR BROWARD COUNTY, FLORIDA

CASE NO:  04-008115 (25)

STEVENS WEISS,

        Plaintiff,

vs.

ATLANTIC RECORDING
CORPORATION,

        Defendant.

_____/

## AMENDED COMPLAINT

COMES NOW the Plaintiff, STEVENS WEISS and sues the Defendant, ATLANTIC

RECORDING CORPORATION, and alleges as follows:

1.      This is an action for damages in excess of $15,000 exclusive of attorney's fees, costs

and interest.

2.      Plaintiff, STEVENS WEISS, (herein "WEISS") is an individual residing in

Broward County, Florida.

3.      Defendant, ATLANTIC RECORDING CORPORATION, (herein "ATLANTIC") is

a foreign corporation which is doing substantial and not isolated business activity in Florida and

which maintains an office of its Director of A&R in Florida thereby subjecting ATLANTIC to

1

personal jurisdiction. Such business activities in Florida include but are not limited to production and sale of ATLANTIC's products in Florida, solicitation of musical talent, operation of its Director of A&R in Florida and prosecution of lawsuits in Florida courts.

4.       Despite conducting business activity which is substantial and not isolated and maintaining an office in Florida, ATLANTIC is not authorized to do business in Florida and it does not enjoy statutory venue privileges. Accordingly, venue is appropriate in any county in Florida, including Broward County, Florida.

### Background and General Allegations

5.       Plaintiff, STEVENS WEISS, (herein "WEISS") is an attorney who has represented successful rock bands including The Yardbirds, Bad Company, and most pertinent to this case, Led Zeppelin. In 1968, WEISS negotiated Led Zeppelin's[1] first recording contract with ATLANTIC as well as subsequent extensions thereto. (Exhibit Composite "A", Record Contract). In consideration for his services, WEISS received irrevocable assignments of a percentage of Led Zeppelin's advances, royalties and other payments earned through its recording contract and extensions. (Exhibit Composite "B", Assignments).

6.       Although Led Zeppelin stopped recording as a band in 1980 after the untimely death of drummer, John Bonham, there have been several very successful posthumous Led Zeppelin albums consisting of "greatest hits" as well as previously unreleased studio and live material. As a result of a dispute concerning WEISS' entitlement to payments made to Led Zeppelin for one such release known as the "Box Set", WEISS and ATLANTIC entered into a written agreement in 1991 which, among other things, defined WEISS' rights with regard to certain future Led Zeppelin

---

[1] The services of Led Zeppelin were legally furnished through an entity called Superhype Tapes

2

releases by ATLANTIC. (Exhibit "C", 1991 Agreement).

7.      In particular, ATLANTIC agreed to pay WEISS a sum equal to 4.2%[2] of any money it paid to Led Zeppelin, (Superhype Tapes, Ltd. or Swan Song, Inc.) as royalties or otherwise, for the right to release "compilation" or "compilation-plus" albums. "Compilation" and "compilation-plus" albums are defined as wholly or primarily containing "catalogue" Led Zeppelin recordings. "Catalogue" recordings are in turn defined in relevant part as follows:

> The previously released recordings of Led Zeppelin... and any other master recordings heretofore recorded by, delivered to or made for Atlantic for release or potential release as phonograph records by Atlantic...

8.      By way of contrast, the 1991 agreement defined "non-catalogue" recordings, to which WEISS' entitlement would not apply pursuant to the agreement, as follows:

> Recordings of the audio portion of any Led Zeppelin performance made for television, radio, reference or copyright purposes **and not heretofore delivered to, made for, or intended for delivery to Atlantic Records for inclusion in the Catalogue or for release or potential release as phonograph records by Atlantic.** (emphasis added).

9.      This case, in part, concerns two recent Led Zeppelin releases; a compact disc and music-only DVD entitled "How the West Was Won" and a DVD entitled "Led Zeppelin", both released by ATLANTIC in 2003 and both of which contain previously unreleased live Led Zeppelin recordings made during the life of the recording contracts negotiated by WEISS.

10.     The aforesaid releases are "catalogue" within the meaning of the 1991 agreement which obligates ATLANTIC to pay WEISS 4.2% of any money it paid to Led Zeppelin for these releases.

11.     ATLANTIC has paid Led Zeppelin money in connection with the aforesaid releases

---

Ltd.

3

and WEISS has made a demand on ATLANTIC for payment of his respective percentages in accordance with the 1991 agreement. ATLANTIC has refused to comply with WEISS' demand.

12.     Further, on August 4, 1995, WEISS and ATLANTIC entered into an additional agreement wherein ATLANTIC purchased WEISS' rights to a future release described as the "Next Qualifying Album", but which left intact all WEISS' other rights including those defined in the above referenced 1991 agreement and assignments to WEISS. (Exhibit "D" 1995 Agreement).

13.     A contingent payment structure was established in the 1995 agreement wherein WEISS was entitled to money when and if the "Next Qualifying Album" reached sales targets of 1,500,000 and 2,000,000 of "royalty-bearing copies".

14.     The "Next Qualifying Album" turned out to be the "BBC Sessions", a double compact disc embodying recordings of live performances by Led Zeppelin in 1969 and 1971. The double compact disc has reached sales in excess of 1,000,000 units.

15.     In the case of a multiple-disc release such as the "BBC Sessions", each disc sold qualifies as one "royalty bearing copy". Accordingly, the applicable targets for the "BBC Sessions" double compact disc have been reached and ATLANTIC is obligated to pay WEISS in accordance with the 1995 agreement.

16.     WEISS has demanded payment of the applicable contingent payments from ATLANTIC for meeting the sales targets and ATLANTIC has refused to comply.

17.     In addition, ATLANTIC has licensed the Led Zeppelin recordings of "That's the Way," "Misty Mountain Hop," "Tangerine,", "Bron-Yr-Aur," and "The Rain Song," for use in the DreamWorks soundtrack and film, "Almost Famous". ATLANTIC also licensed the Led

---

[2] The agreement provides for 3.5%, increased by 20%, totaling 4.2%.

4

Zeppelin recording of "Rock and Roll" to General Motors for use in commercials promoting Cadillac automobiles. All of these recording were made by Led Zeppelin prior to 1980 during the life of the recording contract with ATLANTIC which was negotiated by WEISS.

18.     ATLANTIC's right to license commercial uses of these songs stems from the aforementioned recording contract providing ATLANTIC with but not limited to the following rights;

> The right to manufacture, sell, lease, license or otherwise use or dispose of in any or all fields of use, records subject hereto upon such terms and conditions as Atlantic may determine…

19.     ATLANTIC has paid Led Zeppelin advances, royalties or other payments in connection with the commercial use of the Led Zeppelin recordings and WEISS is entitled to a percentage of these payments in accordance with his irrevocable assignments to any advances, royalties or other payments made to Led Zeppelin in connection with the ATLANTIC recording agreement. (Exhibit "B", Assignments).

20.     WEISS has demanded payment from ATLANTIC in accordance with the applicable assignments and ATLANTIC has refused to comply with WEISS' demand.

21.     All conditions precedent have been satisfied or waived by ATLANTIC.

### Count I – Breach of 1991 Agreement

Plaintiff realleges and reavers paragraphs 1 through 21 as though fully set forth herein.

22.     ATLANTIC and WEISS entered into a written agreement wherein ATLANTIC is obligated to pay WEISS 4.2% of any payments made to Led Zeppelin in connection with releases entitled "How the West Was Won" and a DVD entitled "Led Zeppelin".

23.     ATLANTIC breached its agreement by failing to pay WEISS the aforesaid money

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

after demand was made.

24.     As a proximate result of ATLANTIC's breach, WEISS has suffered damages.

WHEREFORE, Plaintiff, STEVENS WEISS demands judgment for damages, prejudgment interest and taxable costs against the Defendant, ATLANTIC RECORDING CORPORATION.

### Count II – Breach of 1995 Agreement

Plaintiff realleges and reavers paragraphs 1 through 21 as though fully set forth herein.

25.     ATLANTIC and WEISS entered into a written agreement wherein ATLANTIC agreed to pay WEISS money when certain sales targets of Led Zeppelin recording "BBC Sessions" were met.

26.     The applicable sales targets have been met; however, ATLANTIC has breached its agreement to pay WEISS after demand was made.

27.     As a proximate result of ATLANTIC's breach, WEISS has suffered damages.

WHEREFORE, Plaintiff, STEVENS WEISS demands judgment for damages, prejudgment interest and taxable costs against the Defendant, ATLANTIC RECORDING CORPORATION.

### Count III – Breach of Assignments

Plaintiff realleges and reavers paragraphs 1 through 21 as though fully set forth herein.

28.     ATLANTIC has agreed to be responsible for paying WEISS's assignment of his percentages of any advances, royalties or other payments made to Led Zeppelin paid in connection with its recording contract and subsequent modifications with Led Zeppelin.

29.     ATLANTIC has breached its agreement by failing to pay WEISS a percentage of money paid by ATLANTIC to Led Zeppelin for the commercial use of the recordings of "That's the Way," "Misty Mountain Hop," "Tangerine,", "Bron-Yr-Aur," and "The Rain Song," in the film

6

and soundtrack for "Almost Famous" and for the use of the recording of "Rock and Roll", in commercials endorsing Cadillac automobiles.

30.    As a proximate result of ATLANTIC's breach, WEISS has suffered damages.

WHEREFORE, Plaintiff, STEVENS WEISS demands judgment for damages, prejudgment interest and taxable costs against the Defendant, ATLANTIC RECORDING CORPORATION.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable by right.

CONRAD & SCHERER
Attorneys for Plaintiff
633 S. Federal Highway
Fort Lauderdale, Florida 33301
(954) 462-5500

BY: _____
WILLIAM R. SCHERER III
FLORIDA BAR NO. 041671

7

**Exhibit 2**

AGREEMENT, made as of the 1st day of November 1968, by and between ATLANTIC RECORDING CORPORATION, of 1841 Broadway, New York, New York (hereinafter called "Atlantic") and SUPERHYPE TAPES, LTD., c/o Michal Simpkins, 53 Upper Brook Street, London W.1, England (hereinafter called "Tapes").

WHEREAS, Tapes is entitled by agreement to the joint and several exclusive recording services of James Patrick Page, John Baldwin p/k/a John Paul Jones, Robert Anthony Plant and John Bonham, jointly tentatively professionally known as    "LED ZEPPELIN" (and hereinafter jointly and severally called "Artist") throughout the world; and

WHEREAS, Tapes desires to produce recordings by the Artist for Atlantic upon the terms and conditions of this agreement, and to grant to Atlantic the exclusive right to market same throughout the world upon the terms and conditions of this agreement, and Atlantic desires to acquire such right.

NOW, THEREFORE, in consideration of the premises, it is hereby agreed as follows:

1. During the term hereof, and subject to the terms and conditions of this agreement, Tapes hereby grants to Atlantic the exclusive right to market Tapes  recordings of Artist throughout the world.  All recordings made by Artist during the term hereof shall automatically be covered by this agreement.

2. The term of this agreement shall be for a period of three (3) years commencing on the date hereof.

3. (a) During each contract year of the term hereof, Tapes agrees to cause Artist to jointly record and

Tapes will produce and Atlantic will accept and release in
and in England, among other areas
the United States/commercially satisfactory master record-
ings consisting of at least twenty-four (24) record sides
at 45 rpm or the equivalent thereof in playing time;

(b)   All material to be recorded hereunder
shall be selected by Tapes.  Material shall not be offensive
to public morals in the United States;

(c)   Tapes agrees to deliver master recordings
to Atlantic pursuant to a mutually agreeable schedule;
provided, however, that Tapes must deliver twelve (12)
record sides within ninety (90) days after formal notice by
Atlantic requiring same subject to the limitations of
paragraphs 3(a) and 3(d).  Tapes shall not be responsible
for final mixing, equalizing, editing and sequencing for
which Atlantic shall make suitable arrangements;

(d)   At Atlantic's option, Tapes will cause
Artist to jointly record hereunder and Tapes will produce
subject to the provisions of sub-paragraphs (b) and (c)
above additional record sides but Tapes shall not be requir-
ed to produce more than twelve (12) additional record sides
in any one (1) contract year of the term hereof, without
Tape's consent.  Atlantic must exercise its option for
additional record sides not later than thirty (30) days
prior to the expiration of the first and second contract
years hereof respectively and sixty (60) days prior to the
expiration of the last contract year of the term of this
agreement.  Atlantic agrees to reimburse Tapes for the
actual costs of recording such additional sides up to
Ten Thousand ($10,000.00) Dollars for twelve (12) sides.
Atlantic shall not be responsible for any costs in excess
of Ten Thousand ($10,000.00) Dollars unless it has given

- 2 -

Tapes its approval thereof prior to the time that such excess costs are incurred. Payment by Atlantic of such recording costs shall constitute an advance against and shall be recouped by Atlantic out of all royalties becoming payable to Tapes by reason of this agreement;

(e) Subject to the provisions of this agreement respecting the scheduling of delivery of master tapes and for additional sides, should Tapes fail to produce and deliver any record sides to Atlantic hereunder for any reason other than the fault of Atlantic, then the term of this agreement shall automatically be extended for a period of time equal to the period of any such failure or unavailability; provided, however, that such period of extension shall not exceed sixty (60) days for each record side which Tapes failed to produce and deliver. All such extensions of the term of this agreement shall apply consecutively at the end of the term of this agreement. Atlantic shall, however, notify Tapes of all such extensions and the limiting dates thereof at least ninety (90) days prior to the end of the term hereof;

(f) If, during the term of this agreement, Atlantic fails except for reasons beyond its control to release the minimum number of record sides as provided for herein, and if within thirty (30) days after the expiration of the then current contract year of the term hereof, Tapes notifies Atlantic by registered mail of Tapes' request that Atlantic release such of Artist's performances as will fulfill Atlantic's minimum obligations hereunder, then Atlantic shall within the next sixty (60) days fulfill said minimum obligations subject to the availability to Atlantic on the date of such notice of sufficient unreleased record

- 3 -

sides to enable Atlantic to perform such obligations.

4.   Tapes agrees and warrants and represents that:

(a)  During the term of this agreement Artist will not perform for any person, firm or corporation other than Tapes for the purpose of making phonograph records;

(b)  Artist shall not perform any selections which Artist has performed hereunder for any person, firm or corporation other than Atlantic for the purpose of making phonograph records for a period of five (5) years from the date of the initial release of such selections; and

(c)  If, during the term of this agreement, or any extension of such term, the Artist performs any composition for the purpose of making any recording for any medium other than phonograph records, Artist will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof shall be used directly or indirectly for the pur-pose of making phonograph records.  Anything to the contrary herein contained notwithstanding, Artist's performances may be included in one original motion picture sound track album released during/the term hereof by a company other each year of than Atlantic provided that:

(i)  Tapes has used its reasonable efforts to obtain rights therein for Atlantic;

(ii)  Such recordings may be released only in the form of one long play record containing the original sound track of the motion picture;

(iii)  The performances of Artist in such album are limited to music performed by Artist visually in the motion picture from which the album is derived.

-4-

5. Subject to the provisions of this agreement, all recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon shall be entirely Atlantic's property throughout the world. Not in limitation of the foregoing or of any other rights granted herein, but in addition thereof, and without further payment other than as herein provided, Tapes grants to Atlantic for the entire world:

(a) The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of in any or all fields of use, records subject hereto upon such terms and conditions as Atlantic may determine but no use or disposition may be made of such master recordings that is not generally applicable to Atlantic's other top recording artists;

(b) The right to use and publish and to permit others to use and publish, the Artist's present and future names, professional names and likenesses and all biographical material concerning Artist but all photographs and artistic representations of Artist used on album covers in the United States shall be subject to Tapes' prior approval; to write and publish and to permit others to write and publish articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of Artist's records without restriction, and to use as descriptive of the Artist the phrase "exclusive artist," said words "exclusive artist" to be prefaced by any label, name or names designated by Atlantic, or any other similar appropriate phrase consistent with this agreement, it being agreed that Atlantic may release or sell records and masters of selections made hereunder under its name and/or

- 5 -

any other name which from time to time may be selected by it; provided, however, that during the term hereof, Artist's recordings shall be released by Atlantic in the United States only under the "Atlantic" label;

(c)  The sole and exclusive rights in, title to, and ownership of all recordings made hereunder for the entire world, including, but not limited to, the right to use and control subject to the provisions of this agreement all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other now or hereafter known, obtained from recordings made hereunder and the performances embodied therein in accordance with this agreement; and

(d)  The sole and exclusive right, if Atlantic so desires, to publicly perform the records, or to permit the public performances thereof, by means of radio broadcast or otherwise.

6.  Atlantic will pay to Tapes for the rights granted herein and for the services rendered hereunder:

(a)  A royalty of seven and one-third (7-1/3%) percent in respect of recordings sold in the United States, Canada and the United Kingdom and five and one-half (5-1/2%) percent in respect of recordings sold throughout the rest of the world of the suggested retail list price in the country of sale less taxes, duties, excise and tariffs, if any, and Atlantic's standard package deductions generally applicable to Atlantic's top recording artists on ninety (90%) percent of all records manufactured and sold and not returned embodying performances of Artist subject to this agreement. Atlantic may not couple recordings by the Artist with

- 6 -

recordings by other artists provided; however, that Atlantic may, if it so desires, issue no more than two (2) long play records per year of "The Greatest Hits" or "Best Of" variety which will contain performances by the Artist together with those of other artists in which event the royalty payable to Tapes on any such record shall be based on that fraction of the suggested retail list price as the number of recordings by the Artist contained in such record bears to the total number of recordings contained therein.  Atlantic shall have the right to set up reasonable self-liquidating reseves to provide for returns.  Anything to the contrary herein contained notwithstanding, the package deductions used by Atlantic shall:

(i)  Be in the case of recordings sold by Atlantic's licensees, the actual deductions used by such licensees;

(ii)  Not exceed forty (40¢) cents per 12 inch 33-1/3 r.p.m. long play record sold directly by Atlantic;

(iii)  Not exceed 10% of the suggested retail list price or 50¢ whichever is lower per pre-recorded tape sold directly by Atlantic.

(b)  Royalties for records sold outside of the United States are to be computed in the currency of the country of sale and are to be payable only after such royalties are received by Atlantic in the United States in United States currency and will be payable in the dollar equivalent at the rate of exchange at the time Atlantic received payment.  In the event that Atlantic is unable for a period of six (6) months after payment is due to Atlantic to obtain payment in the United States in United States dollars of royalties payable hereunder and elects to accept payment outside of the United States in a foreign

- 7 -

currency, or Atlantic does not so elect, Atlantic will, upon request by Tapes, deposit such royalties in an account designated by Tapes in the currency received by Atlantic in the country where such funds are located;

(c) Royalties for records sold ~~xxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxx~~ pursuant to mail order or "club" plans as distinguished from sale through retail stores shall be computed at one-half (1/2) the applicable royalty rate. No royalty shall be payable on bonus or free records distributed to persons upon joining such plan or for purchasing a required number of records pursuant to such plan provided, however, that free or bonus records shall not exceed one such bonus or free record for each /record sold pursuant to such mail order or "club plans;" of Artist's

(d) No royalties shall be paid on records given away or sold at less than Atlantic's cost therefor, for promotional or advertising purposes or on records sold at less than fifty (50%) percent of Atlantic's normal wholesale price; provided, however, that no records shall be sold or distributed pursuant to this subparagraph for the purpose of inducing the sale of records which are not subject to this agreement; and

(e) Tapes warrants and represents that it is solely responsible for and will pay all monies becoming payable to Artist, producers and any other parties in respect of sales of records subject to this agreement.

7. Tapes shall pay and be solely responsible for the payment of all costs of producing hereunder and recording all master records produced hereunder except as provided for in paragraph 3(d) above. All recordings shall be produced by Tapes in accordance with the rules and regulations of all unions having jurisdiction. Tapes warrants

- 8 -

that recordings made by it hereunder will not be made within the jurisdiction of the American Federation of Musicians or the American Federation of Radio and Television Artists unless Tapes and Atlantic otherwise agree.

8. Subject to Tapes' and Artist's performances of all of their obligations to Atlantic pursuant to this agreement, Atlantic agrees to make the following non-returnable payments to Tapes:

| | |
|---|---|
| Upon the execution of this agreement | $ 104,100.00 |
| On or before November 1, 1969 | 51,300.00 |
| On or before November 1, 1970 | 51,300.00 |

Each such payment shall constitute a non-returnable general advance to Tapes against and shall be recouped by Atlantic out of all royalties thereafter becoming payable to Tapes by reason of this agreement.

9. Atlantic will, within sixty (60) days after the expiration of each calendar quarter, render a statement of accrued royalties under this agreement earned during such preceding calendar quarter. Atlantic will pay to Tapes, simultaneously with the rendering of such statement, the amount, if any, which may be due to Tapes over and above costs, if any, payments and advances deductible hereunder. A certified public accountant representing Tapes may examine Atlantic's books and records at reasonable times during normal business hours insofar as same pertain to the subject matter of this agreement.

10. It is agreed that the Artist's services for the purpose of recording phonograph records hereunder are of a special, unique and extraordinary character. In the event of breach of any material term, condition or covenant

- 9 -

of this agreement, by Tapes ŏᴇXᴌᴇᴇɪᴇʍ, Atlantic shall be entitled to injunctive relief against Tapes in addition to any other rights or remedies available to it.

11. This agreement is subject to all rules and regulations of any union having jurisdiction.  No failure of Atlantic to perform because of such rules and regulations shall be deemed to be a breach of this agreement.

12. Tapes may if it so desires engage the services of other persons in substitution for the present members of "The Led Zeppelin" (which other persons shall render their services to Tapes as recording artists) which substitution(s) shall in no way affect this agreement provided:

(a)  In all events James Page shall be a member of and the leader of   "Led Zeppelin";

(b)  Such substitute(s) shall execute the Artist form of personal guarantee attached; and

(c)  The person or persons whose services are terminated shall not use the name "The Led Zeppelin" in any commercial or artistic endeavors.

13.  (a)  All notices hereunder shall be in writing and shall be sent by registered mail or prepaid telegram as follows:

If to Tapes:    To Tapes at its address
                first above written with a
                copy to:

                Stevens H. Weiss, Esq.
                Steingarten, Wedeen & Weiss
                444 Madison Avenue
                New York, New York

If to Artist:   To Artist in care of Tapes
                at its address first above
                written with a copy to:

                Stevens H. Weiss, Esq.
                Steingarten, Wedeen & Weiss
                444 Madison Avenue
                New York, New York

If to Atlantic:    To Atlantic at its address
first above written,
Attention:  Gerald Wexler
with a copy to:

Myron S. Mayer, Esq.
Mayer & Nussbaum
1841 Broadway
New York, New York 10023

(b)  All statements to be rendered hereunder shall be sent to Tapes at its address first above written with a copy to Stevens H. Weiss, Esq. at his above address and a copy to Mr. Peter Grant, 8 Beulah Hill, Upper Norwood, London S.E. 19, England;

(c)  All payments hereunder shall be to the order of Tapes and shall be sent to Tapes at its address first above written or as Tapes may otherwise from time to time direct;

(d)  Wherever in this agreement Tapes or Artist's approval or consent is required, Atlantic may require Tapes or Artist, as the case may be, to formally give or withhold such approval or consent by giving Tapes or Artist, as the case may be, notice requesting same and by furnishing Tapes or Artist with the information or material in respect of which such approval or consent is sought.  Tapes or Artist as the case may be shall give Atlantic notice of approval or disapproval within twenty (20) days after such notice is sent by Atlantic.  In the event of disapproval or no consent, the reasons therefor shall be stated.  Failure to give such notice to Atlantic as aforesaid shall be deemed to be a consent or approval.

14.  For the purposes of this agreement, the following definitions shall apply:

Recording costs - All costs incurred by or on behalf of Tapes incident to the recording of the Artist's performances including but not limited to costs of

- 11 -

musicians, singers, actors and producers, costs of arrange-
ments, copying charges, cartage of musical instruments,
studio technicians, tape, editing, dubbing and re-dubbing
costs and expenses.

Phonograph record, recording and record -
Any device now or hereafter known used for the reproduction
of sound by electrical, mechanical, magnetic or other
means.

Master record - Any device used as the mould
or permanent manufacturing agent from which records can be
manufactured.

Atlantic - Atlantic, its successors, lesees
and licensees.

15.  Tapes warrants that Tapes is free to enter
into this agreement and has the right to grant Atlantic all
of the services and rights herein granted, and that no prior
contract or agreement of any kind entered into by Tapes or
by the Artist, nor any prior performance by Tapes or by the
Artist, other than those prior contracts, agreements or
performances of which Atlantic has been given written
notice at the time of the execution hereof, will interfere
in any manner with the complete performance of this
agreement by Atlantic, Tapes or Artist.  It is acknowledged
that Artist has recorded for others under prior agreements.

16.  Tapes agrees to indemnify Atlantic and hold
Atlantic harmless from and against all liability, loss,
damage, cost or expense, including reasonable legal fees,
paid or incurred by Atlantic by reason of any breach or
failure of Tapes' representations or warranties hereunder.
Pending the determination of any claim involving such
breach or failure, Atlantic may withhold payments hereunder
in an amount reasonably related to the value of such claim.

- 12 -

No settlement of any claim for which Tapes may be required to indemnify Atlantic shall be made by Atlantic without Tapes' prior written consent, which shall not be unreasonably withheld.

17.  With respect to any musical composition embodied in records released by Atlantic hereunder which are written, owned or controlled by Tapes directly or indirectly, Tapes shall cause a mechanical license to be issued to Atlantic in the United States for each such musical composition at the statutory rate then prevailing for each record manufactured and sold.

18.  Atlantic shall have the right to secure insurance with respect to Artist for its own benefit.  Tapes agrees to cause Artist to make themselves available for physical examinations by a qualified physician as and when reasonably requested by Atlantic and agrees to cause Artist to complete such questionnaires and other documents as Atlantic or any insurance carrier may from time to time require in connection with securing and maintaining such insurance.

19.  This agreement may not be modified, except in writing signed by both parties.  This agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be wholly performed therein.  Illegality or unenforceability of any portions hereof shall not affect the legality or enforceability of the balance of this agreement.

IN WITNESS WHEREOF, the parties hereto have

- 13 -

hereunto set their hands and seals the day and year
hereinabove first written.

ATLANTIC RECORDING CORPORATION

By: _____

SUPERHYPE TAPES, LTD.

By: _____

**Exhibit 3**

032105rt.txt

IN THE CIRCUIT COURT
OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD, FLORIDA
GENERAL JURISDICTION DIVISION

CASE NO. 04-008115(25)

STEVENS WEISS,                                )
                                              )
                    Plaintiff,                )
                                              )
vs.                                           )
                                              )
ATLANTIC RECORDING CORPORATION,               )
                                              )
                    Defendant.                )   March 21, 2005
_____ )   10:37 a.m.

\*\*\* REPORTER'S ROUGH TRANSCRIPT \*\*\*

- - - - -

S T E V E N S     W E I S S

- - - - -

DEPOSITION taken pursuant to Notice at the Law
Office of Conrad & Scherer, LLP, 633 So. Federal
Highway, 8th Floor, Fort Lauderdale, Florida,
before Ana Reid, a Shorthand Reporter and Notary
Public within the State of Florida.

2

A P P E A R A N C E S

Page 1

032105rt.txt

FOR THE PLAINTIFF:

CONRAD & SCHERER
BY:   WILLIAM R. SCHERER, III, ESQ.
633 So. Federal Highway, 8th Floor
Ft. Lauderdale, Florida   33301


FOR THE DEFENDANT:

NIXON PEABODY, LLP
BY:   KENNETH L. BRESSLER, ESQ.
437 Madison Avenue
New York, New York    10022


DEFENDANT'S EXHIBITS:
NUMBER:  PAGE:   DESCRIPTION:

D
                                                                    3


STEVENS WEISS

was called as a witness by the defendant, having been first

duly sworn, was examined and testified as follows:

                         EXAMINATION

BY MR. BRESSLER:

    Q.    Mr. Weiss, how are you feeling today?

    A.    Reasonably.

    Q.    Is there any reason that you can't testify

today?  Is there any medication you are on or any reason

that would call into doubt your testimony today?

    A.    I take heart -- I take heart medication every

morning and the side effects usually last several hours but

I don't feel any side effects now.

    Q.    So you're comfortable giving testimony today?

    A.    Yes, I am.

032105rt.txt

artists, questions that relate to artist's careers.

Q.    Does it include negotiating contracts for them?

A    With the artist?

Q.    For the artist, on behalf of the artist?

A.    Oh, yes.

Q.    Does it include drafting contracts on behalf of the artist?

A.    It was more often redrafting.

Q.    And how long did you perform management duties for?

A.    Basically for -- at the beginning for almost the rest of my career I was very involved in the artists that I represented and the not just on legal -- what we would normally consider to be a legal matter. I didn't just sit in my office.

Q.    What other groups besides Herman's Hermits and obviously Led Zeppelin did you represent?

A.    I'm sorry, I didn't hear you.

Q.    What other groups did you represent besides Herman's Hermits and Led Zeppelin?

A.    Did I represent at that time?

Q.    From the early sixties on.

A.    Not in order of importance -- okay. Herman's

8

Hermits -- I'm trying to give it to you chronologically as best I can the Dave Clark Five, Rascals, Vanilla Fudge, Dusty Springfield, Jimmy Hendricks, Michael Bolton. I know I haven't exhausted the list but those were some of the clients I represented.

Q.    Bad Company also?

Page 6

032105rt.txt

A.    From who?

Q.    From all your bands?  Did you always ask for receive five percent, for example?

A.    That was my normal fee.

Q.    Was that five percent of all earnings including

12

touring?

A.    Normally, yes.

Q.    What was your deal with respect to Led Zeppelin?

A.    It was basically the same -- same deal, I would render services and I would be compensated on the basis of five percent formula.

Q.    Five percent of all earnings for Led Zeppelin including touring?

A.    Yes, including touring but again it depends what you mean by earnings.

Q.    Well, define for me what earnings means in relation to Led Zeppelin?

A.    It was after the act became very popular that basically self promoted their debts.  They kept 90 percent of the profits after all the expenses were paid and my five percent was predicated upon that.

Q.    Let me make sure I understand.  You were the promoter for Led Zeppelin --

A.    No, absolutely not.

Q.    You said you self promoted.  What does that mean?

A.    Prior to this time --

Q.    What time, sir?

A.    Early seventies -- acts were on a 60/40 basis with promoters.  A promoter would guarantee an act a

Page 10

032105rt.txt

A.    All the US tour dates.  Not at the beginning.  At the very beginning there was actually -- actually there was no money.

Q.    So it was starting sometime in the early seventies?

A.    Either 69 -- probably -- yes, probably 1970.

Q.    And what services did you perform in connection with Led Zeppelin's touring?

A.    It was so extensive.  It's very difficult -- it was everything from hiring the plane, contracts, figuring out which promoters would be best for which shows and which venues, settling the shows.  That was an era before computers obviously and after each show you had to determine what the profit and loss was so that meant making sure the ticket count was correct, expenses were correct, getting paid, making merchandise deals, answering my opinion about almost everything, recording, touring, everything.  I traveled with them every day in the United States.

Q.    I'm sorry?

A.    I traveled with them every day in the United States commencing in 1970.  It was like -- it was a 24/7 type job.

Q.    Did you travel with them abroad?

15

A.    In Florida?

Q.    Abroad?  Did you travel with Led Zeppelin --

A.    Yes, I'm going to be respond to your question.  I did not travel with them on most of the dates in Europe.  I did -- I was asked by Peter to be present at certain events in Europe and I did accompany the group on their entire last

Page 12

032105rt.txt

what Led Zeppelin paid me, is that what you're asking me.

Q.    Anybody paid you in connection with the touring of Led Zeppelin?

A.    Okay, then the answer stands.

Q.    Did you receive any other monies from other people in connection with Led Zeppelin?

A.    No, the monies I received from Led Zeppelin really -- they didn't pay me five percent in addition to what they paid Peter. They paid Peter 15 percent -- he was paid 20 percent. Of the 20 percent, he received 15 and I

18

received five.

Q.    And there was no other monies that you received in connection with touring other than that five percent?

A.    Yes, I would say -- yes, I received five percent of the merchandise that was sold on tour.

Q.    Do you know whether the five percent of touring and the five percent of merchandising was greater than, less than or equal to the amount that you received from the sale of records?

A.    During the -- I can't really answer that. The general rule is you make your most money touring but I don't have any specific figures.

Q.    Do you know how much money you've made in total from the sale of records?

A.    Pardon me?

Q.    Do you know how much money you've made in total over the years from the sale of Led Zeppelin records?

A.    I believe you submitted a paper from Karen Nolan (*spell) that says I have been paid 7 million dollars. I have no idea if that's accurate.

Page 15

032105rt.txt

Q.    It could be more, could be less, could be accurate? You don't know?

A.    No.

Q.    Was part of your responsibility in representing bands from Herman's Hermits to Vanilla Fudge to Led Zeppelin

19

to negotiate recording agreements with the record companies?

A.    Yes.

Q.    Was part of your responsibilities in representing --

A.    Some of those artists already had record deals before I was hired, but if they didn't have a record deal, I negotiated it.

Q.    And you would also redraft certain provisions of the recording agreements?

A.    That I didn't find satisfactory, yes.

Q.    I'm going to show you what I will mark as Defendant's Exhibit A.  It is a copy of the November 1st, 1968 agreement between Atlantic recording corporation and Superhype tapes limited.

A.    Okay.

Q.    Did you negotiate this agreement between --

A.    Yes.

Q.    In general, Mr. Weiss, if you will let me finish the question so we have a clear transcript.

A.    Okay.

Q.    You negotiated this contract between Atlantic and Superhype, correct?

A.    Yes.

Q.    And did you make any changes to the agreement

Page 16

032105rt.txt

A.   Obviously they didn't want material to be used in any other aspect without their consent.

Q.   And do you believe that they were given that right under Defendant's Exhibit A?

MR. SCHERER:  Form.

THE WITNESS:  That they were giving the right to accept or reject?

BY MR. BRESSLER:

Q.   Yes.

A.   No.  I wish I could have gotten it.  Please understand that we cannot view Led Zeppelin in today's context.  At that time the Yardbirds were not -- were not really very successful.  It was probably successful from an artistic point of view and I was not in a situation where I was representing an artist that had already sold a million records and I would have greater negotiating power.

Q.   So the best you were able to do was if Atlantic were required to obtain consent from its other top recording artists, then it would have to obtain such consent from Led

23

Zeppelin?

A.   No, I would say that the language means -- well, the way I tried to protect the group was that they could not like single out the Led Zeppelin for treatment in that area in a way that was not applicable to their other leading artists.

Q.   So, in other words, if Atlantic would ask for consent from other artists --

A.   No, it's a policy.  The policy -- my experience with recording agreements at that time was that it was like the Dark Ages of recording agreements as far as artists are

Page 19

032105rt.txt

concerned and that record companies habitually got very, very broad rights to use recordings which probably today they would not get.

Q.   You had other band in a you represented who were signed to Atlantic, right?

A.   The Rascals, yes.

Q.   Anybody other than the Rascals?

A.   Vanilla Fudge, Dusty Springfield.

Q.   So you were fairly familiar with the way that Atlantic operated?

A.   No.  Well, those were all at different times. No, I was only interested in my artists and the job that Atlantic did or did not do for my artists.  I really didn't care about what they did for any other artist.

24

Q.   Do you know of any time when Atlantic insisted on using the recordings by any of your artists in a way that your artists did not consent?

A.   I'm sorry, do that again.

Q.   Can you recall any situation where Atlantic wanted to license out any of the recordings by any of your artists and your artists did not consent and Atlantic did it anyway?

A.   I don't recall them licensing out any recordings of those particular artists for any uses whatsoever so the question did not arise.

Q.   What do you understand as licensing out?

A.   I beg your pardon.

Q.   What would licensing out constitute?

A.   I can't hear.

032105rt.txt

Q. For how long?

A. Until I was fired.

Q. When were you fired?

A. I don't recall. I honestly don't recall. It was after the 40th anniversary concert.

26

Q. I'm sorry, I can't hear you.

A. I'm just trying to recall. I don't recall the date but I think Bill Curbishley had become the new manager.

Q. Is this before or after Peter Grant died?

A. Curbishley started out by representing I think Jimmy Page, and I believe -- no, I think Peter was still alive at that time and Robert had another manager, and John Paul Jones had another manager, and John Bonham was dead.

Q. Why were you fired?

MR. SCHERER: Form.

THE WITNESS: There was never a reason assigned.

BY MR. BRESSLER:

Q. Do you recall the decade that you were fired?

A. Yes, it was probably late '80s.

Q. After you were fired as the attorney for Led Zeppelin, did you continue to keep in touch with any members of the bands or their management?

A. Management?

Q. Management for --

A. You're talking about Peter Grant.

Q. Peter Grant or Bill Curbishley?

A. I only met Bill Curbishley once and that was in the dressing room at the Atlantic 40th anniversary concert.

Page 22

032105rt.txt

I never met him any other time.

27

Q.     After the time that you were fired in the late '80s, did you continue to become aware or know what the band was doing in connection with Atlantic?  For example, did you continue to see whatever agreements passed between them?

A.     No, I would say I was -- no.  I was -- yes, I'm sorry what was the question again?  Was I consulted.

Q.     Were you aware of the various agreements entered into between Led Zeppelin and Atlantic after the time you were fired?

A.     Any contracts?

Q.     Yes.

A.     Not at the time they were made but when I found out that I wasn't being paid the box sets, that in connection with the settlement I was furnished what copy of the box set agreement that they had signed in the year before.  The rental agreements I was furnished head of time, no.

Q.     Let me show you what I will mark as Defendant's Exhibit D.  It's a copy of the Amended Complaint that you filed in this action.

A.     Yes.

Q.     Did you review this Amended Complaint prior to the time that it was filed?

A.     Yes.

Q.     And did you approve of the contents of the

28

Amended Complaint?

A.     I'm sure I did.

Page 23

032105rt.txt

MR. SCHERER:  You want to do it?

MR. BRESSLER:  I'd like to get into it.

THE WITNESS:  There is -- I think there is a second page.

MR. BRESSLER:  Well, the letter itself --

MR. SCHERER:  This is the one I told you about that we didn't produce a second page of eight.  You have seven of 10 -- hold on Stevens.  Because it was identical --

MR. BRESSLER:  You said something had been produced.

MR. SCHERER:  So we didn't give you two pages of that.  That would be eight of 10.

MR. BRESSLER:  And then where is 10 of 10?

MR. SCHERER:  I don't know.  This may have been the one --

MR. BRESSLER:  I don't have 10.  If you can look for 10 of 10.

MR. SCHERER:  Let me see.

(Time noted:  12:05)

37

(An off-the-record discussion was had.)

(Time noted:  12:11)

BY MR. BRESSLER:

Q.    Are you ready?

A.    Which one are we talking about?

Q.    The 1991 agreement which you should have in front of you.

A.    Okay.

Q.    The 1991 agreement is a settlement of a dispute between you and Atlantic and Swan Song and Superhype?

A.    Yes.

032105rt.txt

Q.    And the dispute concerned not only a box set but other calculation of royalties and royalties due to you?

A.    It arose out of a failure to pay me on the box set.

Q.    There are issues other than the box set?

A.    Whatever is in the agreement is in the agreement.

Q.    Well, I'm trying to find out what the dispute was because --

A.    The dispute --

Q.    Go on, Mr. Weiss.

A.    The dispute was that they would not pay me on the box set.

Q.    If you look at page 3 on the third where as, it states that this is to resolve and determine --

38

A.    Are you talking about the third paragraph?

Q.    The third "whereas" clause on page 3.  Says that all parties wish to settle --

A.    Can I read it please?

A.    Okay.

Q.    So it's not just the box set but any issues of amount of royalties payable to you from the sale of the catalogue, right?

        MR. SCHERER:   Form.

        THE WITNESS:   Yes.

BY MR. BRESSLER:

Q.    So there was a dispute as between you and Atlantic relating to you royalties other than the box set prior to the time that you entered the 1991 agreement?

A.    Depends how you -- yes.

Page 32

032105rt.txt

Q.    And the purpose of the 1991 agreement was to resolve your dispute, right?

A.    Yes.

Q.    Let me show you what I will mark as Defendant's Exhibit D.  It is a May 16th, 1991 letter from Elliot Hoffman enclosing a draft of the 1991  agreement.

A.    Okay.

Q.    Is this the first draft Settlement Agreement you received in connection with this matter?

A.    I don't know.

39

Q.    Says that it's a proposed Settlement Agreement. Do you recall any draft agreements you received prior to receiving this agreement?

A.    Yes.

Q.    What drafts do you recall receiving?

A.    There was a draft before.

Q.    Do you have a copy of that draft that you received prior to this date?

A.    If it's not among the papers that I turned over to my attorney, no.

Q.    Let me show you what I will mark as Defendant's Exhibit E.  It's a May 20th, 1991 fax from you to Elliot Hoffman?

A.    Yes.

Q.    If you can put that down for a moment.  This is a letter that you wrote to Mr. Hoffman?

A.    It's a fax.

Q.    It's a fax that you wrote and sent to Mr. Hoffman?

A.    Correct.

032105rt.txt

Mr. Weiss, which is the runover from paragraph Roman numeral 3.  It says at the top paragraph in red line, provided that no such release, and continues.  Do you see that red line portion?

A.   No.

MR. SCHERER:  Here.

THE WITNESS:  (Reading).

BY MR. BRESSLER:

Q.   Do you know who added that language?

A.   Me.

Q.   You drafted that language and added it?

A.   Yes.

Q.   Why did you add it?

A.   I wasn't going to give up existing rights that I had.

Q.   Is there a document that you have seen in which you propose this language to Mr. Hoffman?

A.   I would have to go through all the documents.

Q.   Well, there is not one that has been produced to us?

A.   It's my language.

Q.   How do you recall its your language?  Anything in particular?

50

A.   I recall it because I said to myself I'm not going to give up something I already have.

Q.   What do you understand you already have at that point that you do not want to give up?

A.   Because I knew that the 68 agreement dealt with Atlantic's right to licensee other uses, so therefore I

Page 42

032105rt.txt

wasn't going to give up something that I already had.

Q. Does that mean -- do you understand this as stating that if Atlantic licenses any Led Zeppelin recordings for commercials, for TV broadcast or motion pictures or videos, you shall have a right to royalties?

A. Yes. I'm entitled to be paid if under the existing contract Atlantic has a price.

Q. And you weren't at the time -- withdrawn. At that time in 1991 did you know whether Atlantic had licensed out any master recordings to other -- to third parties?

A. Whether who did?

Q. Atlantic had?

A. Of this?

Q. Withdrawn.

A. No, I don't know.

Q. So weren't you at the time trying to preserve your right to receive payments on any deals that had already been struck in licensing these out?

A. No.

51

Q. Can you move your hand from your mouth? I can't hear you with your hand in front of your mouth.

A. No, that's not what he says.

Q. Do you have a recollection at the time?

A. That I was trying to protect myself against past deals?

Q. Yes.

A. No.

Q. So your interpretation of this parenthetical, it negates the entire avoidance of misunderstanding clause?

MR. SCHERER: Object to the form.

Page 43

032105rt.txt

A.   I knew I would be entitled to it and I inserted it to protect myself and I think I did it -- I did it in a way that does it.

Q.   "Does that" meaning negates the entire --

A.   I don't know.  It's not my judgment to make.  I'm not here to interpret other language in this agreement. I'll answer you very directly.  I am entitled to be paid on commercials, motion pictures presently permitted in any recording agreement.  I knew what I was doing.

Q.   Did you have any discussions with anybody about that inserted language?

A.   I did have discussions.  I can't remember with who.

Q.   Well, do you recall it was with anybody --

52

A.   I can't.  I can't.  Whether it was with Atlantic, with Hoffman, I don't know.

Q.   Could it have been with your own attorney?

A.   My own attorney is a trial attorney.  He was not -- it was not like a music expert and, no.  This was mine.  You can put me on the rack, okay?  This is my language.

Q.   If not for that language that you added, is it your understanding at the time that you would not have been entitled to receive any payments on either Point A or B within Roman numeral three of the '91 agreement?

A.   Yes.

Q.   So by adding -- withdrawn.  Who drafted the bracketed section at the end of Roman numeral three in Exhibit I which begins with the avoidance and

Page 44

032105rt.txt

THE WITNESS:  No, I think the language  relates to subparagraph B.

BY MR. BRESSLER:

Q.   Well, subparagraph A talks about release and subparagraph B talks about license and the language you put

54

in talks about release or licensing, so doesn't it refer to A and B?

MR. SCHERER:  Form.

THE WITNESS:  I can't -- (reading).  Yes, sure right.

BY MR. BRESSLER:

Q.   So was it your understanding that by adding that parenthetical that starts with no such release, that you would therefore be entitled to payments if Atlantic would release any Led Zeppelin recordings derived from non-catalogue masters?

A.   Provided that I was like -- if I was entitled to be paid under any existing agreement, yes.

Q.   Were you entitled to be paid if Led Zeppelin -- I'm sorry, withdrawn.  Were you entitled to be paid if Atlantic released any Led Zeppelin recordings derived from non-catalogue masters?  Were you entitled to be paid under any prior agreement between Atlantic and either STL or SSI?

A.   Yes.

Q.   So by adding this language provided that  no such release or licensing shall be presently permitted in any recording agreement between Atlantic and either STL or SSI you are modifying this paragraph that says for the avoidance and misunderstanding, so that it was clear in your mind and

032105rt.txt

MR. BRESSLER:  It's marked it as C.  You have it in front of you.

BY MR. BRESSLER:

Q.    Mr. Weiss, I believe this is the final version.

A.    (Reading.)

A.    All right.  What's the question?

Q.    Let's turn to an entirely different question.  In Roman numeral three, for avoidance of misunderstanding section, A talks about non-catalogue masters?

A.    Correct.

Q.    Do you deem that to be the same as non-catalogue recordings?

A.    In this context?

Q.    Yes.

A.    Yes.

Q.    So getting back to the original question, while you're adding the language provided no such release or licensing shall be presently permitted in any recording agreement between Atlantic and either STL or SSI, you made

58

it clear that Atlantic would have to pay you if it released any Led Zeppelin recordings derived from these non-catalogue masters or non-catalogue recordings?

Well, let me take you back.  I'll take you step by step, Mr. Weiss.  Previously you testified a few minutes ago that under the prior agreement you would be entitled to be paid should Atlantic release any Led Zeppelin recordings derived from non-catalogue masters or recordings.  You testified to that a few minutes ago.

MR. SCHERER:  Object to the form.

THE WITNESS:  I think what I testified to

Page 49

032105rt.txt

20 percent?

62

A.     It was part of the compromise to settle a matter between my being paid in full and the amount provided for in the agreement.

Q.     It was part of the entire Settlement Agreement, right?

A.     Yes.

Q.     Let me show you Exhibit J.  It's a November 12, 1997 letter that you sent to Phil Wild.

A.     Okay.

Q.     Do you mind if I come around here since I only have one copy?

In that letter were you asking to be paid as if the BBC album constituted two separate albums?

A.     Yes.

Q.     And you were asked -- withdrawn.

Q.     You were asking to be paid an advance on each one of the records contained within the BBC set, correct?

A.     I don't know that they were advances.  It's what was called for in the 1995 agreement.

Q.     You were being asked for a lump sum payment of --

A.     Yes, because --

Q.     You wanted two separate payments because there were two albums, right?  Withdrawn.  You wanted two separate -- Mr. Weiss, let me finish.  You wanted two separate payments because there were two CDs or two records

63

within the BBC set, correct?

MR. SCHERER:  Form.

Page 53

032105rt.txt

THE WITNESS:  It was a double album.

BY MR. BRESSLER:

Q.   So you wanted two payments?

A.   Correct.

Q.   You didn't receive two payments, did you?

A.   No.

Q.   You're being paid royalties on the -- withdrawn.

Q.   How are you being paid royalties on the BBC album?

A.   On which album?

Q.   BBC?

A.   I haven't been paid anything.

Q.   So you're being paid the percentage there and you're now asking for the bonus?

A.   There's not a percentage here.

Q.   Withdrawn.

Q.   You were paid the lump sum payment and now you're asking for a bonus, right?

A.   The agreement provides that if a certain number of units were sold, correct.

Q.   What is a royalty bearing unit?

MR. SCHERER:  Form.

Q.   What is your understanding as a person who has

64

practiced law and advised some of the top recording artists of their day as to what a loyalty bearing unit constitutes?

MR. SCHERER:  Form.

THE WITNESS:  It depends on -- it depends on the context, all right.

BY MR. BRESSLER:

Page 54

032105rt.txt

Q.    What is a royalty bearing copy?

MR. SCHERER:   Form.

THE WITNESS:   It's a copy -- it's a CD on which royalties are paid.

BY MR. BRESSLER:

Q.    Can a royalty bearing copy be a box set containing more than one CD?

MR. SCHERER:   Form.

THE WITNESS:   Well, I wouldn't use -- I wouldn't use that language.

BY MR. BRESSLER:

Q.    What language would you use if there was more than one CD?

A.    Box set.

Q.    Did anybody ever tell you you'd be paid a bonus as if the BBC set were two separate units?

A.    No, it was assumed that the BBC album would be a single album.

Q.    Who assumed that?

65

A.    I certainly did and in my conversations with Mel Winter -- I mean, I never know what's in his mind but I believe that he assumed it as well.

Q.    Did he ever tell you it's going to be a single album release?

A.    No one knew what the next release would be but the assumption was -- I mean no -- the normal assumption for an album is that its a single album.

Q.    When you and I met with George Fearon and Michael Kushner (*spell) some time ago, you told us that Phil Wild told you that you would receive your bonus; is

032105rt.txt

THE WITNESS:  Are you talking to me?

MR. SCHERER:  He's just making a comment for the record.

THE WITNESS:  Pardon me?

MR. SCHERER:  He's just making a comment for the

68

record.

BY MR. BRESSLER:

Q.    Who did you negotiate the deal with?

A.    Mel Winter.

Q.    Did you negotiate the 1.5 million and two million unit bump yourself?

A.    No, here's what happened.  I didn't want to settle for this further.  I wanted a lump sum of $100,000 more which he was not willing to do.  Then I said we have to work out something because I'm just not going to settle for this figure.  And he's just like scribbling on his page and he said, okay, 50,000, one million five, 50,000 and two million and I said no let's make it a million and a million five and he looked down and said no, it has to be -- he looked down at whatever he was scribbling and said it has to be 1.5 to two million.

Q.    And did you say to him, well, what happens if it's a double album?

A.    No.

Q.    Did you say to him what happens if it's a triple album?

A.    No.

Q.    If this were a 10 CD box set, would you be entitled to a multiple of 10 times in determining the

032105rt.txt

bonus?

69

MR. SCHERER:  Form.

THE WITNESS:  No, I didn't say it.

BY MR. BRESSLER:

Q.    I'm sorry?

A.    No, I didn't say if it's a 10 CD box or anything like that.

Q.    You, of course, know that it's an issue -- withdrawn.  You know being a lawyer in representing bands that if you want to make an issue as to whether a forthcoming album has one album versus two or three albums contained within it that you make that issue in the negotiation, right, you raise the issue?

A.    No, I put it the opposite.  I would say that the record company would insert a clause saying that the two CD set is equivalent to one album.

Q.    For the purposes of meeting requirements under recording agreement to record a certain number of albums, right?

A.    It could come under a number of circumstances and that is certainly one of them, yes.

Q.    Now, if you wanted this bonus to kick in at half the number of units it was a double set, you could have asked Mr. Mel Winter to change the agreement, right?

A.    If -- in other words if the anticipation was that it was going to be a double album, yes, I would have asked

70

them.

Q.    Did you ever ask Mr. Lou Winter -- withdrawn.

Page 59

**Exhibit 4**

As of November 1, 1968

Atlantic Recording Corporation
1841 Broadway
New York, New York 10036

Gentlemen:

Reference is made to a certain agreement of even date between you and us with respect to the "LED ZEPPELIN."

We hereby irrevocably and without recourse transfer, set over and assign and direct you to deduct six and eighty-two one hundredths (6.82%) percent of all advances payable to us and of all royalties and other payments actually payable to us (after your recoupment of all chargeable advances and costs including any recording costs incurred by you) pursuant to said agreement and to pay same over quarter-annually on our behalf to Stevens H. Weiss, Esq., or assignee, in payment for services heretofore rendered by Stevens H. Weiss, at the following address:

444 Madison Avenue
New York, New York 10022

We agree that you shall not have any liability to us or to Mr. Weiss by reason of your failure to comply with this letter of instructions or by reason of any error in calculation made by you.

Very truly yours,

SUPERHYPE TAPES, LTD.

By_____

December 4, 1969

Atlantic Recording Corporation
1841 Broadway
New York, N. Y.

Stevens H. Weiss, Esq.
444 Madison Avenue
New York, N. Y.

Gentlemen:

Reference is made to the attached irrevocable assignment dated as of November 1, 1968 wherein Atlantic Recording Corporation is directed to make the payments to Mr. Stevens H. Weiss as set forth therein.

This will confirm that the attached irrevocable assignment is applicable to the extended term (two additional years, November 1, 1971 to October 31, 1973) of the recording contract between ourselves and Atlantic Recording Corporation regarding the Led Zeppelin in the same manner and to the same extent as same is applicable to the three-year original term (November 1, 1968 to October 31, 1971).

This confirmation is irrevocable and may not be revoked or modified without the written consent of Mr. Stevens Weiss.

Very truly yours,

SUPER HYPE TAPES, LTD.

By

original delverd to
mille Moye 12/10

5

Stevens H. Weiss
444 Madison Avenue
New York, New York

Dear Sir:

Reference is made to the irrevocable assignment dated as of November 1, 1968, letter of extension and confirmation thereof dated December 4, 1969, and modification and confirmation of the foregoing dated as of December 5, 1969 wherein Superhype Tapes Ltd. irrevocably assigned to you six and eighty-two one hundredths (6.82%) per cent of all royalties and other payments earned by it, as provided for in said agreements.

It is agreed that the foregoing agreements are to continue to be applicable to all of the five (5) Led Zeppelin albums (and singles therefrom) heretofore delivered to Atlantic Recording Corporation.

It is further agreed that such agreements are not to be applicable to the five (5) additional "Led Zeppelin" albums required to be delivered to Atlantic Recording Corporation by Superhype Tapes Ltd. pursuant to its existing agreement with

00260

Superhype Tapes Ltd., as modified by agreement of even date between Atlantic Recording Corporation, Superhype Tapes Ltd., Swan Song Inc., James Page, John Baldwin, Robert Plant, John Bonham, Peter Grant and yourself (said agreement being referred to herein as the "Atlantic - Swan Song - Superhype Agreement"), nor shall such agreements be applicable to the sixth Led Zeppelin album provided for in the "Atlantic - Swan Song - Superhype Agreement" and in lieu thereof Swan Song Inc. does hereby irrevocably transfer, set over and assign to Stevens H. Weiss, his heirs, personal representatives and assigns the following percentages of all royalties and all other payments earned by Swan Song Inc. on each of the next six Led Zeppelin albums (and singles therefrom) pursuant to the Atlantic - Swan Song - Superhype agreement and Swan Song Inc. does hereby agree to pay same over not less frequently than quarter-annually together with an appropriate written statement to Stevens H. Weiss, his heirs, personal representatives and assigns, in payment for services heretofore rendered by

00261

Stevens H. Weiss at the following address: 444 Madison Avenue,

New York, New York 10022.

| COUNTRY OF SALE | PERCENTAGE TO BE PAID TO STEVENS H. WEISS |
|---|---|
| United States | Nine and three one hundredth (9.03%) per cent on next five albums and five per cent (5%) on sixth album |
| All other countries throughout the world | Ten and eighty one hundredth (10.80%) per cent |

This irrevocable assignment shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be wholly performed therein and may not be revoked or modified without the written consent of Stevens H. Weiss nor may any change hereafter be made in said Atlantic - Swan Song - Superhype Agreement which would result in the loss, reduction or delay in any payments to Stevens H. Weiss without the written consent of Stevens H. Weiss.

00262

Signed in New York City,
this ___ day of May, 1974.

Very truly yours,

SWAN SONG INC.

By _____
                   President

AGREED TO:

Superhype Tapes' Ltd.

By _____

_____
Stevens H. Weiss

_____
James Page

_____
John Baldwin

_____
Robert Plant

_____
John Bonham

00263

## EXHIBIT "A"

1.   On October 31, 1973 Atlantic Recording Corporation purchased, inter alia, the interest of Entertainment Overseas Ltd., in and to royalties payable, by reason of divers assignments, by Superhype Tapes Ltd., to Entertainment Overseas Ltd., for services rendered by Peter Grant as Executive Producer of the first five (5) Led Zeppelin albums.

2.   Superhype Tapes Ltd., did by irrevocable assignments dated as of November 1, 1968, letter of extension and confirmation thereof dated December 4, 1969, modification and confirmation dated as of December 5, 1969 and modification and confirmation dated May 8, 1974 irrevocably assign to Stevens H. Weiss, his heirs and assigns, for services theretofore rendered, Six and Eighty-Two One Hundredths (6.82%) percent of all royalties and other payments earned by Superhype Tapes Ltd., pursuant to Superhype's recording agreement with Atlantic dated November 1, 1968 as modified by agreements' of December 4, 1969, December 5, 1969 and May 8, 1974 from each of the following five (5) albums.

LED ZEPPELIN

LED ZEPPELIN II

LED ZEPPELIN III

SYMBOLS ALBUM (SD 7208)

HOUSES OF THE HOLY

The aforesaid interest of Stevens H. Weiss is not being assigned or sold to Atlantic by agreement of even date

00142

and Atlantic, its successors and assigns, unconditionally and irrevocably agrees to pay directly to Stevens H. Weiss, his heirs and assigns quarter-annually, commencing with the statement of February 15, 1978 an amount equal to Six and Eighty-Two One Hundredths (6.82%) percent of all royalties and other payments which would have otherwise been earned by Superhype Tapes Ltd., from any and all of the aforesaid albums were it not for the agreement of even date, such payments to continue for so long as any of said five (5) albums shall earn any royalties or other payments.

Swan Song Inc., did by modification and assignment agreement dated May 8, 1974 irrevocably transfer, set-over and assign to Stevens H. Weiss, his heirs, personal representatives and assigns for services theretofore rendered the following percentages of all royalties and all other payments earned by Swan Song Inc., on each of the albums other than the sixth album provided for in the Atlantic/Swan Song/Superhype agreement of May 8, 1974.

| United States: | Nine and Three One Hundredths (9.03%) percent |
|---|---|
| All Other Countries Throughout The World: | Ten and Eighty One Hundredths (10.80%) percent |

The aforesaid interest of Stevens H. Weiss with respect to PRESENCE and PHYSICAL GRAFFITI is not being assigned or sold to Atlantic by agreement of even date and Atlantic, its successors and assigns, unconditionally and irrevocably agrees to pay directly to Stevens H. Weiss, his heirs, personal representatives and assigns quarter-annaully commencing

-2-

00143

with the statement of February 15, 1978 an amount equal to the aforesaid percentages of all royalties and other payments which would have otherwise been earned by Swan Song Inc., and paid by it to Stevens H. Weiss were it not for the agreement of even date, such payments to continue so long as either PHYSICAL GRAFFITI or PRESENSE shall earn royalties or other payments (it being further understood that the PRESENCE advance has not been recouped and that no royalties or other payments are payable to Stevens H. Weiss thereon unless and until said advance is recouped).

Payments to Stevens H. Weiss shall be mailed to the address set forth below unless and until Atlantic is notified in writing of a different address.

This will further serve to confirm that Atlantic shall not be required to make any payments to Stevens H. Weiss on any of the other albums provided for in the May 8, 1974 Atlantic/Superhype/Swan Song agreement, such payments to be made to Stevens H. Weiss by Swan Song Inc., as per the modification and assignment agreement of May 8, 1974.

AGREED TO:                    00144

SUPERHYPE TAPES LTD.

By_____

SWAN SONG INC.

By_____

ATLANTIC RECORDING CORPORATION

By_____Sheldon Vogel Exec VP_____

_____
Stevens H. Weiss
34 Pheasant Run
Old Westbury, New York 11568

Dated:   March 15, 1978

**Exhibit 5**

RB/kk (7-A-09742) 4881C/180C

ATLANTIC RECORDING CORPORATION
75 Rockefeller Plaza
New York, New York   10019

Dated:  As of *May 29* , 1990

Superhype Tapes Ltd.
c/o Joan Hudson & Co.
91 Tabernacle Street
London, EC2A 4BA,
England

Gentlemen:

It is our intention to commercially release two (2) compilations of recordings embodying the performances of "LED ZEPPELIN", identified and set forth in Schedule "A" annexed hereto and made a part hereof.  One compilation (hereinafter referred to as the "4 CD Package") will be released in the United States, Canada, and Europe, and such other territories as we shall in our sole discretion determine, will be comprised of all of the recordings identified on Schedule "A" hereto in the sequence therein set forth, and shall be embodied on four (4) compact discs and other equivalent formats and configurations.  The other compilation (hereinafter referred to as the "2 CD Package") will be released in the United Kingdom, Ireland and Europe, and such other territories as you and we shall mutually agree upon, will be comprised of certain of the recordings identified on Schedule "A" hereto, as you and we shall mutually select and sequence, and shall be embodied on two (2) compact discs and other equivalent formats and configurations.  The 2 CD Package shall not contain recordings not heretofore released by us on any LP.

When signed by you and by us in the places indicated below, this shall constitute an agreement between you and us in respect of the 4 CD Package and the 2 CD Package (hereinafter sometimes individually and collectively referred to as the "Packages").

1.    (a)   (i)    It is understood and agreed that while we are the copyright owner of the performances (as distinguished from the copyright owner of the musical compositions) embodied in the masters comprising the compilation recordings referred to herein as the Packages (excluding recordings licensed from BBC Enterprises), we do not have the right to sell or distribute, or to license the sale or distribution of the Packages without your consent.  Accordingly, you hereby grant to us such rights as we require in order to exploit the Packages and recordings derived therefrom, subject to subparagraph

- 1 -

(7-A-09742) 4881C/180C

3(b)(iii) of this Agreement.  You shall cause Messrs. Robert Plant, Jimmy Page and John Paul Jones to assist us in the creation and marketing of the Packages, and they agree to render such services, including without limitation:

(ii)     To take part in interviews with writers mutually selected to prepare printed materials to be included with, or otherwise published, distributed or utilized in conjunction with the Packages;

(iii)    To assist in the selection of photographs and other graphic materials and packaging to be included with the Packages, or to be otherwise published, distributed or utilized in conjunction with the Packages;

(iv)     To assist in selecting previously unreleased recordings for inclusion in the Packages, and in mixing and mastering recordings to be utilized in the manufacture of the Packages, and to make available to us high quality master tapes not previously utilized in the manufacture of records;

(v)      To provide to us high quality master tapes not previously utilized in the manufacture of records embodying recordings contained in the Packages;

(vi)     To participate in interviews with journalists, critics and broadcasters, and in personal appearances, as may be mutually determined, for the purpose of publicizing and promoting the distribution and sale of the Packages.

(b)  You shall have approval of all artwork for the Packages and any printed material contained therein.

2.    We shall be solely responsible for costs to be incurred in connection with the creation of the Packages, not to exceed the sum of One Hundred Twenty Thousand ($120,000.00 U.S.) United States Dollars, such costs to include expenses of travel, mastering, mixing, graphics and artwork, recording studios, and airfare and hotel accommodations.  In the event costs exceed $120,000.00 with your approval, we shall have the right to recoup fifty (50%) percent of such excess costs from royalties otherwise payable to you pursuant to this Agreement.

3.    We shall pay to you the following royalties in respect of retail sales of the Packages and records derived therefrom:

(a)  (i)     (A)   A royalty of eighteen (18%) percent in respect of retail sales in the United States of LPs derived from the

- 2 -

(7-A-09742) 4881C/180C

Packages;

(B)    The royalty rate hereinabove set forth in subparagraph 3(a)(i)(A) shall be hereinafter referred to as the "Basic U.S. LP Rate".

(ii)    (A)    A royalty of fifteen (15%) percent in respect of retail sales in Canada of LPs derived from the Packages;

(B)    A royalty of fourteen (14%) percent in respect of retail sales in the United Kingdom of LPs derived from the Packages;

(C)    A royalty of thirteen (13%) percent in respect of retail sales of LPs derived from the Packages outside the United States, Canada and the United Kingdom in those territories where we have a wholly-owned affiliate which itself manufactues and distributes records;

(D)    A royalty of eleven (11%) percent in respect of retail sales of LPs derived from the Packages outside the United States, Canada, the United Kingdom, and outside those territories referred to in subparagraph 3(a)(ii)(C) above;

(E)    The royalty rates hereinabove set forth in subparagraphs 3(a)(ii)(A) through (D) shall each be hereinafter referred to as a "Basic Foreign LP Rate".

(b)    (i)    We agree that we shall not have the right to commercially release and distribute singles and/or maxi-singles derived from the Packages without your prior written consent and approval, which consent and approval we agree you are free to grant or withhold in your sole and absolute discretion.  However, in the event that at some future time you should grant such consent and approval, you and we hereby agree that the royalties payable to you in respect of retail sales of singles or maxi-singles derived from the Packages shall be as follows:

(ii)    (A)    A royalty of twelve (12%) percent in respect of retail sales in the United States of Singles and Maxi-singles derived from the Packages;

(B)    The royalty rate hereinabove set forth in subparagraph 3(b)(ii)(A) shall be hereinafter referred to as the "Basic U.S. Singles Rate".

(iii)    (A)    A royalty of nine and one-third (9-1/3%) percent in respect of retail sales in Canada of Singles and

- 3 -

(7-A-09742)  4881C/180C

Maxi-singles derived from the Packages;

(B)   A royalty of eight and two-thirds (8-2/3%) percent in respect of retail sales in the United Kingdom of Singles and Maxi-singles derived from the Packages;

(C)   A royalty of six and two-thirds (6-2/3%) percent in respect of retail sales outside the United States, Canada and the United Kingdom of Singles and Maxi-singles derived from the Packages;

(D)   The royalty rates hereinabove set forth in subparagraphs 3(b)(iii)(A) through (C) shall each be hereinafter referred to as a "Basic Foreign Singles Rate".

(iv)   Intentionally omitted.

(v)   (A)   Notwithstanding anything to the contrary contained herein, with respect to records sold in Brazil, Greece, Portugal, India, Kenya, Zambia, Zimbabwe, Nigeria and any other territory in which governmental or other authorities place limits on the royalty rates permissible for remittances to the United States in respect of records sold in such territory(ies), the royalty rate payable to you hereunder in respect of sales of records in such territory(ies) shall equal the lesser of (1) the applicable Basic Foreign Singles Rate or applicable Basic Foreign LP Rate, as the case may be, or (2) the effective royalty rate permitted by such governmental or other authority for remittances to the United States less a royalty equivalent to three (3%) percent of the retail list price and such monies as we or our licensees shall be required to pay to all applicable union funds in respect of said sales.

(B)   Royalties in respect of sales of records outside the United States shall be computed in the same national currency as we are accounted to by our licensees and shall be paid to you at the same rate of exchange as we are paid.  It is understood that such royalties will not be due and payable until payment thereof is received by us in the United States of America. In the event we are unable to receive payment in United States dollars in the United States due to governmental regulations, royalties therefor shall not be credited to your account during the continuance of such inability except that (1) if any accounting rendered to you hereunder during the continuance of such inability shows your account to be in a credit position, we will, after your request and at your expense, if we are able to do so, deposit such royalties to your credit in the applicable foreign currency in a

- 4 -

(7-A-09742) 4881C/180C

foreign depository, or (2) if the royalties not credited to your account exceed the amount, if any, by which your account is in a debit position, then we will, after your request and at your expense, and if we are able to do so, deposit such excess royalties to your credit in the applicable foreign currency in a foreign depository. Deposit as aforesaid shall fulfill our obligations under this Agreement as to record sales to which such royalty payments are applicable.

(c)  With respect to records sold through any direct mail or mail order distribution method, excepting only a straight mail order purchase plan offered by advertisement appearing in a print publication affiliated with us or owned, controlled or affiliated with Time Warner, Inc., but otherwise including, without limitation, record club distribution, whether or not such record club is affiliated with us, the royalty payable in connection therewith shall be the lesser of (A) one-half (1/2) of our net earned royalty receipts in respect of reported sales through such channels or (B) one-half (1/2) of the Basic U.S. Singles Rate, applicable Basic U.S. LP Rate, applicable Basic Foreign Singles Rate, or applicable Basic Foreign LP Rate, as the case may be.  No royalties shall be payable with respect to records given away as "bonus" or "free" records as a result of joining a record club or plan or of purchasing a required number of records or with respect to records received by members of any such club operation either in an introductory offer in connection with joining such club or upon recommending that another join such club operation, provided, however, that for the purposes hereof, the number of non-royalty bearing club records shall not exceed fifty (50%) percent of the total number of records distributed through such means.  We shall not distribute the Packages through retail outlets in conjunction with "special" advertisements on radio or television (as opposed to normal radio or television campaigns) without your prior written consent and approval, which consent and approval you are free to grant or withhold in your sole discretion.  However, in the event that at some future time you should grant consent and approval for such a "special" radio or television advertising campaign, then you and we hereby agree that the royalty payable to you hereunder for retail sales in conjunction with such "special" radio or television advertising campaigns shall be as set forth in "(A)" or "(B)", as applicable, of this subparagraph 3(c).  For the sake of clarity, it is acknowledged and agreed that no radio or television advertising in connection with the promotion and sale of the 2 CD Package (as such term is hereinabove defined) shall be considered "special advertising", and that all sales in conjunction therewith shall bear full royalties unless otherwise agreed in writing.  We shall not manufacture the 2 CD Package after March 31, 1991, without your prior written consent and approval, which consent and approval you

- 5 -

(7-A-09742) 4881C/180C

are free to grant or withhold in your sole discretion.  The preceding sentence shall not be deemed to preclude or restrict the advertising, promotion, distribution, or sale of the 2 CD Package after March 31, 1991.

(d)   Notwithstanding anything contained herein, with respect to records in digital audio tape form ("DAT"), the royalty rate payable shall be seventy-five (75%) percent of the Basic U.S. Singles Rate, applicable Basic U.S. LP Rate, applicable Basic Foreign Singles Rate, or applicable Basic Foreign LP Rate, as the case may be.

(e)   The royalty rate payable for records sold to the United States government, its subdivisions, departments and agencies, and to educational institutions and libraries shall be the otherwise applicable basic U.S. rate and shall be based upon the retail list price (Post Exchange list price where applicable) of such records, provided that if our selling price to such customers is less than our normal stated wholesale price to our United States distributors, the royalty rate therefor shall be reduced proportionately.

(f)   No royalties shall be payable in respect of: (i) records given away or furnished on a "no-charge" basis to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with us, which records do not exceed 300 non-royalty bearing Singles out of every 1,000 Singles distributed and 200 non-royalty bearing LPs out of every 1,000 LPs distributed; (ii) such additional "no-charge" records distributed during short term special promotions or marketing campaigns, which such records do not exceed the limits set forth in subparagraph 3(f)(i) above plus an additional ten (10%) percent of the total number of records distributed; (iii) records given away or sold at below stated wholesale prices for promotional purposes to disc jockeys, record reviewers, radio and television stations and networks, motion picture companies, music publishers, our employees, you, or other customary recipients of promotional records or for use on transportation facilities; (iv) records sold as scrap, salvage, overstock or "cut-outs"; (v) records sold below cost; (vi) "sampler" records intended for free distribution to automobile purchasers and containing not more than two (2) masters subject hereto.  No royalties shall be payable on any sales by our licensees until payment has been received by us in the United States.

(g)   As to records sold at a discount to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with us, in lieu of the records given away or furnished on a "no-charge" basis as provided in subparagraphs 3(f)(i) and (ii) above, the

- 6 -

(7-A-09742) 4881C/180C

applicable royalty rate otherwise payable hereunder with respect to such records shall be reduced in the proportion that said discount wholesale price bears to the usual stated wholesale price, provided that said reduction in the applicable royalty rate does not exceed the percentage limitations set forth in subparagraphs 3(o)(i) and (ii) above.

(h)   The royalty rates provided for in this Paragraph 3 shall be applied against the retail list price (less our container deductions, excise taxes, duties and other applicable taxes) for ninety (90%) percent of records sold which are paid for and not returned.  The term the "retail list price" as used in this Agreement shall mean (i) for records sold in the United States, the manufacturer's suggested retail price in the United States and (ii) for records sold outside the United States, the manufacturer's suggested retail price in the country of manufacture or sale, as we are paid.  In those countries where a manufacturer's suggested retail price is not utilized, the generally accepted retail price shall be utilized.  In computing sales, we shall have the right to deduct all returns made at any time and for any reason.

(i)   Our container deductions shall be a sum equal to: (A) ten (10%) percent of the retail list price for records in disc form (other than compact-disc records), (B) twelve and one-half (12-1/2%) percent of the retail list price for records in disc form (other than compact-disc records) in "double-fold" jackets or covers or in jackets which contain an insert or any other special elements, (C) twenty (20%) percent of the retail list price for records in analog pre-recorded tape form, and (D) twenty-five (25%) percent of the retail list price for compact-disc records, records in digital pre-recorded tape form, and any other form or configuration of record or form of package, container or box other than as described herein.  Subparagraph 3(i)(B) shall apply, if at all, only to the 2 CD Package in vinyl disc form.

4.   Intentionally omitted.

5.   Statements as to royalties payable hereunder shall be sent by us to you within sixty (60) days after the expiration of each calendar quarter for the preceding quarterly period ending February 28, May 31, August 31 or November 30.  Concurrently with the rendition of each statement, we shall pay to you all royalties shown to be due by such statement.  No statements need be rendered by us for any such quarterly period for which there are no sales of Packages hereunder.  All payments shall be made to the order of Superhype Tapes Ltd. and shall be sent to the address first above written.  We shall be entitled to maintain a single account with respect to all Packages and records derived therefrom.  We may

- 7 -

(7-A-09742) 4881C/180C

maintain reasonable reserves, however, we agree that regarding such reserves: (i) with respect to LPs in tape configurations and compact-disc configurations, each base reserve as initially established shall not exceed twenty-five (25%) percent of records shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to ten (10%) percent and (ii) with respect to LPs in vinyl disc configurations and to Singles in all configurations, each base reserve as initially established shall not exceed thirty-five (35%) percent of such records shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to ten (10%) percent. We shall fully liquidate each base reserve within four (4) years from the date that such base reserve was established. At such time as a reserve is liquidated, it shall be deemed to be a sale in the period in which it was liquidated. Notwithstanding the foregoing, in those countries in which we or our licensee(s) do not accept returns, a reserve will not be maintained pursuant to this Paragraph 5 in respect of applicable sales. You shall be deemed to have consented to all accountings rendered by us hereunder and said accountings shall be binding upon you and not subject to any objection by you for any reason unless specific objection, in writing, stating the basis thereof, is given to us within five (5) years after the date rendered, and after such written objection, unless suit is instituted within one (1) year after the date upon which we notify you that we deny the validity of the objection.

6.    You shall have the right at your sole cost and expense to appoint a Certified Public Accountant who is not then currently engaged in an outstanding audit of us to examine our books and records as same pertain to sales of Packages subject hereto and records derived therefrom as to which royalties are payable hereunder, provided that any such examination shall be for a reasonable duration, shall take place at our offices during normal business hours on reasonable prior written notice and shall not occur more than once in any calendar year.

7.    Before any payments are made to you by us under this Agreement, and from time to time thereafter upon our request, you will complete, execute and deliver to us a completed certificate (in the form then prescribed by the United States Internal Revenue Service) sufficient to permit you to claim the benefit of an exemption from withholding of United States income tax under the applicable income tax treaty. If this certificate is not so completed, executed and delivered, or if the exemption is not available or ceases to be effective for any reason, it is understood and agreed that we will withhold income taxes in accordance with the requirements of the laws of the United States.

- 8 -

(7-A-09742) 4881C/180C

8.    (a)    All notices to you may be served upon you or your representative personally, by prepaid telegram, or by depositing the same, postage prepaid, in any mail box, chute, or other receptacle authorized by the United States Postal Service for mail, addressed to you at your address first above written.  We will undertake to send a courtesy copy of each notice sent to you to George R. Fearon, Esq., at Phillips, Nizer, Benjamin, Krim & Ballon, 40 West 57th Street, New York, New York 10019-4001, but our failure to send such courtesy copy will not constitute a breach of this Agreement or impair the effectiveness of the notice concerned.

(b)    All notices to us shall be in writing and shall be sent postage prepaid by registered or certified mail, return receipt requested, and addressed to our address first above written with a simultaneous copy sent in the same manner to Mayer, Katz, Baker & Leibowitz, P.C., 75 Rockefeller Plaza, New York, New York 10019.

9.    (a)    It is understood and agreed that mechanical royalties for sales in the United States and Canada in respect of the musical compositions embodied in the Packages and records derived therefrom shall be computed and paid by us in the same manner and at the same royalty rate, if any, as heretofore computed and paid by us in respect of recordings embodying the performances of said musical compositions by "LED ZEPPELIN".

(b)    In the event the 4 CD Package shall have net sales, full priced as initially released, through normal retailer channels in the United States in excess of 200,000, but less than 400,000, royalty-bearing copies, the total aggregate mechanical royalties payable to Flames of Albion in respect of each such copy, if any, shall be increased in the total amount of Eight ($.08) Cents, but only with respect to those net sales, full priced as initially released, through normal retailer channels in the United States, in excess of 200,000, but less than 400,000 royalty bearing copies of the 4 CD Package.

(c)    In the event the 4 CD Package shall have net sales, full priced as initially released, through normal retailer channels in the United States in excess of 399,999 royalty-bearing copies, the total aggregate mechanical royalties payable to Flames of Albion in respect of each such copy, if any, shall be increased in the total amount of Sixteen ($.16) Cents, but only with respect to those net sales, full priced as initially released, through normal retailer channels in the United States, in excess of 399,999 royalty bearing copies of the 4 CD Package.

(d)    All mechanical royalties which are payable shall be

- 9 -

(7-A-09742) 4881C/180C

paid solely on the basis of one hundred (100%) percent of net royalty-bearing records sold for which you are paid royalties pursuant to Paragraph 3 hereof, provided however, that subparagraph 3(h), referring to ninety (90%) percent, shall not apply to mechanical royalties.

(e)   It is further understood and agreed that as to musical compositions embodied in the Packages not heretofore released by us and as to the musical composition "Babe I"m Gonna Leave You" we shall pay mechanical royalties for sales in the United States and Canada at the full statutory rate in accordance with all of the terms and conditions of the then current Harry Fox Agency mechanical license form agreement at the date of release.

(f)   In respect of sales outside the United States and Canada, mechanical royalties shall be computed and paid in accordance with general practices then prevailing in each country.

(g)   The foregoing shall not be construed to amend or modify any other agreement, nor shall it constitute a waiver by any party to any such other agreement of any rights, interests or remedies therein or thereunder.

10.   (a)   It is expressly understood and agreed that the royalties as above set forth in Paragraph 3 hereof shall constitute full and complete compensation to you and to all other third parties, in respect of the recordings comprising the Packages and records derived therefrom, and are in lieu of any other royalties of other payments or compensation which might otherwise be payable to you or to any other third party, in respect of the recordings comprising the Packages and records derived therefrom, by reason of any other agreement or otherwise.   You shall be solely responsible for and shall pay all monies becoming payable to Jimmy Page, Robert Plant, John Paul Jones and the Estate of John Bonham, the BBC, and BBC Enterprises, and their heirs, successors or assigns, and parties claiming through any of them, in respect of sales of the Packages or records derived therefrom.   You agree that any monies paid by us to the BBC, BBC Enterprises or any other above identified third party in respect of sales of the Packages or records derived therefrom shall be deducted from royalties otherwise payable to you pursuant to this Agreement.

(b)   You warrant and represent that no materials, or any use thereof, will violate any law or infringe upon or violate the rights of any third party.   "Materials", as used in this subparagraph 10(b) shall include without limitation (i) all musical compositions and other material contained on recordings subject hereto, and (ii) all other materials, ideas, other intellectual properties or elements furnished or selected by you and contained in or used in connection with the Packages or records derived therefrom, or the packaging, sale, distribution, advertising,

- 10 -

(7-A-09742)  4881C/180C

publicizing or other exploitation thereof.

(c)   You agree to indemnify us and hold us harmless from and against all liablity, loss, damage, cost or expense including without limitation reasonable legal fees, paid or incurred by us by reason of any breach or failure of your representations or warranties hereunder.   Pending the determination of any claim involving such breach or failure, we may withhold payments hereunder in an amount reasonably related to the value of such claim.   No settlement of any claim for which you may be required to indemnify us shall be made by us without your prior written consent.

11.   For the purposes of this Agreement, the following definitions shall apply:

(a)   "Single" - A record embodying thereon two (2) masters.

(b)   "Maxi-single" - A record emboding thereon not more than four (4) masters.

(c)   "Records", "phonograph records", "recordings" and "sound recordings" - All forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for home use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, electrical, mechanical, magnetic or any other medium or device embodying sound alone.

12.   This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof.   No modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon us unless confirmed by a written instrument signed by an officer of the corporation.   No modification or amendment of this Agreement shall be binding upon you unless confirmed by a written instrument signed by you or your representative.

13.   Subject to subparagraphs 9(e) and 10(a) hereof, nothing contained in this Agreement shall be deemed to constitute an amendment to or modification of any other existing agreement in respect of the recordings and/or musical compositions subject hereto, all of the terms and conditions of all of such other agreements being hereby expressly ratified and confirmed.

14.   This Agreement shall be deemed to have been made in the State of New York and its validity, construction, performance and breach shall be governed by the laws of the State of New York applicable to agreements made and to be wholly performed therein. All parties hereto agree to submit to the jurisdiction of the

- 11 -

(7-A-09742)  4881C/180C

Federal or State courts located in New York City in any action which may arise out of this Agreement and said courts shall have exclusive jurisdiction over all disputes between or among any parties hereto pertaining to this Agreement and all matters related thereto. In this regard, any process in any action or proceeding commenced in the courts of the State of New York arising out of any claim, dispute or disagreement under this Agreement may, among other methods, be served upon you by delivering or mailing the same, via registered or certified mail, addressed to you at the address provided herein for notices to you; any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of New York. Nothing contained herein shall constitute a waiver of any other remedies available to us. Nothing contained in this Paragraph 14 shall preclude us from joining any party hereto in an action brought by a third party against us in any jurisdiction, although our failure to join any such party in any such action in one instance shall not constitute a waiver of any of our rights with respect thereto, or with respect to any subsequent action brought by a third party against us.

15. This Agreement shall not become effective until executed by all parties.

Very truly yours,

ATLANTIC RECORDING CORPORATION

By:_____
                CFO/SR. V.P

ACCEPTED AND AGREED:

SUPERHYPE TAPES LTD.

By:_____

SWAN SONG INC.

BY:_____
                    President

JIMMY PAGE

X_____

ROBERT PLANT

_____

JOHN PAUL JONES

ESTATE OF JOHN BONHAM

By:_____        TRUSTEE

- 12 -

(7-A-09742) 4881C/180C

**Exhibit 6**

**AGREEMENT** at New York City, New York, as of this 18 day of April, 1991, by, between and among the following parties:

**ATLANTIC RECORDING CORP.**, 75 Rockefeller Plaza, New York City, New York, 10019 ("Atlantic" herein); and

**SUPERHYPE TAPES LIMITED**, c/o Joan Hudson & Co., 91 Tabernacle Street, London, England EC2A 4BA ("STL" herein); and

**SWAN SONG, INC.**, 35 Lake Shore Drive, Copake, New York 12516 ("SSI" herein); and

**STEVENS H. WEISS**, ESQ., 166 Cleft Road, Mill Neck, New York 11769 ("Weiss" herein).

**DEFINITIONS:**
For the purposes of this agreement the following definitions shall apply:

**Box Set:** An assemblage of 52 previously released and 2 previously unreleased recordings of LED ZEPPELIN, remastered by Jimmy Page in the summer of 1990 and marketed by Atlantic throughout the world since October 1990 in a single 4 CD package product called a "4 Compact Disc Set" (identified as Product #7-82144-2 in the United States) and as a 2 CD set or "2 Pack" containing 26 of the above remastered recordings (see below) in various territories outside the United States and Canada.

**Two-Pack:** An assemblage of 26 of the master recordings contained in the Box Set currently offered outside the United States and Canada in a single package of two LPs, CDs or Audio Cassettes.

**Compilation Album:** An Album consisting wholly of Led Zeppelin recordings from the Catalog (as defined below), including any so-called "Best Of" or "Greatest Hits" Albums.

**Compilation-Plus Album:** An Album consisting primarily of Led Zeppelin recordings from the Catalog (as defined below) with one or more non-Catalog records (as defined below).

**Led Zeppelin:** A band consisting of Jimmy Page, Robert Plant, John Paul Jones and the late John Bonham.

**The Catalog:**    The previously released recordings of Led Zeppelin owned and controlled by Atlantic as provided in various agreements between and among STL and SSI and Atlantic prior to May 29, 1990, and any other master recordings heretofore recorded by, delivered to or made for Atlantic for release or potential release as phonograph records by Atlantic.    For the purposes of this agreement the definition of the Catalog does not include the master recordings in the album "The Song Remains the Same" or which were recorded for the motion picture of the same name.

**Non-Catalog Recordings:**    Recordings of the audio portion of any Led Zeppelin performance made for television, radio, reference or copyright purposes and not heretofore delivered to, made for, or intended for delivery to Atlantic Records for inclusion in the Catalog or for release or potential release as phonograph records by Atlantic.

**The Weiss Assignment:**    All documents (including those dated November 1, 1968, December 4, 1969, December 5, 1969, May 8, 1974 and March 15, 1978) heretofore delivered by STL and SSI to Atlantic instructing Atlantic and SSI to remit to Weiss certain moneys resulting from the distribution of the Catalog.

**The Box Set Agreement:**    A written instrument executed between STL and Atlantic dated May 29, 1990 and countersigned by Swan Song, Inc., Jimmy Page, Robert Plant, John Paul Jones and the Estate of John Bonham, a copy of which is being delivered to Weiss herewith, and any subsequent amendments thereto that are not in violation of the limitations set forth in Paragraph VIII below.

**WHEREAS**, a dispute to be described below has arisen amongst the parties concerning the meaning and operative effect of certain documents heretofore executed between and among the parties, and

**WHEREAS**, Weiss has heretofore received directly from Atlantic and SSI, as provided in the Weiss Assignment, regular payments of record royalties based upon sales by Atlantic of the Catalog and

**WHEREAS**, on or about May 29, 1990, STL, with the express approval of SSI, entered into the Box Set Agreement with Atlantic permitting Atlantic to manufacture and sell the Box Set upon the terms set forth therein, and included in such terms is an obligation on the part of Atlantic to pay STL various royalties thereon, and

**WHEREAS**, Atlantic has thereafter manufactured and distributed for sale said Box Set, and

**WHEREAS**, Weiss has demanded that Atlantic and SSI pay to him, in accordance with Weiss's interpretation of the Weiss Assignment, not less than 5% of any moneys due STL or SSI from Atlantic by reason of Atlantic's distribution of the Box Set, and

**WHEREAS**, STL and SSI have disagreed with Weiss's interpretation of the Weiss Assignment and have requested Atlantic to reject Weiss's claim to any royalties from distribution of the Box Set, and

**WHEREAS**, Atlantic is desirous of assisting STL, SSI and Weiss to resolve their dispute without litigation and publicity, and

**WHEREAS**, all parties wish to settle their respective conflicting claims and to establish herein a formula that will both determine Weiss's entitlement to payments based upon the sales of the Box Set to date and in the future and will resolve, retroactive to the royalty quarter beginning September 1, 1990, any issues as to the amount of royalties payable to Weiss from Atlantic's continuing sales of the Catalog,

**NOW, THEREFORE**, the parties agree as follows:

I.   STL and SSI hereby irrevocably instruct and authorize Atlantic to pay to Steve Weiss, and Atlantic agrees to pay, simultaneously with each payment of STL's royalties pursuant to the Agreement, a sum equal to 3.5% of any sum to which STL heretofore has, presently is, or hereinafter shall be entitled pursuant to the terms of the Box Set Agreement, retroactive to the initial release of the Box Set and simultaneously with all such payments due STL thereunder. [Reimbursement of costs (i.e. limited to actual costs approved by, and reimbursed by Atlantic) shall not be deemed payments with respect to which Weiss is entitled to payment hereunder.]   The first such payment to Weiss shall be made at the time of execution hereof, or as soon as possible after the execution hereof and shall be for the quarterly periods commencing September 1, 1990 and December 1, 1990, less all moneys heretofore advanced to Weiss by Atlantic on account thereof.   Each such payment to Weiss shall be accompanied by a copy of the royalty statement delivered by Atlantic to STL for the identical period.

II.   Atlantic will charge STL's royalty account with 71.428% of each payment of royalties on the Box Set remitted to Weiss (i.e., STL will retain 97.5% of its gross entitlement and neither STL nor SSI shall be responsible for any additional amount paid by Atlantic to Weiss to fulfill the payment required by Paragraph I above).

III.   The formula in Paragraphs I and II above for determining Weiss's share of royalties on the Box Set shall also apply to all advances to STL of such royalties and to any releases of the Box Set in additional territories, if any, and to any future re-releases of the Box Set, on CD, Cassette or LP or any other device for the reproduction of sound recordings now known or hereafter devised (e.g. DAT).   In addition, if Atlantic shall at any time in the future pay any money to STL or SSI, as royalties or otherwise, other than for **reimbursements of costs** (i.e. only

actual out-of-pocket costs approved by and reimbursed by Atlantic), for the right to release other Compilation Albums or Compilation-Plus Albums, Atlantic shall pay Weiss the same share thereof [but in the instance of Compilation-Plus Albums proportionately reduced on a ratio of Non-Catalog titles to total titles] as is provided in Paragraphs I and II above, and the warranty set forth for Weiss's benefit in Paragraph V below shall be deemed automatically applicable to any such other Compilation or Compilation-Plus Album(s). [For the avoidance of misunderstanding, should Atlantic ever (A) release any Led Zeppelin recordings derived from Non-Catalog masters, or (B) license any Led Zeppelin master recordings for commercials, TV broadcast, Motion Pictures or Videos, provided that no such release or licensing shall be presently permitted in any recording agreement between Atlantic and either STL or SSI, Weiss shall have no right to royalties or any other interest therein.]

IV.   The term "royalties" as used herein shall not include moneys customarily paid by Atlantic to publishers and writers of music for negotiated or compulsory licenses to record and reproduce copyrighted musical compositions on sound recordings (i.e., so-called copyright or publishing royalties), payments to the American Federation of Musicians Trust/Special Payments Fund or reimbursements of costs (i.e. limited to actual out-of-pocket costs approved by and reimbursed by Atlantic).

V.   STL, SSI and Atlantic collectively and severally warrant and represent to Weiss that the Agreement contains all terms and conditions under which Atlantic may distribute the Box Set now and in the future; that it is the only Agreement relating to the Box Set and that neither Led Zeppelin nor STL nor SSI nor anyone affiliated with any of them has received, will receive or is entitled to receive, directly or indirectly, any consideration relating to Atlantic's right to distribute or otherwise exploit the Box Set except as expressly set forth in the Agreement.

VI.   Weiss acknowledges receipt of a copy of the Agreement and of all statements of sales and royalties heretofore rendered by Atlantic to STL with respect to the Box Set. Weiss will continue to receive duplicates of any instruments which may amend the Agreement in the future and of all such royalty statements relating to the Box Set.   Upon execution hereof Atlantic will account to Weiss for the royalties to which he is entitled by reason of the various royalty directions and adjustments that are herein made retroactive to September 1, 1990, and remit to Weiss the sum to which he is thereby entitled.

VII.   Atlantic, SSI and Weiss agree that the Weiss Assignment is hereby amended retroactive to the quarter beginning September 1, 1990, by increasing Weiss's aggregate entitlement to royalties on Atlantic's continuing distribution of the Catalog by twenty (20%) percent.  Said increase shall be borne entirely by Atlantic without charging either STL or SSI directly or indirectly therefor.   For the avoidance of misunderstanding, Weiss's entitlement to royalties from Atlantic and SSI on continuing sales of the Catalog under the Weiss Assignment will be, commencing as of September 1, 1990, in the aggregate, 120% of Weiss's former entitlement thereunder; Atlantic and SSI shall continue to calculate Weiss's royalties thereon in the same manner as in Atlantic's statements to date, but increased by 20%.

If Atlantic agrees to increase SSI's or STL's royalty on the Box Set in the future, SSI and STL will cause Weiss to receive out of their increased royalty his share of any such increase.  Moreover, if Atlantic, as a corporate policy, increases the royalty rate on CD sales (above the current policy of 75% of the otherwise applicable royalty), Weiss shall be entitled to the benefit of such increase.   For the avoidance of doubt, Atlantic will continue to pay Weiss with respect to the albums "In Through The Out Door" and "Coda" and STL will have no further obligation to do so.   STL will continue to pay Weiss with respect to the album "The Song Remains The Same" and Atlantic will have no obligations to Weiss with respect thereto.

VIII.   Neither SSI nor STL nor Atlantic shall individually or in concert do anything which will have the effect of reducing or diverting either Weiss's proportionate share of STL's royalties from sales of the Box Set as provided in Paragraphs I and II above or from sales of any additional Compilation or Compilation-Plus Albums as provided in Paragraph III above or any royalties to which Weiss may be entitled pursuant to The Weiss Assignment. Notwithstanding the foregoing, Weiss acknowledges that as between himself on the one hand and the other parties to this agreement on the other, they and not Weiss shall have the sole and exclusive control over all Led Zeppelin recordings, including those in the Catalog.

IX.   Atlantic will continue to distribute the Catalog in the normal course of its business until such time as Atlantic determines, in its sole discretion, that it is no longer economically feasible or desirable for Atlantic to do so.

X.   All terms of this settlement will remain confidential and no party shall publicly announce or otherwise disclose the terms set forth herein.

XI.   This Agreement shall be interpreted and enforced as an Agreement made and intended to be fully-performed within the State of New York.

XII.  This Agreement is complete, and as such it supersedes any and all prior representations and understandings between and among the parties, oral or written, unless expressly recited herein.

XIII. Each person signing below warrants that he or she has the authority to execute this instrument on behalf of, and to bind to the terms hereof, the persons or entities identified below by their respective signatures.

WHEREFORE the parties have affixed their signatures on multiple counterparts hereof and intend that each such executed counterpart shall be deemed an original executed Agreement effective as of the date first appearing above.

_____
for ATLANTIC RECORDING CORP.

_____
for SUPERHYPE TAPES LIMITED

_____, President
for SWAG SONG INC.

_____
STEVENS H. WEISS, ESQ.

**Exhibit 7**

RB (5-B-59071) PT2406

**ATLANTIC RECORDING CORPORATION**
**75 Rockefeller Plaza**
**New York, New York 10019**

Dated: as of August 4, 1995

Stevens H. Weiss, Esq.
Stevens H. Weiss, P.C.
Twelve Gables
166 Cleft Road
Mill Neck, New York 11765

Dear Mr. Weiss:

Reference is hereby made to all rights, title and interests of any and all kinds which Stevens H. Weiss, Stevens H. Weiss, P.C., and/or each of their respective successors, assigns, licensees, designees, heirs, trustees, executors or administrators, or any other third parties claiming by or through Stevens H. Weiss or Stevens H. Weiss, P.C. and/or each of their respective successors, assigns, licensees, designees, heirs, trustees, executors or administrators (all of the foregoing being hereinafter individually and jointly referred to as "you" and "your") presently or may hereafter own or may own, or claim, may claim, or have claimed, known and unknown, and asserted and unasserted, in or to the recordings hereinafter individually and collectively defined and referred to as the "Led Zeppelin Recordings", including without limitation all agreements, arrangements, rights, interests and choses in action of any and all kinds which exist or may exist, known and unknown, asserted and unasserted, by which you presently or hereafter are or may be, or have claimed, or may claim, to be entitled to receive accountings, payments or compensation or consideration of any other kind from any party including without limitation Atlantic Recording Corporation ("we", "us" and "our") and Superhype Tapes, Ltd., by reason of the distribution, sale or other exploitation by us, or our parents, subsidiaries, affiliates, assigns, licensees or designees (all of the foregoing being hereinafter sometimes individually and jointly referred to as "Atlantic") of recordings of any kind, in any medium, format, configuration or technology now known or hereafter devised, heretofore or hereafter recorded, embodying the performances of Robert Plant and/or Jimmy Page and/or John Paul Jones and/or John Bonham, and/or any other individuals utilizing in any way the name, identity, trademarks, service marks, logotypes or any other

- 1 -

(5-B-59071) PT2406

identifying characteristics or properties relating to or associated with "LED ZEPPELIN" (such identifying characteristics and properties being hereinafter individually and collectively referred to as the "Led Zeppelin Identifications"), PROVIDED SAME were initially commercially released by Atlantic after September 1, 1994 (hereinafter individually and collectively referred to as the "Led Zeppelin Recordings"). Without limitation of the generality of the foregoing, but for the avoidance of ambiguity, (a) you expressly acknowledge that any recording embodying the performances of Jimmy Page and/or Robert Plant with or without any other performers does not in and of itself per se entail the use of any of the Led Zeppelin Identifications, or constitute a "Led Zeppelin Recording" as such term is hereinabove defined, notwithstanding the fact that you have heretofore asserted claims to the contrary, and (b) we expressly acknowledge and agree that any recording solely embodying the joint featured performances of Jimmy Page, Robert Plant, John Paul Jones and John Bonham does in and of itself per se entail the use of the Led Zeppelin Identifications and constitutes a "Led Zeppelin Recording" as such term is hereinabove defined. All such rights, title and interests in and to such recordings, accountings, payments, compensation and other consideration, and all such agreements, arrangements, rights, interests and choses in action as above-described are hereinafter individually and jointly referred to as the "Purchased Properties".

     When signed by you and by us, this shall constitute an agreement between you and us as follows:

     1.     For good and valuable consideration receipt whereof is hereby acknowledged, and in consideration of the payments to you set forth in Paragraph 3 of this Agreement, you hereby sell, assign, transfer and convey to us all of the Purchased Properties throughout the world and in perpetuity, free and clear of any and all claims, rights or interests of any party.

     2.     (a)  You hereby warrant and represent that you are the sole owner of all of the Purchased Properties, and all of the rights, title and interests therein and thereto, and that you have not sold, assigned, transferred, hypothecated or encumbered in any way, or suffered to be sold, assigned, transferred, hypothecated or encumbered in any way, any of the Purchased Properties, or any rights, title and interests therein and thereto, herein sold to us.

          (b)  You hereby indemnify and shall hold Atlantic safe and harmless from and against any and all damages, losses, liabilities, costs and expenses (including without limitation court costs and

- 2 -

(5-B-59071)  PT2406

attorneys' fees) arising from or relating to any breach of, or claim inconsistent with the foregoing representations and warranties.

     3.    In consideration of the foregoing, we shall make an initial payment to you as follows:

          (a)   At such time as you shall request but not earlier than January 2, 1996, the sum of Two Hundred Seventy-Five Thousand ($275,000.00) Dollars (hereinafter referred to as the "Initial Payment").

          (b)   In the event that Atlantic hereafter initially commercially releases a record album solely comprised of recordings not previously released in any form for sale to the public exclusively embodying the joint featured performances of Robert Plant and Jimmy Page with or without other performers (the "Next Qualifying Album"), which may or may not bear or utilize any of the Led Zeppelin Identifications, we shall make payment to you of the following applicable amount (the "Next Album Amount"), less the amount of the Initial Payment.  For the purposes of the preceding sentence of this subparagraph 3(b), the term "a record album solely comprised of recordings not previously released in any form for sale to the public" shall mean a record album derived from and embodying master sound recordings not less than seventy-five (75%) percent of which have not been previously released in any form for sale to the public.

          (i)    If the Next Qualifying Album consists solely of studio recordings embodying only the joint featured performances of Robert Plant and Jimmy Page with or without other performers, not bearing or utilizing any of the Led Zeppelin Identifications, and not containing a full-length performance of the musical composition "Stairway To Heaven", the Next Album Amount shall be Two Hundred Seventy-Five Thousand ($275,000.00) Dollars;

          (ii)   If the Next Qualifying Album consists solely of studio recordings embodying only the joint featured performances of Robert Plant and Jimmy Page with or without other performers, not bearing or utilizing any of the Led Zeppelin Identifications, and containing a full-length performance of the musical composition "Stairway To Heaven", the Next Album Amount shall be Three Hundred Seventy-Five Thousand ($375,000.00) Dollars, less the amount of the Stairway Album Payment (as such term is hereinafter defined in Paragraph 4) paid to you, if any;

          (iii)  If the Next Qualifying Album consists solely of studio recordings embodying only the joint featured performances of Robert Plant and Jimmy Page with or without other performers, bearing or utilizing any of the Led Zeppelin Identifications, and not containing a full-length performance of the musical composition

- 3 -

(5-B-59071) PT2406

"Stairway To Heaven", the Next Album Amount shall be Three Hundred Fifty Thousand ($350,000.00) Dollars;

(iv)   If the Next Qualifying Album consists solely of studio recordings embodying only the joint featured performances of Robert Plant and Jimmy Page with or without other performers, bearing or utilizing any of the Led Zeppelin Identifications, and containing a full-length performance of the musical composition "Stairway To Heaven", the Next Album Amount shall be Four Hundred Fifty Thousand ($450,000.00) Dollars, less the amount of the Stairway Album Payment (as such term is hereinafter defined in Paragraph 4) paid to you, if any;

(v)   If the Next Qualifying Album consists solely of so-called "live" recordings (i.e., recordings not recorded in a studio) embodying only the joint featured performances of Robert Plant and Jimmy Page with or without other performers, not bearing or utilizing any of the Led Zeppelin Identifications, and not containing a full-length performance of the musical composition "Stairway To Heaven", the Next Album Amount shall be Two Hundred Seventy-Five Thousand ($275,000.00) Dollars;

(vi)   If the Next Qualifying Album consists solely of "live" recordings embodying only the joint featured performances of Robert Plant and Jimmy Page with or without other performers, not bearing or utilizing any of the Led Zeppelin Identifications, and containing a full-length performance of the musical composition "Stairway To Heaven", the Next Album Amount shall be Three Hundred Seventy-Five Thousand ($375,000.00) Dollars, less the amount of the Stairway Album Payment (as such term is hereinafter defined in Paragraph 4) paid to you, if any;

(vii)   If the Next Qualifying Album consists solely of "live" recordings embodying only the joint featured performances of Robert Plant and Jimmy Page with or without other performers, bearing or utilizing any of the Led Zeppelin Identifications, and not containing a full-length performance of the musical composition "Stairway To Heaven", the Next Album Amount shall be Three Hundred Twenty-Five Thousand ($325,000.00) Dollars;

(viii) If the Next Qualifying Album consists solely of "live" recordings embodying only the joint featured performances of Robert Plant and Jimmy Page with or without other performers, bearing or utilizing any of the Led Zeppelin Identifications, and containing a full-length performance of the musical composition "Stairway To Heaven", the Next Album Amount shall be Four Hundred Twenty-Five Thousand ($425,000.00) Dollars, less the amount of the Stairway Album Payment (as such term is hereinafter defined in Paragraph 4) paid to you, if any;

- 4 -

(5-B-59071) PT2406

(ix)    If the Next Qualifying Album consists solely of "live" recordings embodying only the joint featured performances of Robert Plant, Jimmy Page, John Paul Jones and John Bonham exclusively, and recorded during the term(s) of the agreement(s) pursuant to which we owned the exclusive rights to the recording services of Robert Plant, Jimmy Page, John Paul Jones and John Bonham, collectively professionally known as "LED ZEPPELIN", and not containing a full-length performance of the musical composition "Stairway To Heaven", the Next Album Amount shall be Three Hundred Fifty Thousand ($350,000.00) Dollars;

(x)     If the Next Qualifying Album consists solely of "live" recordings embodying only the joint featured performances of Robert Plant, Jimmy Page, John Paul Jones and John Bonham exclusively, and recorded during the term(s) of the agreement(s) pursuant to which we owned the exclusive rights to the recording services of Robert Plant, Jimmy Page, John Paul Jones and John Bonham, collectively professionally known as "LED ZEPPELIN", and containing a full-length performance of the musical composition "Stairway To Heaven", the Next Album Amount shall be Four Hundred Fifty Thousand ($450,000.00) Dollars, less the amount of the Stairway Album Payment (as such term is hereinafter defined in Paragraph 4) paid to you, if any;

(c)   (i)    In the event the Next Qualifying Album shall have net sales through normal retailer channels in the United States in excess of 1,500,000 royalty-bearing copies, for which we pay a royalty (or give a credit against advances previously taken therefor) to performers or other parties from whom we derive the rights to sell said Album, we shall pay you a further additional payment of Fifty Thousand ($50,000.00) Dollars;

(ii)    In the event that the Next Qualifying Album shall have net sales through normal retailer channels in the United States in excess of 2,000,000 royalty-bearing copies, for which we pay a royalty (or give a credit against advances previously taken therefor) to performers or other parties from whom we derive the rights to sell said Album, we shall pay you a further additional payment of Fifty Thousand ($50,000.00) Dollars.

(iii)  At your request, we shall furnish to you extracts of the agreement(s) by which we derive the rights to sell the Next Qualifying Album.

(d)   All payments to you under this Agreement shall be by check to the order of Stevens H. Weiss, unless we are instructed otherwise by you.

(e)   The Next Album Amount shall be payable within thirty (30) days following Atlantic's initial commercial release of the Next

- 5 -

(5-B-59071) PT2406

Qualifying Album.  Our failure to make such payment within said thirty (30) day period shall not be deemed a breach of this Agreement unless within sixty (60) days after the expiration of said thirty (30) day period you serve written notice thereof on us and we fail to make such payment within thirty (30) days after receipt of such notice.

4.   (a)   (i)   For the purposes of this Paragraph 4, the following definitions shall apply:

(A)   The "Composition" - The musical composition entitled "Stairway To Heaven".

(B)   "Plant/Page Master(s)" - Masters exclusively embodying the joint featured performances of Robert Plant and Jimmy Page with or without other performers, which may or may not bear or utlilize any of the Led Zeppelin Identifications.

(C)   "Old Plant/Page Master(s)" - Plant/Page Master(s) released in any form for sale to the public prior to the date hereof.

(D)   "New Plant/Page Master(s)" - Plant/Page Master(s) not released in any form for sale to the public prior to the date hereof.

(E)   "Old Composition Master(s)" - Old Plant/Page Master(s) embodying a full-length performance of the Composition.

(F)   "New Composition Master(s)" - New Plant/Page Master(s) embodying a full-length performance of the Composition.

(G)   "Stairway Album" - An album:

(1)   Which is not a Next Qualifying Album; and

(2)   Which is initially commercially released by us after the date hereof and prior to our initial commercial release of the Next Qualifying Album, if any; and

(3)   Which is comprised of recordings solely derived from and embodying exclusively Plant/Page Masters more than twenty-five (25%) percent, but less than seventy-five (75%) percent of which are Old Plant/Page Masters; and

(4)   Which contains a New Composition Master and/or an Old Composition Master.

- 6 -

(5-B-59071) PT2406

(H)    "Stairway Album Payment" - A payment to you in the amount of One Hundred Thousand ($100,000.00) Dollars, payable, if at all, in accordance with the terms and conditions hereinafter set forth.

(ii)    Notwithstanding anything to the contrary set forth in subparagraph 4(a)(i)(G)(3), in the event that an album meets all of the requirements of subparagraph 4(a)(i)(G) except that it is comprised of recordings solely derived from and embodying exclusively Plant/Page Masters more than seventy-five (75%) percent of which are Old Plant/Page Masters, said album shall nevertheless constitute a Stairway Album if it contains a New Composition Master.

(iii)    In the event that we hereafter initially commercially release a Stairway Album, we shall make payment to you of the Stairway Album Payment pursuant and subject to the terms and conditions of this Paragraph 4.

(iv)    If the Stairway Album embodies an Old Composition Master for which a royalty is otherwise payable to you by reason of pre-existing agreement(s), and the Stairway Album Payment is payable to you hereunder, said Stairway Album Payment shall constitute an advance against and shall be recoupable from royalties otherwise payable to you by reason of the use of said Old Composition Master in said Stairway Album. Notwithstanding the foregoing, if the Stairway Album embodies a New Composition Master instead of, or in addition to an Old Composition Master, and the Stairway Album Payment is payable to you hereunder, said Stairway Album Payment shall constitute a nonrecoupable payment to you, without prejudice to your continued right to receive royalties due you in respect of the Old Composition Master embodied thereon, if any.

(b)    The Stairway Album Payment shall be payable within thirty (30) days following Atlantic's initial commercial release of the Stairway Album. Our failure to make such payment within said thirty (30) day period shall not be deemed a breach of this Agreement unless within sixty (60) days after the expiration of said thirty (30) day period you serve written notice thereof on us and we fail to make such payment within thirty (30) days after receipt of such notice.

(c)    For the avoidance of doubt or ambiguity, it is expressly acknowledged and agreed that there shall be only one (1) Stairway Album, if any, i.e. the first record album hereafter commercially released by us prior to our initial commercial release of the Next Qualifying Album, if any, meeting the definition of the Stairway Album as above set forth, and there shall only be one (1) Stairway Album Payment payable to you, if any.

- 7 -

(5-B-59071)  PT2406

09/03

(d)   For the further avoidance of doubt or ambiguity, it is further expressly acknowledged and agreed that under no circumstances shall we ever be obligated to produce, record, acquire or release in any manner the Next Qualifying Album, nor shall we under any circumstances ever be obligated to produce, record, acquire or release in any manner the Stairway Album.

5.   (a)   For the purposes of this Agreement, the terms "records" and "recordings" shall mean all forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for home use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, magnetic recording tape, film, electronic video recordings and any other medium or device for the production of artistic performances manufactured or sold primarily for home use, juke box use or use on or in means of transportation, whether embodying (i) sound alone or (ii) sound synchronized with visual images, e.g. "sight and sound" devices.

(b)   (i)   For the purposes of this Agreement, the term "a full-length performance of the musical composition 'Stairway To Heaven'" shall constitute a performance of said composition in excess of two minutes twenty-eight seconds (2:28) in duration. Notwithstanding the foregoing, in the event that the Next Qualifying Album or Stairway Album contains a performance of "Stairway To Heaven" of two minutes twenty-eight seconds (2:28) or less in duration, and "Stairway To Heaven" is listed as a separate track on the album credits of the Next Qualifying Album or Staiway Album, as initially commercially released in the United States, or there is a label or similar device affixed to the album packaging as initially commercially released in the United States to the effect that the composition "Stairway To Heaven" is included in said album as a separate track, then said album shall be deemed to contain "a full-length performance of 'Stairway To Heaven'".

(ii)   For the avoidance of doubt or ambiguity, it is expressly acknowledged and agreed that for the purposes of this subparagraph 5(b), the term "listed as a separate track" shall not apply to a performance of "Stairway To Heaven" of two minutes twenty-eight seconds (2:28) or less in duration in or as part of a medley or performance of another composition or compositions or other material where the title "Stairway To Heaven" is not separately listed in such album credit, or label or similar device, apart from the other composition(s) comprising said medley(ies) or such other composition(s) in or as part of which "Stairway To Heaven" was performed.

6.   (a)   You and Atlantic expressly acknowledge and agree that the Purchased Properties do not include rights you have to receive accountings and payments in respect of the distribution, sale or other

- 8 -

(5-B-59071)  PT2406

exploitation by us of recordings embodying the joint performances of Robert Plant, Jimmy Page, John Paul Jones and John Bonham initially released by us prior to September 1, 1994, in any medium, format, configuration or technology now known or hereafter devised, all of which rights are hereby ratified and confirmed, and shall remain in full force and effect.

(b)   Without limitation of the generality of the foregoing, we and you expressly acknowledge and agree that this Agreement is not intended to and shall not be construed so as to eliminate, reduce or delay any accountings or payments which may now or hereafter be payable to you in respect of the distribution, sale or other exploitation by Atlantic of the following albums or other records reproduced and/or derived from master sound recordings (as same may be enhanced, supplemented, replaced or changed as existing or new technologies may require and/or as may be desirable) embodied on (i) the following albums: "LED ZEPPELIN", "LED ZEPPELIN II", LED ZEPPELIN III", "LED ZEPPELIN IV" (also known as "ZOSO"), "HOUSES OF THE HOLY", "IN THROUGH THE OUT DOOR", "PHYSICAL GRAFFITI", "PRESENCE", "CODA", and (ii) the recordings to which the agreement between and among Atlantic Recording Corporation, Superhype Tapes Limited, Swan Song, Inc. and Stevens H. Weiss, Esq., dated as of April 18, 1991, is applicable.

(c)   For the avoidance of doubt or ambiguity, the terms "you", "your", "we" and "Atlantic" have the same meanings in this Paragraph 5 as such terms have throughout this Agreement which meanings are defined on the first page of this Agreement.

Sincerely,

ATLANTIC RECORDING CORPORATION

By:_____

PHILIP WILD
SR. VICE PRESIDENT
BUSINESS & LEGAL AFFAIRS

ACCEPTED AND AGREED TO:

_____
STEVENS H. WEISS

STEVENS H. WEISS, P.C.

By:_____

- 9 -

(5-B-59071) PT2406

RB (2-A-59902) RB0761

## PROMISSORY NOTE

$60,000.00

New York, New York
August 7, 1995

FOR VALUE RECEIVED, the undersigned, Stevens H. Weiss, Esq., residing at Twelve Gables, 244 Cleft Road, Mill Neck, New York 11765 (hereinafter "Maker"), promises to pay to or to the order of Atlantic Recording Corporation, at 75 Rockefeller Plaza, New York, New York 10019, the principal sum of Sixty Thousand ($60,000.00) Dollars together with interest on the unpaid balance at the rate of six (6%) percent per annum from the date hereof. Such principal and interest to be paid on demand at any time after January 2, 1996 according to the terms and conditions set out below.

This Note may be prepaid in whole or in part, at any time or times, without additional interest or penalty, but with interest to the date of such prepayment.

Presentation, notice of presentation, protest and demand are hereby expressly waived by the undersigned.

This Note may not be modified or terminated orally.

This Note is made and delivered in, and shall be governed by the laws of the State of New York, applicable to instruments made and to be performed in such State.

In the event any action shall be brought for the enforcement and collection hereof, Maker hereby promises to pay all costs and expenses thereof including reasonable attorneys' fees and disbursements.

_____
Stevens H. Weiss

**Exhibit 8**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

STEVENS WEISS,                                    Case No. 04-60910-CIV-MARTINEZ

      Plaintiff,

vs.

ATLANTIC RECORDING CORPORATION,

      Defendant.

_____/

## PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff STEVENS WEISS, answers the Defendant's First Set of Interrogatories as follows:

1.      Identify all facts upon which you base your contention in paragraph 7 of the Amended Complaint that "ATLANTIC agreed to pay WEISS a sum equal to 4.2% of any money it paid to Led Zeppelin, (Superhype Tapes, Ltd. or Swan Song, Inc.) as royalties or otherwise, for the right to release 'compilation' or 'compilation-plus albums'".

**Response:      Plaintiff and Defendant entered into a written agreement dated April 18, 1991 (herein, "1991 Agreement") which is attached to the Amended Complaint wherein Defendant agreed to these terms.   Plaintiff clarified in his deposition that he is contending to be entitled to 3.5%, not 4.2%.**

2.      Identify all facts upon which you base your contention in paragraph 10 of the Amended Complaint that *How The West Was Won* and *Led Zeppelin* were "'catalogue' within the meaning of the 1991 Agreement" attached to the Amended Complaint as Exhibit C.

**Response:      The recordings were made during the applicability of Atlantic's 1968 recording contract with Led Zeppelin, Michael Kushner testified that these recordings were owned by Atlantic and could not be released under any other label, the recordings**

N224560.3

were registered by Atlantic with the Library of Congress as "work made for hire", the recordings are of professional quality, professionally recorded (and in some cases professionally filmed), they are multi-track recordings, they contain stereo audience tracks, the members of Led Zeppelin wore the same outfits over different nights during filming at Earl's Court and Knebworth, Led Zeppelin professionally recorded multiple shows at the same venue or in the same proximity containing the same songs, Stevens Weiss was consulted about whether Atlantic should pay for the recordings made at Knebworth as well as tax issues concerning the expenses for the Knebworth recordings, Jimmy Page made statements concerning How the West Was Won in Led Zeppelin Interview Disc 2003 which demonstrate an intention to release the recordings when they were made and made statements in an interview with VH-1 concerning the Royal Albert Hall which demonstrate an intention to release the recordings when they were made, Led Zeppelin commonly made reference recordings directly from the mixing board, two of the songs recorded at Royal Albert Hall were in fact delivered to Atlantic prior to 1991 and released on Coda in 1982, the studio versions of Communication Breakdown, Over the Hills and Far Away and Traveling Riverside Blues are contained on the DVD, the recordings made at Royal Albert Hall, Earl's Court and Knebworth were considered as possible live audio releases in place of BBC Sessions, the recordings contained in *How The West Was Won* and relevant portions of *Led Zeppelin* were not released on television or radio and the recordings subject to this case were in fact delivered to and released by Atlantic.

Plaintiff has made a reasonable effort to include all facts but reserves the right to include and rely upon additional facts at trial in support of its contentions.

3.      Identify all facts upon which you base your contention in paragraph 12 of the Amended Complaint that the 1995 Agreement attached as Exhibit D to the Amended Complaint "left intact all WEISS' other rights including those defined in the above referenced 1991 agreement and assignments to WEISS."

Response: The terms of the 1995 Agreement.

4.      Identify all facts upon which you base your contention in paragraph 15 of the Amended Complaint that "[i]n the case of a multiple-disc release such as the 'BBC Sessions', each disc sold qualifies as one 'royalty bearing copy'".

Response:      The provision, "royalty bearing copies" is vague, the agreement was negotiated at a time when it was not known what the next release would be, sales targets contained in the 1995 Agreement were negotiated on projected sales and revenue generated by a single disc release, Atlantic would enjoy a windfall and would obtain additional profit in addition to what was bargained for in the agreement should each disc sold in BBC

Sessions not count towards the sales targets, each disc would generate a royalty payment if packaged and sold separately and Atlantic applied for certification with the RIAA for "BBC Sessions" on a per-disc basis.

Plaintiff has made a reasonable effort to include all facts but reserves the right to include and rely upon additional facts at trial in support of its contentions.

5.      Identify all facts upon which you base your contention in paragraph 19 of the Amended Complaint that "WEISS is entitled to a percentage of" advances, royalties or other payments made to Led Zeppelin for the use of its recordings in film and commercials "in accordance with his irrevocable assignments to any advances, royalties or other payments made to Led Zeppelin in connection with the ATLANTIC recording agreement".

WEISS received assignments from Led Zeppelin and entered into an agreement with Atlantic in March, 1978 wherein these rights were provided.  All assignments and contracts referred to herein have been produced.

Plaintiff has made a reasonable effort to include all facts but reserves the right to include and rely upon additional facts at trial in support of its contentions.

6.      Identify all facts upon which you base your contention in paragraph 23 of the Amended Complaint that Atlantic breached the 1991 Agreement by failing to pay Weiss 4.2% of any payments made to Led Zeppelin in connection with *How the West Was Won* and *Led Zeppelin* after demand was made.

Response:     Weiss demanded payment from Atlantic and Atlantic did not pay Weiss.

7.      Identify all facts upon which you base your contention in paragraph 26 of the Amended Complaint that Atlantic breached the 1995 Agreement.

- 3 -

**Response:**     Weiss demanded payment from Atlantic and Atlantic did not pay Weiss.

8.     Identify all facts upon which you base your contention in paragraph 29 of the Amended Complaint that Atlantic has breached the Assignments "by failing to pay WEISS a percentage of the money paid by ATLANTIC to Led Zeppelin for the commercial use of the recordings of 'That's the Way,' 'Misty Mountain Hop,' 'Tangerine,' 'Bron-Yr-Aur,' and 'The Rain Song,' in the film and soundtrack for 'Almost Famous' and for the use of the recording of 'Rock and Roll', in commercials endorsing Cadillac automobiles."

**Response:**     Weiss demanded payment from Atlantic and Atlantic did not pay Weiss.

9.  State the amount of damages you contend you have suffered and how you have calculated those damages.

**Response:**     Plaintiff is owed 3.5% of any payments made to Led Zeppelin (or its furnishing companies) made in connection with the release, "How the West Was Won" in compact disc or audio DVD format plus pre-judgment interest. This number is subject to increase upon additional payments made to Led Zeppelin not shown in the documents provided in response to discovery to date. The royalty rate is derived from the 1991 agreement. A specific breakdown of the damage calculation for this release is as follows:

| Statement Date/Type | Amount | Allocation @ 0% | Weiss' Royalty @ 3.5% |
|---|---|---|---|
| 8/31/03/Advance | $1,500,000 | - | $52,500 |
| 2/29/04/Advance | $1,500,000 | - | $52,500 |
| 2/29/04/Royalty Payment | $65,895.44 | - | $2,306.34 |
| 5/31/04/Royalty Payment | $76,785.28 | - | $2,687.48 |

| | | | |
|---|---|---|---|
| 8/31/04/Royalty Payment | $49,091.08 | - | $1,718.19 |
| 11/30/04/Royalty Payment | $201,114.45 | - | $7,039.01 |
| Total through 11/30/04 Statement | $3,392,886.25 | - | $118,751.02 |

Plaintiff is owed 3.5% of any payments made to Led Zeppelin (or its furnishing companies) made in connection with the release "Led Zeppelin DVD", subject to allocation between the titles which are Catalogue and non-Catalogue. This number is subject to increase upon additional payments made to Led Zeppelin not shown in the documents provided in response to discovery to date. The royalty rate is derived from the 1991 agreement.

Paragraph III of the 1991 agreement provides that in the instance of a Compilation-Plus Album, Weiss' share is to be proportionately reduced on a ratio of Non-Catalogue titles to total titles. Using Atlantic's Supplemental Answers to Interrogatories, there are a total of 40 titles on the Led Zeppelin DVD. (Plaintiff is not counting the two interviews as titles). Plaintiff contends that there are 29 Catalogue titles of the 40. (This includes all of the Royal Albert Hall, L.A., Earl's Court, Knebworth, Communication Breakdown, Over the Hills and Far Away and Traveling Riverside Blues titles but does not include Madison Square Garden).

Accordingly, Weiss' share is based on 29/40 (72.5%) of the unallocated amount. A specific breakdown of the damage calculation for this release is as follows:

| Statement Date/Type | Amount | Allocation @ 72.5% | Weiss' Royalty @ 3.5% |
|---|---|---|---|
| 8/31/03/DVD Advance | $2,000,000 | $1,450,000 | $50,750 |
| 2/29/04/DVD Advance | $1,750,000 | $1,268,750 | $44,406 |
| 5/31/04/DVD Advance | $250,000 | $181,250 | $6,343 |
| 8/31/04/Royalty Payment | $792,790 | $574,722 | $20,115 |
| 11/30/04/Royalty Payment | $237,834 | $172,429 | $6,035 |
| Total through 11/30/04 Statement | $5,030,624 | $3,647,151 | $127,649 |

Plaintiff is owed $100,000 plus pre-judgment interest based on the 1995 agreement between Plaintiff and Defendant concerning target sales for the "BBC Sessions" compact discs.

With regard to the recordings used in the Almost Famous film, soundtrack and General Motors Commercial, the damages are calculated from the Plaintiff's percentage applicable to the album in which the particular song is contained as is more fully described in the assignments provided to Plaintiff by Led Zeppelin and assumed by Atlantic in the agreement between Atlantic, Superhype Tapes, Swan Song and Stevens Weiss dated March 15, 1978. Plaintiff is also entitled to pre-judgment interest. This information is based on the documents supplied by Atlantic and assumes that such information was complete and accurate.

For example, "Rock and Roll", used in the GM Commercial is from Led Zeppelin's Fourth Album. Plaintiff's assignment which is applicable to that album is in the amount of 6.82% of all advances, royalties or other payments made to Led Zeppelin (or its furnishing companies) pursuant to the 1968 recording contract between Atlantic and Led Zeppelin.

A specific breakdown of the damage calculation for this release is as follows:

| Date | Amount | Song | Album | Royalty % | Total |
|------|--------|------|-------|-----------|-------|
| 5/02 | $62,500 | "That's the Way" | LZ III | 6.82% | $4,262.50 |
| 5/02 | $.50 | "Tangerine" | LZ III | 6.82% | $0 |
| 5/02 | $62,500 | "Misty Mountain Hop | LZ IV | 6.82% | $4,262.50 |
| 5/02 | $62,500 | "Rain Song" | Houses of the Holy | 6.82% | $4,262.50 |
| 5/02 | $62,500 | "Bron-y-aur" | Physical Graffiti | 9.03% | $5,643.75 |
| 3/03 | $416,687.50 | "Rock and Roll" | LZ IV | 6.82% | $28,418.09 |
| 6/03 | $3,214.29 | "That's the Way" | LZ III | 6.82% | $219.21 |
| 6/04 | $291,648.05 | "Rock and Roll" | LZ IV | 6.82% | $19,890.40 |
| 6/04 | $416,687.50 | "Rock and Roll" | LZ IV | 6.82% | $28,418.09 |

**Total**                                                    **$95,337.04**

STATE OF FLORIDA
COUNTY OF BROWARD

The foregoing was acknowledged before me this __1st__ day of __June__, 2005 by __Stevens Weiss__, who is personally known to me or who produced __FL ID__ as identification and who (did) (did not) take an oath.

W200·788·25·092·0

_Rosellen Lawrence_
Notary Public

My commission expires: 5-7·2006

ROSELLEN LAWRENCE
NOTARY
My Comm. Expires
May 7, 2006
No. DD115379
PUBLIC
STATE OF FLORIDA

- 7 -

**Exhibit 9**

This AGREEMENT made and entered into as of this / ˢᵗ day of JUNE , 1982 by and between ATLANTIC RECORDING CORPORATION, 75 Rockefeller Plaza, New York, New York 10019 ("COMPANY") and SUPERHYPE TAPES LTD., c/o Joan Hudson & Co., 31-33 High Holborn, London, WC1V 6AX, England ("TAPES").

WHEREAS, TAPES is entitled by agreement to the exclusive recording services of ROBERT ANTHONY PLANT (p/k/a Robert Plant and hereinafter called "ARTIST") throughout the world; and

WHEREAS, TAPES desires to produce recordings by the ARTIST for COMPANY upon the terms and conditions of this agreement, and to grant to COMPANY the exclusive right to market same throughout the world upon the terms and conditions of this agreement, and COMPANY desires to acquire such right;

NOW, THEREFORE, in consideration of the premises, it is hereby agreed as follows:

1.  (A)  COMPANY hereby engages TAPES to produce and deliver to COMPANY masters embodying the individual performances of ARTIST, and TAPES hereby accepts such engagement and agrees to deliver masters embodying the individual performances of ARTIST exclusively to COMPANY during the term hereof as provided for in this agreement.

(B)  The rights herein granted to COMPANY shall be for the world ("Territory").

2.  The term of this agreement shall commence on the date first set forth above and shall end upon delivery by TAPES to

COMPANY of the last of the Five (5) albums provided for in Paragraph 3 hereof.

3.   During the term of this agreement, ARTIST shall record and TAPES shall produce and deliver to COMPANY masters the equivalent in playing time of Five (5) LPs of the individual performances of ARTIST.  Each such LP will be released by COMPANY and/or COMPANY's licensees on the Swan Song label (as provided in Paragraph 6 (D)) in all countries throughout the world wherein COMPANY and/or COMPANY's licensees shall sell or distribute COMPANY's product.

4.   TAPES shall have complete and absolute technical and artistic control and approval of every aspect of the production and recording of each master comprising each of Five (5) LPs, including but not limited to, the materials to be recorded (but TAPES agrees that such material shall not have been previously recorded by ARTIST), the selection and performances of the musicians accompanying ARTIST whose performances are embodied in the masters, the performances by ARTIST, the person (who may be ARTIST himself) or persons (including ARTIST) who shall act as producer, the designation of recording studios, the mixing, mastering, equalizing, editing and sequencing of the masters, the selection of which, if any single(s) shall be released from each LP (and the packaging of each album.) *deleted*

Each master shall be technically satisfactory to COMPANY in accordance with generally applicable U.S. industry standards.

TAPES shall deliver to COMPANY a two-track stereo tape for each master. Each master shall be completed, fully edited and mixed prior to delivery to COMPANY, in the proper form for the production of the parts necessary for the manufacture of commercial phonograph records. Each LP shall be delivered by TAPES to COMPANY at COMPANY's office either in London or in New York. Each LP and the packaging thereof shall be manufactured, sold and distributed by COMPANY "as is" delivered by TAPES.

5. TAPES warrants and agrees that except as otherwise set forth in this agreement:

(A) During the Term, ARTIST shall not as an individual artist perform for the purpose of making records for anyone other than TAPES or COMPANY for distribution in the Territory and neither TAPES nor ARTIST shall authorize the use of ARTIST's name, likeness, or other identification for the purpose of distributing, selling, advertising or exploiting records of the individual performances of ARTIST for anyone other than COMPANY in the Territory.

(B) ARTIST shall not perform any selection recorded hereunder for the purpose of making records for anyone other than COMPANY for distribution in the Territory for a period of five (5) years after the initial date of release of the respective record containing such selection ("Re-recording Restriction").

(C) Should ARTIST make any sound recording during the Term for motion pictures, television, electrical transcriptions or any other medium or should ARTIST after the Term perform for any

such purpose any selection recorded hereunder to which the Re-recording Restriction then applies, ARTIST will do so only pursuant to a written agreement prohibiting the use of such recordings, directly or indirectly, for record purposes in the Territory.  TAPES or ARTIST shall furnish to COMPANY a copy of the provisions of any such contract relating to the foregoing.

6.  Provided that COMPANY shall make the payments to TAPES provided for in this agreement and except as otherwise set forth in this agreement, all masters recorded hereunder by ARTIST during the Term and all reproductions derived therefrom, together with the per-formances embodied thereon, shall be the property of COMPANY for the world free from any claims whatsoever by TAPES or ARTIST or any per-son deriving any rights or interests from TAPES or ARTIST.  Without limiting the generality of the foregoing, COMPANY and its designee(s) shall have the exclusive and unlimited right to all the results and proceeds of ARTIST's recording services rendered hereunder during the Term, including, but not limited to, the exclusive, unlimited and per-petual rights throughout the world:

(A)  To manufacture, advertise, sell, lease, license, distribute or otherwise use or dispose of, in any or all fields of use by any method now or hereafter known, records embodying the mas-ters recorded by ARTIST hereunder during the Term, all upon such terms and conditions as COMPANY may elect, or at its discretion, to refrain therefrom, provided that no use or disposition may be made of such records that is not applicable to Atlantic's other top recording artists.

(B)   To use and publish and to permit others to use and publish ARTIST's name (including any professional name heretofore or hereafter adopted by ARTIST), photographs, likeness and biographical material concerning ARTIST for advertising and trade purposes in connection with all masters recorded by ARTIST hereunder during the Term, provided that no such photographs, likenesses or biographical material of ARTIST may be so used unless such photographs, likeness or biographical material has either been approved by TAPES or furnished by TAPES.

(C)   To obtain copyrights and renewals thereof in sound recordings (as distinguished from the musical compositions embodied thereon) recorded by ARTIST hereunder during the Term, in COMPANY's name as owner and employer-for-hire of such sound recordings.

(D)   To release records derived from masters recorded by ARTIST hereunder during the Term on the Swan Song label, for so long as Atlantic has the right to use the Swan Song label, and thereafter on either the Swan Song label if Swan Song shall agree to extend the time Atlantic may use such label in connection with such records, or if not on Atlantic's top line label.

(E)   To perform such records publicly and to permit public performances thereof by means of radio broadcast, or any other method now or hereafter known.

7.   COMPANY shall pay TAPES the following non-returnable sums which shall be deemed to be advances against and recoupable by

COMPANY out of all royalties thereafter becoming payable to TAPES pursuant to this agreement:

| MASTERS | ADVANCE TO BE PAID TO TAPES |
|---|---|
| (A)  The First LP | |
| (B)  The Second LP | |
| (C)  The Third LP | |
| (D)  The Fourth LP | |
| (E)  The Fifth LP | |

Payment of the advances for the Five (5) LPs shall be made by COMPANY to TAPES as follows:  Payment of the entire advance for the First LP shall be made by COMPANY to TAPES upon execution of this agreement or upon delivery of the First LP, whichever shall first occur.  Payment of the advance for each of the remaining Four (4) LP's shall be made by COMPANY to TAPES as follows:          Per-cent of the advance for each LP shall be made by COMPANY to TAPES within ten (10) days after TAPES notifies COMPANY in writing that it has commenced the recording of such LP and the remaining                shall be paid by COMPANY to TAPES upon the delivery by TAPES to COMPANY of such LP.

With respect to the production and recording of the masters and all sales of recordings derived from said masters, TAPES shall be solely responsible for and shall pay all monies becoming payable to ARTIST and to all other parties rendering services in con-nection with the production and recording of the masters.

8.   COMPANY shall pay TAPES for the rights granted herein and for the services and masters furnished hereunder the following royalties in respect of records subject to this agreement:

(A)   A royalty of                              in respect of retail sales in the United States of the First and Second LP and singles derived or to be derived therefrom.

(B)   A royalty of                              in respect of retail sales in the United States of the Third, Fourth and Fifth LP and all singles derived or to be derived therefrom.

(C)   The royalty rates hereinabove set forth in Sub-Paragraphs 8 (A) and (B) shall each be hereinafter referred to as a "Basic U.S. LP Rate".

(D)   A royalty o1                              in respect of retail sales in Canada of the First and Second LP and singles derived or to be derived therefrom.

(E)   A royalty of '                            in respect of retail sales in Canada of the Third, Fourth and Fifth LP and singles derived or to be derived therefrom.

(F)   A royalty of Fif:                         in respect of retail sales in the United Kingdom of the First and Second LP and singles derived or to be derived therefrom.

(G)   A royalty of                              in respect of retail sales in the United Kingdom of the Third, Fourth and Fifth LP and singles derived or to be derived therefrom.

(H)   A royalty of                              in respect of retail sales of the First and Second LP and singles derived or to be derived therefrom in all other countries wherein records are sold or distributed by a WEA owned company.

(I)   A royalty of                              in respect of retail sales of the Third, Fourth and Fifth LP and singles derived or to be derived therefrom in all other countries wherein records are sold or distributed by a WEA owned company.

(J)   A royalty of                              in respect of retail sales of the First and Second LP and singles derived or to be derived therefrom in all other countries wherein records are sold or distributed by a WEA licensee.

(K)   A royalty of                              in respect of retail sales of the Third, Fourth and Fifth LP and singles derived or to be derived therefrom in all other countries wherein records are sold or distributed by a WEA licensee.

(L)   The royalty rates hereinabove set forth in Sub-Paragraphs 8 (D) through       shall each be hereinafter referred to as a "Basic Foreign LP Rate".

(M)   Royalties in respect of sales of records outside the United States shall be computed in the same national currency as COMPANY is accounted to and shall be paid to TAPES at the same rate of exchange as COMPANY is paid.  It is understood that such royalties will not be due and payable until payment thereof is received by COMPANY in the United States but COMPANY shall make all reasonable

efforts to have such funds promptly remitted to COMPANY.  In the event that COMPANY is unable for a period of six (6) months after payment is due to COMPANY to obtain payment in the United States in United States dollars and elects to accept payment outside of the United States in a foreign currency, or even if COMPANY does not so elect, COMPANY will, upon request of TAPES, deposit such royalties payable to TAPES in an account designated by TAPES in the currency received by COMPANY in the country where such funds are located and COMPANY shall notify TAPES as to the date of such deposit and the amount thereof.

(N)  With respect to records sold (i) through any direct mail or mail order distribution method, including, without limitation, record club distribution, (ii) by distribution through retail outlets in conjunction with special advertisements on radio or television in the form of K-Tel or similar packages, or (iii) by any combination of the methods set forth above, the royalty payable in connection there-with shall be (a)                   of COMPANY's net earned royalty receipts in respect of reported sales through such channels or

⅟           of the applicable Basic U.S. LP Rate or the Basic Foreign LP Rate, as the case may be, whichever is the basis upon which COMPANY is paid.  No royalties shall be payable with respect to records given away as "bonus" or "free" records as a result of joining a record club or plan or of purchasing a required number of records or with respect to records received by members of any such club operation either in an introductory offer in connection with joining such club or upon recommending that another join such club operation, provided,

however, that "free" or "bonus" records shall not exceed one such bonus or free record for each of ARTIST's records sold by such record club or pursuant to such record club plan.

(O)   The royalty rate payable for records sold to the United States government, its subdivisions, departments and agencies, and to educational institutions and libraries shall be the applicable Basic U.S. LP Rate except if the sales price to the above named shall be less than the normal sales price to retail outlets the royalty rate shall be reduced proportionately (but in no event shall the royalty rate be less than          of the applicable Basic U.S. LP Rate).

(P)   The royalty rate payable for records sold as "premiums" shall be          of the applicable Basic U.S. LP Rate or Basic Foreign Rate, as the case may be, and the retail list price for such records shall be deemed to be COMPANY's actual sales price, but no records of ARTIST may be sold as a premium without TAPES prior written consent.

(Q)   The royalty rate payable for records sold in the form of pre-recorded tape (whether reel-to-reel or cartridge) or any other form (other than disc), shall be the applicable royalty rate otherwise payable.

(R)   COMPANY shall, provided it shall first obtain TAPES prior written consent, have the right to license the masters to third parties for record use and/or all other types of use on a flat-fee basis.   COMPANY shall credit TAPES royalty account with          of the net amount received by COMPANY under each such license approved by TAPES.

(S)   As to records not consisting entirely of masters recorded and delivered hereunder, the royalty rate otherwise payable to TAPES hereunder with respect to sales of any such record shall be prorated by multiplying such royalty rate by a fraction, the numerator of which is the number of masters recorded and delivered hereunder embodied on such record and the denominator of which is the total number of masters embodied thereon.

8. (T)   No royalties shall be payable in respect of: (i) records given away or furnished on a "no-charge" basis to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with COMPANY, in connection with the sale of ARTIST's records hereunder; (ii) records given away or sold at below stated wholesale prices for promotional purposes of ARTIST's records hereunder to disc jockeys, record reviewers, radio stations and networks, music publishers, COMPANY's employees, TAPES, ARTIST or other customary recipients of promotional records or for use on transportation facilities; (iii) records sold as scrap, salvage, overstock or "cut-outs" but no such records may be sold prior to three (3) years after the term of this contract; (iv) records sold below cost for the purpose of advertising and promotion of ARTIST's records hereunder.

(U)   As to records sold at a discount to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with COMPANY, in connection with the sale of ARTIST's records hereunder, in lieu of records given away or furnished on a "no-charge" basis as provided in Sub-Paragraph 8 (T) above, the applicable royalty rate otherwise payable hereunder with respect to such records shall be reduced in the proportion that said discount wholesale price bears to the

usual stated wholesale price provided that the said reduction in the applicable royalty rate does not exceed the non-royalty bearing records percentage limitations then applicable to COMPANY's top recording artists.

(V)    Notwithstanding the provisions of Sub-Paragraphs (T) and (U) above, the "free goods" policy applicable to ARTIST's records hereunder shall in no event be less favorable to TAPES than the policy of COMPANY then applicable to COMPANY's top recording artists.

(W)    The royalty rates provided for in this Paragraph 8 shall be applied against the retail list price (less the container deductions set forth in Sub-Paragraph 8 (X), excise taxes, duties and other applicable taxes, if any) for Ninety                        of records sold which are paid for and not returned.  The retail list price for records sold in the United States shall be the manufacturer's suggested retail price in the United States.  For records sold outside the United States, the retail list price shall be the manufacturer's suggested retail price in the country of manufacture or sale, as COMPANY is paid. In those countries where a manufacturer's suggested list price is not utilized or permitted, the generally accepted retail price shall be utilized.  In computing sales, COMPANY shall have the right to deduct returns.

(X)    COMPANY's container deductions shall be:

(i) In the case of recordings sold outside of the United States, the actual deductions used by the WEA owned Company or COMPANY's licensee.

(ii) In the case of recordings sold in the

United States, the packaging deduction shall not exceed

per 12 inch 33-1/3 r.p.m. long play record; (b)

of the suggested retail list price or                    which-

ever is lower per pre-recorded tape.

(Y)  Coupling of any recordings hereunder with those of any other artist is prohibited; with respect to all recordings hereunder there shall be no "Best Of", "Greatest Hits" or any other compilation album, nor any radio or T.V. promotional album whether in the form of K-Tel or any other type package, nor any direct mail or mail order distribution (other than record club distribution) without the prior written consent of TAPES by its representative Peter Grant, which consent may be withheld for any reason.  These prohibitions shall survive delivery of all LPs provided for herein.

9.  Statements as to royalties payable hereunder shall be sent by COMPANY to TAPES within sixty (60) days after the expiration of each calendar quarter for the preceding quarterly period ending February 28, May 31, August 31 and November 30.  Concurrently with the rendition of each statement, COMPANY shall pay TAPES all royalties shown to be due by such statement, after deducting all payments made on behalf of TAPES, (but no payments shall be made on behalf of TAPES without its prior written consent) and all advances made to TAPES prior to the expiration of the applicable quarterly period.  No statements need be rendered by COMPANY for any such quarterly period after the expiration of the Term hereof for which there are no sales of records derived from masters hereunder.  All payments shall be made to the order of TAPES and shall be sent to TAPES at TAPES' address

first above written. COMPANY shall be entitled to maintain a single account with respect to all recordings subject to this agreement. COMPANY may maintain reasonable self-liquidating reserves to provide for returns of records shipped hereunder. A certified or chartered accountant representing TAPES may examine COMPANY's books and records at reasonable times during normal business hours insofar as same pertains to the subject matter of this agreement.

10. TAPES shall pay and be solely responsible for the payment of all recording costs for all masters recorded and produced hereunder. All recordings shall be produced by TAPES in accordance with the rules and regulations of all unions having jurisdiction. TAPES warrants that recordings made by it hereunder will not be made within the jurisdiction of the American Federation of Musicians or the American Federation of Television and Radio Artists unless TAPES and COMPANY otherwise agree.

11. (A) All notices to TAPES may be served upon a principal or officer of TAPES personally, by prepaid telegram, or by depositing the same postage prepaid, in any mail box, chute, or other receptacle authorized by the United States Postal Service for mail, addressed to TAPES at TAPES' address first above written with a simultaneous copy to Peter Grant, Horselunges Manor, Hellingly, Sussex, England and to Stevens H. Weiss, P.C., 444 Madison Avenue, New York, New York 10022.

(B) All notices to COMPANY shall be in writing and shall be sent postage prepaid by registered or certified mail, return receipt requested, and addressed to COMPANY's address first above written with a simultaneous copy to Mayer, Nussbaum, Katz & Baker, P.C., 75 Rockefeller Plaza, New York, New York 10019.

12.   With respect to any musical composition embodied in a record released by COMPANY hereunder, the publishing rights to which are owned or contro-led by TAPES or ARTIST, directly or indirectly, (i.e. controlled compositions) TAPES shall cause a mechanical license to be issued to COMPANY in the United States for each such musical composition at the statutory rate then prevailing for each record manufactured and sold.

13.   COMPANY reserves the right, at its election, to suspend the operation of this agreement for a period not exceeding six (6) months in any of the following contingencies provided that by reason of any such contingency COMPANY is materially hampered in the performance of its obligations under this agreement or its normal business operations are materially delayed or become impossible or commercially impracticable:   Act of God, fire, catastrophe, acts of government, its agencies or officers, any disagreement, order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting COMPANY or the record industry, delays in the delivery of materials and supplies, or any other similar cause beyond COMPANY's control.

14.   TAPES expressly acknowledges that ARTIST's services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach by TAPES or ARTIST of any material term, condition or covenant hereof, COMPANY

16.

will be caused irreparable injury.  TAPES expressly agrees that COMPANY shall be entitled to injunctive and other equitable relief, as permitted by law, to prevent such breach by TAPES or ARTIST which relief shall be in addition to any other rights or remedies available to COMPANY.

15.  TAPES warrants that TAPES and ARTIST are free to enter into this agreement and have the right to grant to COMPANY all of the services and rights herein granted, and that no prior contract or agreement of any kind entered into by TAPES or by the ARTIST, nor any prior performance by TAPES or by the ARTIST will interfere in any manner with the complete performance of this agreement by COMPANY, TAPES or ARTIST.

16.  TAPES warrants and represents that no materials, or any use thereof, will knowingly violate any law or knowingly infringe upon or violate the rights of any third party.  "Materials", as used in this Paragraph 16 shall include: (i) all Controlled Compositions, (ii) each name used by ARTIST in connection with masters recorded hereunder, and (iii) all other materials, ideas, other intellectual properties or elements furnished or selected by TAPES and contained in or used in connection with any masters recorded hereunder or the packaging, sale, distribution or other exploitation thereof.

17.  TAPES agrees to indemnify COMPANY and hold COMPANY harmless from and against all liability, loss, damage, cost or expense including reasonable legal fees, paid or incurred by COMPANY by reason of any breach or failure of TAPES' representations or war-

ranties hereunder.  Pending the determination of any claim involving such breach or failure, COMPANY may withhold payments hereunder in an amount reasonably related to the value of such claim.  No settlement of any claim for which TAPES may be required to indemnify COMPANY shall be made by COMPANY without TAPES' prior written consent.

18.  Wherever in this agreement TAPES' approval or consent is required COMPANY may require TAPES to formally give or withhold such approval or cosent by giving TAPES written notice requesting same and by furnishing TAPES with the information or material in respect of which such approval or consent is sought.  TAPES shall give COMPANY written notice of approval or disapproval within thirty (30) days after such notice is received by TAPES.  Unless TAPES shall give COMPANY written notice that it approves or consents it shall be conclusively deemed that such approval or consent has not been granted and has been disapproved.

19.  During the term, TAPES warrants and represents that ARTIST shall become and remain a member in good standing of any labor union with which the COMPANY may at any time have agreements lawfully requiring such union membership but ARTIST shall not be required to become a member of any American labor union unless ARTIST shall so render his services in the United States or otherwise so act as to lawfully require such union membership.

20.  Anything to the contrary herein contained notwithstanding, ARTIST's performances may be included in one or more original

sound track albums to be released, distributed or sold by a company or party other than COMPANY provided that TAPES has used its reasonable efforts to obtain for Atlantic the right to release, distribute and sell such album or albums.

21. For the purposes of this agreement, the following definitions shall apply:

(A) "Master" - The equivalent of a seven (7") inch 45 r.p.m. single-sided recording of not less than two and one-half (2-1/2) minutes of playing time intended for use in the manufacture and sale of records.

(B) "Single" - A seven (7") inch 45 r.p.m. double-sided record embodying thereon two (2) masters.

(C) "LP" - A twelve (12") inch 33-1/3 r.p.m. double-sided long-playing record of not less than thirty-five (35) minutes of playing time. Multiple sets which consist of more than one (1) LP intended to be released, packaged and sold together for a single overall price, shall be deemed to be the equivalent of two (2) LPs for the purposes of this agreement, but shall not be recorded or delivered hereunder without the mutual agreement of Ahmet Ertegun on behalf of COMPANY and Peter Grant on behalf of TAPES.

(D) "Records", "Phonograph Records", "Recordings" and "Sound Recordings" - All forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for home use, juke box use,

19.

or use on or in means of transportation, including, without limiting the foregoing, by electrical, mechanical, magnetic or any other medium or device embodying sound alone.

No rights whatsoever are granted by TAPES or ARTIST to COMPANY with respect to electronic video recordings or any other medium or device embodying sound synchronized with visual images, e.g. "sight and sound" devices. TAPES agrees that during the term hereof it shall not grant such rights to any other party. If Peter Grant on behalf of TAPES should during the term hereof determine that TAPES desires to grant to COMPANY rights to such sight and sound devices, the terms and conditions thereof shall be negotiated by Peter Grant on behalf of TAPES and Ahmet Ertegun on behalf of COMPANY and if such terms and conditions are mutually satisfactory to both parties such rights shall be granted upon the terms and conditions so negotiated.

(E)  "Delivery", "Deliver", or "Delivered" - The actual receipt by COMPANY of completed, fully mixed, leadered and edited masters, technically satisfactory to COMPANY as defined herein, comprising each LP and ready for COMPANY's manufacture of records, together with all materials, consents, approvals, licenses and permissions that may be required, other than for musical compositions that are not controlled compositions.

(F)  "Recording Costs" - Wages, fees, advances and payments of any nature made to or in respect of all musicians, vocalists, conductors, arrangers, orchestrators, engineers, producers, copyists,

etc.; all studio, tape, editing, mixing, mastering and engineering costs; all costs of travel, per diems, rehearsal halls, non-studio facilities and equipment, dubdown, rental and transportation of instruments; all costs occasioned by the cancellation of any scheduled recording session; and all other costs and expenses incurred in producing the master recordings hereunder which are then customarily recognized as recording costs in the recording industry.

(G)   "COMPANY" - Atlantic Recording Corporation, its licensees, lessees, affiliates and subsidiaries.

22.   This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof.  No modification, amendment, waiver, termination or discharge of this agreement, shall be binding upon COMPANY unless confirmed by a written instrument signed by an officer of COMPANY.  No modification, amendment, waiver, termination or discharge of this agreement shall be binding upon TAPES unless confirmed by a written instrument signed by an officer of TAPES.  A waiver by COMPANY of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.  A waiver by TAPES of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.  All of COMPANY's rights and remedies in this agreement shall be cumulative and none of them shall be in limitation of any other remedy or right available to COMPANY.  All of TAPES' rights and

remedies in this agreement shall be cumulative and none of them shall be in limitation of any other remedy or right available to TAPES. Should any provision of this agreement be adjudicated by a court of competent jurisdiction as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein.  It is agreed that all accountings and payments required herein, and all grants made herein, shall survive and continue beyond the expiration or earlier termination of this agreement.  No breach of this agreement by COMPANY shall be deemed material unless within thirty (30) days after TAPES learns of such breach, TAPES serves written notice thereof on COMPANY specifying the nature thereof and COMPANY fails to cure such breach, if any, within sixty (60) days after receipt thereof.  No breach of this agreement by TAPES shall be deemed material unless within thirty (30) days after COMPANY learns of such breach, COMPANY serves written notice thereof on TAPES specifying the nature thereof and TAPES fails to cure such breach, if any, within sixty (60) days after receipt thereof.

23.  This agreement shall be deemed to have been made in the State of New York and its validity, construction, performance and breach shall be governed by the laws of the State of New York applicable to agreements made and to be wholly performed therein.

22.

24.    This agreement shall not become effective until it
and the accompanying Artist Inducement letter are executed by all
parties.

IN WITNESS WHEREOF, the parties hereto have executed this
agreement on the day and year first above written.

ATLANTIC RECORDING CORPORATION

By _____

SUPERHYPE TAPES LTD.

By _____

Dated:  As of           , 1982

Atlantic Recording Corporation
75 Rockefeller Plaza
New York, New York 10019

Gentlemen:

Reference is made to a certain agreement of even date herewith between you and SUPERHYPE TAPES LTD. (hereinafter called "TAPES") relating to my exclusive services as an individual recording artist ("said agreement").

In order to induce you to enter into said agreement and to pay a good valuable consideration therefor, I hereby agree as follows:

1.  I hereby specifically guarantee the performance by TAPES of all of the warranties and representations and covenants made in said agreement.  I hereby make all of the warranties and representations made to you by TAPES in said agreement, grant you all of the rights and remedies therein granted to you and agree to perform all of the obligations therein undertaken to be performed for you and undertake to be bound thereby as though I was a party to said agreement.  I agree that you shall have the right in addition to any other remedies available to you at law or in equity or by reason of this agreement or said agreement to specifically enforce said agreement against me.  Written notice must be given to me within ten (10) days thereafter of any modification or waiver of the provisions of said agreement in order for you to enforce said agreement or this agreement against me.

2.   Without limiting any of the rights granted to you in the said agreement, I hereby grant you the right to use and publish and to permit others to use and publish my name, likeness and all biographical material concerning me for advertising or trade purposes in connection with the sale and exploitation of my records.  However, no photographs, likeness or biographical material may be so used unless same has either been approved by TAPES or furnished by TAPES.

3.   I agree that I will look solely to TAPES for the payment of all monies payable to me by reason of my rendering my services in accordance with said agreement, and I agree that you shall have no responsibility to me therefor whatsoever.  No breach by TAPES of any agreement or agreements which I may now or from time to time have with TAPES shall be sufficient cause for my failure or refusal to fully perform for you in accordance with the said agreement and this agreement.  Any dispute between TAPES and I shall in no way modify or curtail your obligation to make payments to TAPES under your agreement of even date and you and I agree that you shall continue to make such payments notwithstanding any such dispute.  Should TAPES fail or refuse to produce recordings by me for you pursuant to said agreement or if TAPES should cease to be entitled to my services for any reason during the term of said agreement, I shall render my services directly for you.

4.   During the term hereof, I agree to fully render my performances for you and TAPES in accordance with said agreement.  I further agree that except as otherwise provided for in said agreement

that during the term of said agreement I will as an individual artist exclusively render my performances for you in connection with the production of phonograph records, and I will not perform as an individual artist for any other person, firm or corporation other than you for the purpose of making phonograph records.

5.   It is agreed that my services for the purpose of recording phonograph records pursuant to said agreement and this agreement are of a special, unique and extraordinary character and that in the event of the breach of any material term hereof or of said agreement by me, I agree that you shall be entitled to injunctive relief, as permitted by law, in addition to any other rights or remedies available to you.

6.   I warrant and represent that neither this agreement nor said agreement nor any performance of mine thereunder shall knowingly be in violation of the rights of any third party.  I further warrant and represent that I have the right to enter into this agreement, and that I and TAPES have the right to grant you all of the rights granted in said agreement and in this agreement.

7.   I agree to indemnify you and hold you harmless from and against any liability, loss, damage, cost or expense including reasonable legal fees paid or incurred by you by reason of any material breach by me or TAPES or failure of the covenants, representations

or warranties contained herein or in said agreement. No breach of said agreement or this agreement shall be deemed material, unless within thirty (30) days after you learn of such breach, you serve written notice thereof on TAPES and me specifying the nature thereof and TAPES or I fail to cure such breach, if any, within sixty (60) days after receipt thereof.

8. The foregoing shall bind the undersigned individually.

Very truly yours,

_____
ROBERT ANTHONY PLANT

ACCPETED & AGREED TO:

ATLANTIC RECORDING CORPORATION

By_____

SUPERHYPE TAPES LTD

By_____

**Exhibit 10**

RB/kk (7-A-09882) 5270C/223C

Agreement made and entered into as of this _6TH_ day of _DECEMBER_, 1991 by and between ATLANTIC RECORDING CORPORATION of 75 Rockefeller Plaza, New York, New York 10019 ("COMPANY") and TROLCHARM LIMITED, an English corporation ("PRODUCTIONS") whose address is: c/o Joan Hudson & Co., 91 Tabernacle Street, London EC2A 4BA, England.

WHEREAS, ROBERT PLANT ("ARTIST") has entered into an agreement with PRODUCTIONS to render services as a recording artist exclusively to PRODUCTIONS, and PRODUCTIONS desires to produce recordings by ARTIST exclusively for COMPANY upon the terms and conditions of this Agreement, and

WHEREAS, COMPANY is in the business of exploiting, distributing and marketing records,

NOW, THEREFORE, in consideration of the premises, it is hereby agreed as follows:

1.    (a)   COMPANY hereby engages PRODUCTIONS to produce and deliver to COMPANY masters embodying the performances of ARTIST, and PRODUCTIONS hereby accepts such engagement and agrees to deliver masters embodying the performances of ARTIST exclusively to COMPANY during the term hereof and all extensions and renewals.

      (b)   The rights herein granted to COMPANY and the obligations of PRODUCTIONS and ARTIST shall be for the United States and Canada and their respective territories, possessions and military bases throughout the world ("Territory").

2.    The term of this Agreement (the "Term") shall be for a period commencing on the date hereof and continuing until nine (9) months following delivery to and acceptance by COMPANY of all masters required to be produced, recorded and delivered to COMPANY pursuant to this Agreement (the "Minimum Recording Commitment").

3.    (a)   During the Initial Period, ARTIST shall record and PRODUCTIONS shall produce and deliver masters the equivalent in playing time of four (4) LPs which shall constitute the Minimum Recording Commitment.

      (b)   PRODUCTIONS shall have complete and absolute technical and artistic control and approval of every aspect of the production and recording of each master comprising the Minimum Recording Commitment, including but not limited to the material to be recorded (but PRODUCTIONS agrees that such material shall be newly recorded in a studio and shall not have been previously recorded by ARTIST), the selection and performances of the musicians accompanying ARTIST whose performances are embodied on the masters, the performances by ARTIST, the person (who may be ARTIST himself) or persons (who may include ARTIST) who shall act as producer, the designation of

- 1 -

(7-A-09882) 5270C/223C

recording studios, the mixing, mastering, equalizing, editing and sequencing of the masters, the selection of single(s) released from each LP, if any.  Each master shall be subject to COMPANY's approval as technically satisfactory in accordance with then generally applicable United States industry standards.  PRODUCTIONS shall deliver to COMPANY a two-track stereo tape for each master.  Each master shall be completed, fully edited, mixed, leadered and equalized prior to delivery to COMPANY, in the proper form for the production of the parts necessary for the manufacture of commercial records.  Upon the request of COMPANY, PRODUCTIONS shall cause ARTIST to re-record any selection until a technically satisfactory master shall have been obtained.  Only masters delivered in full compliance with the provisions of this Agreement shall be applied in fulfillment of PRODUCTIONS and ARTIST's recording and delivery obligation and no payments shall be made to PRODUCTIONS in connection with any masters which are not in full compliance.  Each master shall be delivered to COMPANY at Atlantic Studios, 1841 Broadway, New York, New York 10023, or such other place as COMPANY may notify PRODUCTIONS in writing.  Each LP comprising the Minimum Recording Commitment shall be manufactured, distributed and sold by COMPANY as delivered to COMPANY on an "as is" basis.

(c)   The first LP required to be delivered during the Term shall be delivered to COMPANY within sixteen (16) months following commencement of the Term.  The second LP required to be delivered during the Term shall be delivered within thirty-two (32) months following the commencement of the Term or twenty-four (24) months following PRODUCTIONS' delivery to COMPANY in accordance with all of the terms and conditions of this Agreement of the first LP required to be deivered hereunder, whichever is later.  The third LP required to be delivered during the Term shall be delivered within forty-eight (48) months following the commencement of the Term or twenty-four (24) months following PRODUCTIONS' delivery to COMPANY in accordance with all of the terms and conditions of this Agreement of the second LP required to be delivered hereunder, whichever is later.  The fourth LP required to be delivered during the Term shall be delivered within sixty-four (64) months following the commencement of the Term or twenty-four (24) months following PRODUCTIONS' delivery to COMPANY in accordance with all of the terms and conditions of this Agreement of the third LP required to be delivered hereunder, whichever is later.  It is understood that PRODUCTIONS shall not deliver any LP within six (6) months from the date of delivery of a prior LP.

(d)   PRODUCTIONS hereby warrants, represents and agrees (i) to deliver to COMPANY all master tapes, parts and artwork in connection with each LP required to be delivered hereunder promptly following the completion thereof and but in no event later than simultaneously with the delivery of any such materials to any party for distribution outside the Territory and (ii) to arrange with COMPANY a mutually satisfactory release date(s) for each LP throughout the world and (iii) that the masters subject hereto delivered to any party(ies) outside the Territory shall be delivered

- 2 -

(7-A-09882) 5270C/223C

in the same form as delivered to COMPANY in the Territory and (iv) that PRODUCTIONS shall release or cause each such LP to be released outside the Territory in substantially the same form as released by COMPANY in the Territory.

(e) The masters comprising each LP required to be recorded and delivered hereunder shall hereinafter sometimes be referred to as the "First LP", the "Second LP", the "Third LP" and the "Fourth LP", respectively, in the order in which same are accepted by COMPANY hereunder.

4. Except as otherwise provided in this Agreement, PRODUCTIONS warrants and agrees that:

(a) During the Term, ARTIST shall not perform for the purpose of making records for anyone other than PRODUCTIONS or COMPANY for distribution in the Territory and neither PRODUCTIONS nor ARTIST shall authorize the use of ARTIST's name, likeness, or other identification for the purpose of distributing, selling, advertising or exploiting records for anyone other than COMPANY in the Territory.

(b) ARTIST shall not perform any selection recorded hereunder or under the production agreement between COMPANY and Superhype Tapes, Ltd., dated as of June 1, 1982, as amended, modified and/or extended (the "Superhype Agreement"), for the purpose of making records for anyone other than COMPANY (i) for a period of five (5) years after the initial date of the respective record containing such selection or (ii) for a period of eighteen (18) months following delivery to and acceptance by COMPANY of all masters required to be produced, recorded and delivered hereunder, pursuant to all of the terms and conditions of this Agreement ("Re-recording Restriction").

(c) Should ARTIST make any sound recording during the Term for motion pictures, television, electrical transcriptions or any other medium or should ARTIST after the Term perform for any such purpose any selection recorded hereunder to which the Re-recording Restriction then applies, ARTIST will do so only pursuant to a written agreement prohibiting the use of such recordings, directly or indirectly, for record purposes in the Territory. PRODUCTIONS or ARTIST shall furnish to COMPANY a copy of the provisions of any such contract relating to the foregoing.

5. (a) Subject to subparagraph 5(b) hereof, PRODUCTIONS hereby assigns and sets over unto COMPANY in perpetuity throughout the Territory all rights, title and interests in and to all recordings subject to this Agreement in accordance with the terms and conditions thereof, including without limitation all copyrights, and renewals and extensions thereof, in perpetuity throughout the Territory, and further agrees to execute and deliver to COMPANY such additional documents and instruments as COMPANY may reasonably request in order to effectuate such intentions. Without limiting

- 3 -

(7-A-09882) 5270C/223C

the generality of the foregoing, COMPANY and its designee(s) shall have the exclusive and unlimited right to all the results and proceeds of ARTIST's recording services rendered during the Term, including, but not limited to, the exclusive, unlimited and perpetual rights throughout the Territory:

(i)     To manufacture, advertise, sell, lease, license, distribute or otherwise use or dispose of, in any or all fields of use by any method now or hereafter known, records embodying the masters recorded by ARTIST during the Term, all upon such terms and conditions as COMPANY may elect, or at its discretion, to refrain therefrom, provided that no use or disposition may be made of such records that is not applicable to COMPANY's other top recording artists;

(ii)    To use and publish and to permit others to use and publish ARTIST's name (including any professional name heretofore or hereafter adopted by ARTIST), photographs, likeness, and biographical material concerning ARTIST for advertising and trade purposes in connection with all masters recorded by ARTIST during the Term and all Pictures produced during the Term, including, without limitation, in the marketing, sale or other exploitation of records.  During the Term hereof, all photographs and biographical material concerning ARTIST which COMPANY may desire to utilize, for the purposes herein stated shall be subject to PRODUCTIONS' approval, which approval (or disapproval) shall be given to COMPANY within fifteen (15) days after such photographs or biographical material are submitted by COMPANY to PRODUCTIONS. PRODUCTIONS' failure to give such notice to COMPANY as aforesaid shall be deemed to be approval as to the material for which said approval is sought.  Promptly following the execution of this Agreement, PRODUCTIONS shall furnish COMPANY with a reasonable number of photographs of ARTIST and biographical material concerning ARTIST.  All photographs and biographical material concerning ARTIST furnished by PRODUCTIONS to COMPANY or once approved by PRODUCTIONS shall be deemed approved by PRODUCTIONS for the purposes hereof.  An inadvertent failure by COMPANY to obtain PRODUCTIONS' approval pursuant to this subparagraph 5(b) shall not be a breach of this Agreement by COMPANY;

(iii)   To obtain copyrights and renewals thereof in sound recordings (as distinguished from the musical compositions, embodied thereon) recorded by ARTIST, in COMPANY's name as PRODUCTIONS' assignee and owner of such sound recordings for the Territory;

(iv)    To release records derived from masters recorded by ARTIST during the Term under any name, trademark or label which COMPANY or its subsidiaries, affiliates or licensees may from time to time elect.  COMPANY agrees that all releases by COMPANY during and after the Term hereof of records solely embodying masters recorded hereunder shall be under the "Es Paranza" tradename label (the "Name").  COMPANY's trademark, logo and/or tradename

- 4 -

(7-A-09882) 5270C/223C

shall also be included.  PRODUCTIONS warrants and represents that PRODUCTIONS has, and throughout the Term, shall maintain, the full right, power and authority to grant to COMPANY, and does hereby grant to COMPANY, the exclusive right to the use of the Name throughout the Territory in connection with the rights granted to COMPANY hereunder.  In no event shall PRODUCTIONS be entitled to injunctive or other equitable relief in the event of any failure to utilize the Name.

(vi)    To perform such records publicly and to permit public performances thereof by means of radio broadcast, television or any other method now or hereafter known.

(b)  Notwithstanding anything in this Agreement to the contrary, COMPANY shall not own masters, so-called "out-takes" or other recordings recorded by ARTIST during the Term but neither required to be delivered to COMPANY during the Term nor delivered to COMPANY ("Undelivered Masters"), provided, however, that neither PRODUCTIONS nor ARTIST shall have the right to release or otherwise exploit, or authorize or permit the release or other exploitation of Undelivered Masters during the Term, or to at any time during or following the Term release or otherwise exploit, or authorize or permit the release or other exploitation of Undelivered Masters embodying in whole or in part performances of musical compositions or other material embodied in whole or in part on masters delivered to COMPANY hereunder.

6.    PRODUCTIONS acknowledges that the sale of records is speculative and agrees that the judgment of COMPANY with regard to any matter affecting the sale, distribution or exploitation of such records shall be binding and conclusive upon PRODUCTIONS.

7.    COMPANY shall pay PRODUCTIONS the following sums which shall be advances against and recoupable by COMPANY out of all royalties becoming payable to PRODUCTIONS pursuant to this or any other agreement between the parties hereto:

(a)  The sum of                                            United States Dollars, promptly following full execution of this Agreement and Exhibit "A" annexed hereto;

(b)  In respect of the First LP, the sum of                          United States Dollars;

(c)  In respect of each of the Second LP, Third LP and Fourth LP, the sum of                          United States Dollars.

(d)  The advances payable pursuant to subparagraphs 7(b) and 7(c) shall be payable as follows:

(i)    One-half (1/2), promptly following PRODUCTIONS' written notice to COMPANY that recording of the masters comprising

- 5 -

(7-A-09882) 5270C/223C

the applicable LP required to be recorded and delivered hereunder has commenced, and is scheduled to proceed, without interruption, to completion.  Such notice shall also set forth the name of the producer engaged by PRODUCTIONS in accordance with this Agreement; and

        (ii)   The balance, promptly following PRODUCTIONS' delivery to COMPANY in accordance with all of the terms and conditions of this Agreement of the masters comprising the applicable LP required to be recorded and delivered hereunder.

        (e)   The sum                                    U.S.) United States Dollars in the event that at any time COMPANY releases a "Best of" or "Greatest Hits" LP solely embodying ARTIST's performances hereunder in accordance with subparagraph 27(e) of this Agreement, provided that at COMPANY's request ARTIST records and PRODUCTIONS produces and delivers to COMPANY two (2) masters (the "Additional Masters") embodying newly recorded studio performances of ARTIST of material not previously recorded by ARTIST, in all respects pursuant and subject to all of the terms and conditions of this Agreement.  For all purposes, all Additional Masters shall be deemed to have been recorded during the Term of this Agreement, but shall not be deemed to reduce or satisfy in part or in whole the Minimum Recording Commitment or any other recording or delivery commitment or other obligation of PRODUCTIONS or ARTIST under this Agreement, including without limitation, Paragraphs 2 and 3 hereof. The advance pursuant to this subparagraph 7(e), shall be payable to PRODUCTIONS, if at all, promptly following PRODUCTIONS' delivery to COMPANY in accordance with all of the terms and conditions of this Agreement of both of the masters comprising the Additional Masters recorded and delivered hereunder, if any.

        (f)   All monies paid to PRODUCTIONS or to ARTIST or on behalf of PRODUCTIONS or ARTIST or to or on behalf of any person, firm or corporation representing PRODUCTIONS or ARTIST, other than royalties payable pursuant to Paragraphs 10 and 14 of this Agreement, approved by PRODUCTIONS in advance, shall constitute advances recoupable from any monies payable under this or any other agreement between the parties hereto, unless COMPANY shall otherwise consent in writing.

        (g)   For the purposes of this Paragraph 7, in respect of any payment required to be made by COMPANY to PRODUCTIONS, the term "promptly" shall mean promptly following the date on which COMPANY first becomes obligated to make the applicable payment to PRODUCTIONS and not later than fourteen (14) days after COMPANY receives written notice from PRODUCTIONS that said applicable payment is due, together with such additional notice(s), information and materials as may be otherwise required by this Agreement, provided, however, that failure to make payment at such time and in such manner shall not constitute a breach of this Agreement by COMPANY unless PRODUCTIONS serves written notice thereof upon COMPANY following the expiration of said fourteen (14) day period

- 6 -

(7-A-09882) 5270C/223C

specifying such failure of COMPANY and the applicable payment as above set forth, and COMPANY fails to make payment as required within three (3) business days after COMPANY's receipt of such notice.

(h)  In the event that ARTIST dies or is permanently disabled or incapacitated during the Term, PRODUCTIONS' obligation to Company in respect of the repayment of advances received prior thereto shall be no greater than the formula set forth in Paragraph 7 of "Exhibit A" annexed hereto and made a part hereof, subject to COMPANY's right to recoup the entirety thereof pursuant to subparagraph 7(f) of this Agreement.  Except as otherwise hereinabove set forth in this subparagraph 7(h), nothing contained in said "Exhibit A" shall be construed to limit COMPANY's rights or remedies in respect of PRODUCTIONS.

8.  (a)  PRODUCTIONS shall be solely responsible for and shall pay all recording costs incurred in the production of masters subject to this Agreement.  In the event COMPANY elects to pay any such recording costs, all such costs paid by COMPANY shall be deducted from any and all monies becoming payable to PRODUCTIONS under this or any other agreement between the parties hereto.

(b)  PRODUCTIONS warrants that recordings made by it hereunder will not be made in the Territory, or otherwise in any respect within the jurisdiction of the American Federation of Musicians or the American Federation of Radio and Television Artists unless PRODUCTIONS and COMPANY otherwise agree.

(c)  Intentionally omitted.

(d)  PRODUCTIONS shall be solely responsible for and shall pay all monies becoming payable to ARTIST and all other parties rendering services in respect of sales of recordings derived from masters subject to this Agreement.  COMPANY shall pay mechanical royalties becoming payable to the copyright proprietors of musical compositions embodied on masters subject hereto.

(e)  PRODUCTIONS warrants and represents that PRODUCTIONS is a party to all applicable agreements with all applicable unions and guilds which shall remain in full force and effect.  At COMPANY's request, PRODUCTIONS shall furnish COMPANY with appropriate documentation confirming the foregoing.

9.  Each master delivered hereunder shall be produced by a producer selected by PRODUCTIONS.  PRODUCTIONS shall be solely responsible for and shall pay all monies becoming payable to such producer.  In the event COMPANY elects to pay any such producer directly, all such sums so paid by COMPANY shall be deducted from any and all monies otherwise payable to PRODUCTIONS under this or any other agreement between the parties hereto.

- 7 -

(7-A-09882) 5270C/223C

10.  Conditioned upon PRODUCTIONS', and ARTIST's full and faithful performance of each and all of the material terms hereof, COMPANY shall pay PRODUCTIONS the following royalties in respect of records subject to this Agreement:

(a)  (i)  (A)  A royalty of                             in respect of retail sales in the United States of Singles and Maxi-singles derived from masters recorded and delivered during the Term;

(B)  The royalty rate hereinabove set forth in subparagraph 10(a)(i)(A) shall be hereinafter referred to as the "Basic U.S. Singles Rate".

(ii)  (A)  A royalty of                             in respect of retail sales in the United States of LPs derived from masters recorded and delivered during the Term;

(B)  The royalty rate hereinabove set forth in subparagraph 10(a)(ii)(A) shall be hereinafter referred to as the "Basic U.S. LP Rate".

(iii)  (A)  With respect to EPs, the royalty rate shall be three-fourths (3/4) of the Basic U.S. LP Rate.

(B)  The royalty rate hereinabove set forth in subparagraph 10(a)(iii)(A) shall be hereinafter referred to as the "Basic U.S. EP Rate".

(b)  (i)  (A)  A royalty of                             in respect of retail sales in Canada of Singles and Maxi-singles derived from masters recorded and delivered during the Term;

(B)  The royalty rate hereinabove set forth in subparagraph 10(b)(i)(A) shall be hereinafter referred to as the "Basic Canadian Singles Rate".

(ii)  (A)  A royalty of                             in respect of retail sales in Canada of LPs derived from masters recorded and delivered during the Term;

(B)  The royalty rate hereinabove set forth in subparagraph 10(b)(ii)(A) shall be hereinafter referred to as the "Basic Canadian LP Rate".

(iii)  (A)  With respect to retail sales of EPs outside the United States, the royalty rate shall be three-fourths (3/4) of the applicable Basic U.S. LP Rate.

(B)  The royalty rate hereinabove set forth in subparagraph 10(b)(iii)(A) shall be hereinafter referred to as the "Basic Canadian EP Rate".

- 8 -

(7-A-09882) 5270C/223C

(iv)     (A)     Intentionally omitted.

(B)     Royalties in respect of sales of records outside the United States shall be computed in the same national currency as COMPANY is accounted to by its licensees and shall be paid to PRODUCTIONS at the same rate of exchange as COMPANY is paid.  It is understood that such royalties will not be due and payable until payment thereof is received by COMPANY in the United States of America, but COMPANY shall make all reasonable efforts to have such funds promptly remitted to COMPANY.

(c)  With respect to records sold (i) through any direct mail or mail order distribution method, including, without limitation, record club distribution, whether or not such record club is affiliated with COMPANY, (ii) by distribution through retail outlets in conjunction with special advertisements on radio or television (e.g., "K-Tel" type) or (iii) by any combination of the methods set forth above, the royalty payable, in connection therewith shall be one-half (1/2) of COMPANY's net earned royalty receipts in respect of reported sales through such channels.  No royalties shall be payable with respect to records given away as "bonus" or "free" records as a result of joining a record club or plan or of purchasing a required number of records or with respect to records received by members of any such club operation either in an introductory offer in connection with joining such club or upon recommending that another join such club operation, provided, however, that for the purposes hereof, the number of non-royalty bearing club records shall not exceed fifty (50%) percent of the total number of records distributed through such means.

(d)  With respect to mid-priced records, the royalty rate shall be two-thirds (2/3) of the applicable royalty rate payable in respect of full-priced records in the same configuration or format. During the Term, COMPANY shall not release in the United States any such mid-priced LP comprised solely of masters, delivered hereunder prior to twenty-four (24) months following COMPANY's initial United States release of a full-priced record embodying such masters, unless PRODUCTIONS shall consent thereto.

(e)  With respect to budget records, the royalty rate shall be one-half (1/2) of the applicable royalty rate payable in respect of full-priced records in the same configuration or format.  During the Term, COMPANY shall not release in the United States any such budget LP comprised solely of masters delivered hereunder prior to thirty (30) months following COMPANY's initial United States release of a full-priced record embodying such masters, unless PRODUCTIONS shall consent thereto.

(f)  With respect to records in compact disc form ("CD"), the royalty rate payable shall be one hundred (100%) percent of the Basic U.S. Singles Rate, Basic U.S. LP Rate, Basic U.S. EP Rate, applicable Basic Canadian Singles Rate, applicable Basic Canadian LP Rate, or applicable Basic Canadian EP Rate, as the case may be.

- 9 -

(7-A-09882) 5270C/223C

(g)   Notwithstanding anything contained herein, with respect to records in any format, configuration or technology other than vinyl disc, analog tape or compact disc, now known or hereafter devised, including without limitation digital audio tape in any form, the royalty rate payable shall be of the Basic U.S. Singles Rate, Basic U.S. LP Rate, Basic U.S. EP Rate, applicable Basic Canadian Singles Rate, applicable Basic Canadian LP Rate, or applicable Basic Canadian EP Rate, as the case may be.   Notwithstanding anything to the contrary contained in this Agreement, if COMPANY's standard over-all policy applicable to royalties for records sold pursuant to this subparagraph 10(g) payable to major artists (or entities furnishing their recordings or services) subsequent to the date hereof provides for a royalty computation formula which would be more favorable to PRODUCTIONS than the manner of computing PRODUCTIONS' royalties in respect of records sold pursuant to this subparagraph 10(g), then COMPANY shall on a prospective basis compute PRODUCTIONS' royalties for records sold pursuant to this subparagraph 10(g) utilizing the royalty computation formula which is in accordance with COMPANY's said standard over-all policy.

(h)   In the event that COMPANY shall sell or license third parties to sell "records" via telephone, satellite, cable or other direct transmission to the consumer over wire or through the air, PRODUCTIONS shall be paid royalties with respect thereto at the Basic U.S. Singles Rate, applicable Basic U.S. LP Rate, applicable Basic U.S. EP Rate, applicable Basic Canadian Singles Rate, applicable Basic Canadian LP Rate or applicable Basic Canadian EP Rate, as the case may be.   For purposes of calculating royalties payable in connection with such sales, the retail list price of such "records" shall be deemed to be the then-current retail list price of tape copies of such records and in the case of records which have no tape equivalent, the corresponding price of the disc (but in the United States,                                       of the then current retail list price of such tape copies or corresponding disc), and the packaging deduction for such sales shall be made in accordance with subparagraph 10(r)(iv) of this Agreement.   Notwithstanding anything to the contrary contained in this Agreement, if COMPANY's standard over-all policy applicable to royalties for records sold pursuant to this subparagraph 10(h) payable to major artists (or entities furnishing their recordings or services) subsequent to the date hereof provides for a royalty computation formula which would be more favorable to PRODUCTIONS than the manner of computing PRODUCTIONS' royalties in respect of records sold pursuant to this subparagraph 10(h), then COMPANY shall on a prospective basis compute PRODUCTIONS' royalties for records sold pursuant to this subparagraph 10(h) utilizing the royalty computation formula which is in accordance with COMPANY's said standard over-all policy.

(i)   The royalty rate payable for records sold to the United States government, its subdivisions, departments and agencies, and to educational institutions and libraries shall be the

- 10 -

(7-A-09882) 5270C/223C

otherwise applicable basic U.S. rate and shall be based upon the retail list price (Post Exchange list price, where applicable) of such records, provided that if COMPANY's selling price to such customers is less than COMPANY's normal stated wholesale price to COMPANY's United States distributors, the royalty rate therefor shall be reduced proportionately (but in no event shall the royalty rate be less than one-half (1/2) of the applicable basic U.S. rate).

(j)   The royalty rate payable for records sold as "premiums" shall be one-half (1/2) of the otherwise applicable royalty rate, and the retail list price for such records shall be deemed to be COMPANY's actual sales price.  It is understood that COMPANY shall not use ARTIST's name or likeness in connection with any such "premium" record as an endorsement of any product or service.  COMPANY shall not release any such "premium" record in the United States during the Term hereof without PRODUCTIONS' consent.

(k)   COMPANY shall have the right to license the masters to third parties for record use and/or all other types of use on a flat-fee basis, provided that COMPANY shall first obtain the written consent of PRODUCTIONS.  COMPANY shall credit PRODUCTIONS' royalty account with                          of the net amount received by COMPANY under each such approved license after COMPANY shall have first deducted all third party payments for which COMPANY is responsible.

(l)   As to records not consisting entirely of masters recorded and delivered hereunder, the royalty rate otherwise payable to PRODUCTIONS hereunder with respect to sales of any such record shall be prorated by multiplying such royalty rate by a fraction, the numerator of which is the number of masters recorded and delivered hereunder embodied on such record and the denominator of which is the total number of masters embodied thereon.

(m)   Except as otherwise hereinafter set forth, COMPANY shall not couple any recordings hereunder with those of any other artist without the prior written consent of PRODUCTIONS.

(n)   As to masters embodying performances of ARTIST together with the performances of another artist or artists, the royalty rate otherwise payable hereunder with respect to sales of any record derived from any such master and the recording costs and/or advances otherwise payable by COMPANY hereunder with respect to any such master shall be prorated by multiplying such royalty rate or recording costs and/or advances by a fraction, the numerator of which is one and the denominator of which is the total number of artists whose performances are embodied on such master.  COMPANY shall not require ARTIST to record with other artists without PRODUCTIONS' consent, however, if ARTIST does record with other artists, such recordation shall constitute consent.

(o)   No royalties shall be payable in respect of: (i) records given away or furnished on a "no-charge" basis to

- 11 -

(7-A-09882) 5270C/223C

"one-stops", rack jobbers, distributors or dealers, whether or not affiliated with COMPANY, which records do not exceed 300 non-royalty bearing Singles out of every 1,000 Singles distributed and 200 non-royalty bearing LPs out of every 1,000 LPs distributed; (ii) such additional "no-charge" records distributed during short term special promotions or marketing campaigns, which such records do not exceed the limits set forth in subparagraph 10(o)(i) above plus an additional ten (10%) percent of the total number of records distributed; (iii) records given away or sold at below stated wholesale prices for promotional purposes to disc jockeys, record reviewers, radio and television stations and networks, motion picture companies, music publishers, COMPANY's employees, PRODUCTIONS, ARTIST or other customary recipients of promotional records or for use on transportation facilities; (iv) records sold as scrap, salvage, overstock or "cut-outs", but no record shall be sold in such manner prior to three (3) years after the initial release of any such record; (v) records sold below cost; (vi) "sampler" records intended for free distribution to automobile purchasers and containing not more than two (2) masters delivered hereunder, provided that COMPANY shall not distribute such "sampler" records without PRODUCTIONS' written consent.  No royalties shall be payable on any sales by COMPANY's licensees until payment has been received by COMPANY in the United States.  Notwithstanding the provisions of subparagraphs 10(o)(i), (ii) and (iii) hereof, the "free goods" policy applicable to ARTIST's records hereunder shall in no event be less favorable to PRODUCTIONS than the policy of COMPANY then applicable to COMPANY's top recording artists.

(p)  As to records sold at a discount to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with COMPANY, in lieu of the records given away or furnished on a "no-charge" basis as provided in subparagraphs 10(o)(i) and (ii) above, the applicable royalty rate otherwise payable hereunder with respect to such records shall be reduced in the proportion that said discount wholesale price bears to the usual stated wholesale price, provided that said reduction in the applicable royalty rate does not exceed the percentage limitations set forth in subparagaraphs 10(o)(i) and (ii) above, or then applicable to COMPANY's top recording artists, whichever is greater.

(q)  The royalty rates provided for in this Paragraph 10 shall be applied against the retail list price (less COMPANY's container deductions, excise taxes, duties and other applicable taxes) for records sold which are paid for and not returned.  The term the "retail list price" as used in this Agreement shall mean (i) for records sold in the United States, the manufacturer's suggested retail price in the United States and (ii) for records sold outside the United States, the manufacturer's suggested retail price in the country of manufacture or sale, as COMPANY is paid.  In those countries where a manufacturer's suggested retail price is not utilized, the generally accepted retail price shall be utilized. Notwithstanding the foregoing, the retail list price for a "Maxi-single" shall be deemed to be (A) in the United States the

- 12 -

(7-A-09882) 5270C/223C

lesser of       of the retail list price for a Single or the actual retail list price of such Maxi-single and (B) in the remainder of the Territory the retail list price for a Single.  In computing sales, COMPANY shall have the right to deduct all returns made at any time and for any reason.  Returns of records sold and records distributed on a "no-charge" basis pursuant to subparagraph 10(o)(i) shall be pro-rated in the same proportion as initially invoiced.

(r)  COMPANY's container deductions shall be a sum equal to: (i) ten (10%) percent of the retail list price for records in disc form (other than compact-disc records), (ii) twelve and                 percent of the retail list price for records in disc form (other than compact-disc records) in "double-fold" jackets or covers or in jackets which contain an insert or any other special elements, (iii)                 percent of the retail list price for records in analog pre-recorded tape form, and (iv)        percent of the retail list price for compact-disc records, records in digital pre-recorded tape form, and any other form or configuration of record (excluding satellite sales) or form of package, container or box other than as described herein.

(s)  (i)    The monies payable to PRODUCTIONS hereunder shall be inclusive of all monies, if any, required to be paid to the A.F. of M. Music Performance Trust Fund, Phonograph Record Manufacturers Special Payments Fund, AFTRA Pension and Welfare Fund and all other union funds with respect to the manufacture, distribution and sale of records hereunder.  In the event that any monies shall become due to any such union funds, COMPANY shall deduct such monies from any and all monies payable to PRODUCTIONS under this or any other agreement between the parties hereto and shall pay same directly to such union funds.

(ii)    Notwithstanding the foregoing, in the event any monies are required to be paid to the A.F. of M. Music Performance Trust Fund or Phonograph Record Manufacturers Special Payments Fund solely by virtue of the fact that the masters were recorded in the Territory, or embody performances of United States or Canadian artists, then COMPANY shall be responsible for the payment of such monies, provided that COMPANY in advance expressly requested or approved, in writing, that the applicable masters be recorded in the Territory or embody performances of United States or Canadian artists, and provided further that PRODUCTIONS served notice upon COMPANY in advance that the applicable artists were citizens or residents of the United States or Canada, or otherwise subject to the jurisdiction of the American Federation of Musicians or the American Federation of Television and Radio Artists.

(t)  Except as otherwise hereinafter set forth, COMPANY shall not release any "Best Of", "Greatest Hits" or any other compilation LP solely embodying masters subject to this Agreement, nor shall COMPANY release any radio or television promotional LP whether in the form of K-Tel or any other type package, nor any direct mail or mail order distribution LP (other than for record

- 13 -

(7-A-09882) 5270C/223C

club distributicn) solely embodying masters subject to this Agreement, without the prior written consent of PRODUCTIONS, which consent may be withheld for any reason. These prohibitions shall survive delivery of all LPs comprising the Minimum Recording Commitment.

11. Statements as to royalties payable hereunder shall be sent by COMPANY to PRODUCTIONS within sixty (60) days after the expiration of each calendar quarter for the preceding quarterly period ending February 28, May 31, August 31 or November 30. Concurrently with the rendition of each statement, COMPANY shall pay PRODUCTIONS all royalties shown to be due by such statement, after deducting all recording costs paid by COMPANY, all payments made on behalf of PRODUCTIONS (but no payments shall be made on behalf of PRODUCTIONS without the prior written consent of PRODUCTIONS unless COMPANY is required to do so), and all advances made to PRODUCTIONS prior to the expiration of the applicable quarterly period. No statements need be rendered by COMPANY for any such quarterly period after the expiration of the Term hereof for which there are no sales of records derived from masters hereunder. All payments shall be made to the order of PRODUCTIONS and shall be sent to PRODUCTIONS at PRODUCTIONS' address first above written. Before any payments are made to PRODUCTIONS by COMPANY under this Agreement, and from time to time thereafter upon COMPANY's request, PRODUCTIONS will complete, execute and deliver to COMPANY a completed certificate (in the form then prescribed by the United States Internal Revenue Service) sufficient to permit PRODUCTIONS to claim the benefit of an exemption from withholding of United States income tax under the applicable income tax treaty. If this certificate is not so completed, executed and delivered, or if the exemption is not available or ceases to be effective for any reason, it is understood and agreed that COMPANY will withhold income taxes in accordance with the requirements of the laws of the United States. COMPANY shall be entitled to maintain a single account with respect to all recordings subject to this or any other agreement between the parties hereto. COMPANY may maintain reasonable reserves, however, COMPANY agrees that regarding such reserves: (i) with respect to LPs in tape configurations and compact-disc configurations, each base reserve as initially established shall not exceed ' percent of records shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to percent and (ii) with respect to LPs in vinyl disc configurations and to Singles in all configurations, each base reserve as initially established shall not exceed percent of such records shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to percent. COMPANY shall fully liquidate each base reserve within four (4) years from the date that such base reserve was established. At such time as a reserve is liquidated, it shall be deemed to be a sale in the period in which it was liquidated. PRODUCTIONS shall be deemed to have consented to all accountings rendered by COMPANY hereunder and said accountings shall be binding upon PRODUCTIONS and not subject to any objection

- 14 -

(7-A-09882) 5270C/223C

by PRODUCTIONS for any reason unless specific objection, in writing, stating the basis thereof, is given to COMPANY within three (3) years after the date rendered, and after such written objection, unless suit is instituted within one (1) year after the date upon which COMPANY notifies PRODUCTIONS that it denies the validity of the objection.

12.   (a)   PRODUCTIONS shall have the right at PRODUCTIONS' sole cost and expense to appoint a Certified Public Accountant who is not then currently engaged in an outstanding audit of COMPANY to examine COMPANY's books and records as same pertain to sales of records subject hereto as to which royalties are payable hereunder, provided that any such examination shall be for a reasonable duration, shall take place at COMPANY's offices during normal business hours on reasonable prior written notice and shall not occur more than once in any calendar year.

(b)   Notwithstanding anything to the contrary contained in subparagraph 12(a), if COMPANY notifies PRODUCTIONS that the Certified Public Accountant designated by PRODUCTIONS to conduct an audit under subparagraph 12(a) is engaged in an outstanding audit of COMPANY on behalf of another person ("Other Audit"), PRODUCTIONS may nevertheless have PRODUCTIONS' audit conducted by such accountant, and the running of the time within which such audit may be made shall be suspended until such accountant has completed the Other Audit, subject to the following conditions:

(i)   PRODUCTIONS shall notify COMPANY of PRODUCTIONS' election to that effect within fifteen (15) days after the date of COMPANY's said notice to PRODUCTIONS;

(ii)   PRODUCTIONS' accountant shall proceed in a reasonably continuous and expeditious manner to complete the Other Audit and render the final report thereon to the client and COMPANY; and

(iii)   PRODUCTIONS' audit shall not be commenced by PRODUCTIONS' accountant before the delivery to COMPANY of the final report on the Other Audit, shall be commenced within thirty (30) days thereafter, and shall be conducted in a reasonably continuous manner.

(c)   The provisions of subparagraph 12(b) will not apply if COMPANY elects to waive the provisions of subparagraph 12(a) which require that PRODUCTIONS' accountant shall not be engaged in any Other Audit.

13.   (a)   All notices to PRODUCTIONS shall be in writing and shall be sent postage prepaid by registered or certified mail, return receipt requested, and addressed to PRODUCTIONS' address first above written with a simultaneous copy sent in the same manner to George R. Fearon, Esq., Phillips, Nizer, Benjamin, Krim & Ballon, 31 West 52nd Street, New York, New York 10019-6167.

- 15 -

(7-A-09882) 5270C/223C

(b)   All notices to COMPANY shall be in writing and shall be sent postage prepaid by registered or certified mail, return receipt requested, and addressed to COMPANY's address first above written with a simultaneous copy sent in the same manner to Mayer, Katz, Baker & Leibowitz, P.C., 75 Rockefeller Plaza, New York, New York 10019.

14.   (a)   All musical compositions or material recorded pursuant to this Agreement which are written or composed, in whole or in part by ARTIST or any producer of the masters subject hereto, or which are owned or controlled, directly or indirectly, in whole or in part, by PRODUCTIONS and/or ARTIST (herein called "Controlled Compositions") shall be and are hereby licensed to COMPANY:

(i)   For the United States, at a royalty per selection equal to                   percent of the statutory per selection rate (inclusive of playing time formula, if any) effective on the date of manufacture and sale of the records concerned.  The aforesaid                   percent per selection rate (but exclusive of playing time formula and without regard to playing time) shall hereinafter sometimes be referred to as the "U.S. Per Selection Rate"; and

(ii)   For Canada, at a royalty per selection equal to one hundred (100%) percent of the statutory per selection rate (inclusive of playing time formula, if any) effective on the date of manufacture and sale of the records concerned, or, if there is no statutory rate in Canada on such date,                   percent of the per selection rate (inclusive of playing time formula, if any) then generally utilized by major record companies in Canada.  The applicable aforesaid per selection rate (but exclusive of playing time formula and without regard to playing time) shall hereinafter sometimes be referred to as the "Canadian Per Selection Rate".

(b)   (i)   Notwithstanding the foregoing, the maximum aggregate mechanical royalty rate which COMPANY shall be required to pay in respect of any Single, Maxi-single or LP hereunder, regardless of the total number of compositions contained therein, shall not exceed two (2) times, three (3) times, and, subject to subparagraph 14(b)(ii), twelve (12) times the applicable U.S. Per Selection Rate or Canadian Per Selection Rate, respectively, and in respect of any EP hereunder, regardless of the total number of compositions contained therein, shall not exceed the applicable U.S. Per Selection Rate or Canadian Per Selection Rate times the total number of masters contained therein.

(ii)   In the event that COMPANY releases a so-called "Best Of" or "Greatest Hits" compilation containing at COMPANY's express written consent thirteen (13) compositions inclusive of one or more newly-recorded compositions recorded by ARTIST specifically for said compilation at COMPANY's request as aforesaid, the maximum aggregate mechanical royalty rate which COMPANY shall be required to

- 16 -

(7-A-09882) 5270C/223C

pay in respect of such compilation, regardless of the total number of compositions contained therein, shall not exceed thirteen (13) times the applicable U.S. Per Selection Rate or Canadian Per Selection Rate, respectively.

(iii)   Notwithstanding the foregoing provisions of subparagraph 14(b), if COMPANY shall release a multiple set (as defined in subparagraph 29(e)(i) hereof) solely embodying ARTIST's recordings hereunder, the maximum aggregate mechanical royalty rate which COMPANY shall be required to pay in respect of any such multiple set shall be computed by multiplying the otherwise applicable maximum aggregate mechanical royalty rate set forth in subparagraphs 14(b)(i) or (ii) above by a fraction, the numerator of which shall be the retail list price for such multiple set in the respective applicable format and the denominator of which shall be the retail list price applicable to COMPANY's or its licensees' top-line single LPs in the same format.

(c)   (i)      It is specifically understood that in the event that any Single, Maxi-single, EP or LP contains other compositions in addition to the Controlled Compositions and the aggregate mechanical royalty rate for said Single, Maxi-single, EP or LP shall exceed the applicable rate provided in subparagraph 14(b), the aggregate rate for the Controlled Compositions contained thereon shall be reduced by the aforesaid excess over said applicable rate. Additionally, COMPANY shall have the right with respect to any Single, Maxi-single, EP or LP, the aggregate mechanical royalty rate for which exceeds the applicable rate provided in subparagraph 14(b) to deduct such excess payable thereon from any and all monies payable to PRODUCTIONS pursuant to this or any other agreement between the parties hereto.  All mechanical royalties payable hereunder shall be paid on the basis of net records sold hereunder for which royalties are payable to PRODUCTIONS pursuant to this Agreement, except that mechanical royalties shall be payable with respect to :                        percent of LPs which are for all other purposes non-royalty bearing by virtue of subparagraph 10(o)(i) hereof excluding records distributed during short term special promotions or marketing campaigns.  COMPANY may maintain reasonable reserves with respect to payment of mechanical royalties.  If COMPANY makes an overpayment of mechanical royalties in respect of compositions recorded under this Agreement, PRODUCTIONS will reimburse COMPANY for same, failing which COMPANY may recoup any such overpayment from any monies becoming payable to PRODUCTIONS pursuant to this or any other agreement between the parties hereto. Mechanical royalty payments on records subsequently returned are considered overpayments.  Notwithstanding anything to the contrary contained herein, mechanical royalties payable in respect of Controlled Compositions for sales of records for any use other than as described in subparagraphs 10(a), (b) and (f) hereof shall be                        percent of the otherwise applicable U.S. Per Selection Rate or Canadian Per Selection Rate, as the case may be. Controlled Compositions which are arranged versions of any musical compositions in the public domain, when furnished by PRODUCTIONS or

- 17 -

(7-A-09882) 5270C/223C

ARTIST for recording hereunder, shall be free of copyright royalties.  Any assignment of the ownership or administration of copyright in any Controlled Composition shall be made subject to the provisions hereof and any inconsistencies between the terms of this Agreement and mechanical licenses issued to and accepted by COMPANY shall be determined by the terms of this Agreement.  If any Single, Maxi-single, EP or LP contains compositions which are not Controlled Compositions ("Non-Controlled Compositions"), PRODUCTIONS will obtain for COMPANY's benefit mechanical licenses covering such compositions on the same terms and conditions applicable to Controlled Compositions pursuant to this Paragraph 14.

(ii)    If PRODUCTIONS obtains for COMPANY's benefit mechanical licenses covering Non-Controlled Compositions as above set forth in the last sentence of subparagraph 14(c)(i), COMPANY shall credit to PRODUCTIONS' royalty account under this Agreement an amount equal to _____ percent of any "net savings" accruing to COMPANY's benefit by virtue of PRODUCTIONS' obtaining such beneficial licenses but only with respect to to LPs which contain no more than twelve (12) compositions.  As used in this subparagraph 14(c)(ii), the term "net savings" means any financial benefit which COMPANY receives from such licenses by virtue of a discount off the otherwise applicable statutory royalty rate (or its Canadian equivalent, as the case may be), or a reduction in the number of records on which mechanical royalties would otherwise be payable, such as no payment for so-called "free goods".

(d)  In respect of all Controlled Compositions performed in Pictures, COMPANY is hereby granted an irrevocable perpetual license throughout the Territory to record and reproduce such Compositions in such Pictures and to distribute and perform such Pictures including, but not limited to, all Videoshows thereof, and to authorize others to do so.  COMPANY will not be required to make any payment in connection with those uses, and that license shall apply whether or not COMPANY receives any payment in connection with those Pictures.  PRODUCTIONS shall furnish COMPANY with a written acknowledgement from the person(s) or entity(ies) controlling the copyright in each Non-Controlled Composition to be embodied on any Picture confirming the terms upon which said person(s) or entity(ies) shall issue licenses in respect thereof.  Upon COMPANY's request therefor, PRODUCTIONS shall cause said person(s) or entity(ies) to forthwith issue to COMPANY (and its designees) licenses containing said terms and such other terms and conditions as COMPANY (or its designees) may require.  If the copyright in any Controlled Composition is owned or controlled by anyone else, PRODUCTIONS will cause that person, firm or corporation to grant COMPANY the same rights described in this Paragraph 14, on the same terms.

(e)  Intentionally omitted.

15.  (a)  In the event that PRODUCTIONS for any reason fails to timely fulfill any of its production and delivery commitments

- 18 -

(7-A-09882) 5270C/223C

hereunder in accordance with all of the terms and conditions of this Agreement, then, in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to PRODUCTIONS at any time prior to the expiration of the then current Period, (i) to terminate this Agreement without further obligation to PRODUCTIONS as to unrecorded or undelivered masters, (ii) to reduce the minimum number of masters required to be recorded and delivered during the then current Period to the number which have been timely recorded and delivered during such Period, or (iii) to extend the then current Period of the Term for the duration of such default plus one hundred and fifty (150) days with the times for the exercise by COMPANY of its options to extend the Term and the dates of commencement of subsequent Option Periods deemed extended accordingly.  It is specifically understood that COMPANY may exercise any or all of its rights pursuant to subparagraphs 15(a)(i), (ii) and (iii) hereof at any time(s) prior to the date the Term would otherwise expire.  COMPANY's obligations hereunder shall be suspended for the duration of any such default.  Notwithstanding such suspension, COMPANY shall continue to pay PRODUCTIONS' royalties as and when due unless such suspension is due to acts or omissions within PRODUCTIONS' or ARTIST's control.  The provisions of this subparagraph shall not result in an extension of the Term for a period in excess of the period permitted by applicable law, if any, for the enforcement of this Agreement.

        (b)   COMPANY reserves the right, at its election, to suspend the operation of this Agreement for the duration of any of the following contingencies, if by reason of any such contingency, it is materially hampered in the performance of its obligations under this Agreement or its normal business operations are delayed or become impossible or commercially impracticable:  Act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting COMPANY or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond COMPANY's control.  Any such suspension due to a labor controversy which involves only COMPANY shall be limited to a period of six (6) months.  The terms and conditions of this subparagraph 15(b) shall not affect the entitlement of PRODUCTIONS to royalties under this Agreement, if any.

        (c)   If ARTIST's voice should be materially or permanently impaired, then in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to PRODUCTIONS, to terminate this Agreement and shall thereby be relieved of any liability in connection with undelivered masters. Notwithstanding the foregoing, COMPANY's obligations with regard to previously delivered masters shall remain in full effect.

    16.  PRODUCTIONS expressly acknowledges that ARTIST's services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach or

- 19 -

(7-A-09882) 5270C/223C

threatened breach by PRODUCTIONS or ARTIST of any term, condition or covenant hereof, COMPANY will be caused immediate irreparable injury. PRODUCTIONS expressly agrees that COMPANY shall be entitled to injunctive and other equitable relief, as permitted by law, to prevent a breach or threatened breach of this Agreement, or any portion thereof, by PRODUCTIONS or ARTIST which relief shall be in addition to any other rights or remedies, for damages or otherwise, available to COMPANY.

17. (a) PRODUCTIONS warrants and represents that neither PRODUCTIONS nor ARTIST is under any disability, restriction or prohibition, whether contractual or otherwise, with respect,to PRODUCTIONS' right to execute this Agreement or PRODUCTIONS' and ARTIST's rights to perform its terms and conditions. Without limiting the foregoing, PRODUCTIONS specifically warrants and represents that no prior obligations, contracts or agreements of any kind undertaken or entered into by PRODUCTIONS or by ARTIST will interfere in any manner with the complete performance of this Agreement by COMPANY, PRODUCTIONS or ARTIST or with ARTIST's right to record any and all selections hereunder. PRODUCTIONS warrants and represents that there, are now in existence no prior unreleased masters embodying ARTIST's performances. PRODUCTIONS further warrants and represents that it has a valid enforceable exclusive agreement with ARTIST under which ARTIST is required to perform exclusively for PRODUCTIONS as a recording artist, and that said agreement shall continue to be in full force and effect during the Term. PRODUCTIONS shall exercise all options provided to PRODUCTIONS by its agreement with ARTIST so as to enable PRODUCTIONS to fulfill its commitments hereunder and PRODUCTIONS shall take all steps necessary or desirable to keep its agreement with ARTIST in full, force and effect so that COMPANY shall have the benefits of ARTIST's exclusive services as a recording artist during the Term as if ARTIST had contracted directly with COMPANY and shall cause ARTIST to execute and deliver to COMPANY at the time of execution of this Agreement COMPANY's standard Artist Inducement Agreement annexed hereto as Exhibit "A". PRODUCTIONS further warrants and represents that COMPANY shall not be required to make any payments of any nature for, or in connection with, the rendition of PRODUCTIONS' or ARTIST's services or the acquisition, exercise or exploitation of rights by COMPANY pursuant to this Agreement, except as specifically provided herein.

(b) PRODUCTIONS warrants and represents that no materials, or any use thereof, will violate any law or infringe upon or violate the rights of any third party. "Materials", as used in this subparagraph 17(b) shall include: (i) all musical compositions and other material contained on masters subject hereto, (ii) each name used by ARTIST, in connection with masters recorded hereunder, and (iii) all other materials, ideas, other intellectual properties or elements furnished or selected by PRODUCTIONS and contained in or used in connection with any masters recorded hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

- 20 -

(7-A-09882) 5270C/223C

(c)   PRODUCTIONS agrees to and does hereby indemnify, save and hold COMPANY harmless from any and all loss and damage (including court costs and reasonable attorneys' fees arising out of, connected with or as a result of any inconsistency with, failure of, or breach or threatened breach by PRODUCTIONS or ARTIST of any warranty, representation, agreement, undertaking or covenant contained in this Agreement including, without limitation, any claim by any third party in connection with the foregoing.  In addition to any other rights or remedies COMPANY may have by reason of any such inconsistency, failure, breach, threatened breach or claim, PRODUCTIONS shall reimburse COMPANY, on demand, for any payment made by COMPANY at any time after the date hereof with respect to any loss, damage or liability resulting therefrom and in addition thereto COMPANY shall have the right to deduct from any and all monies otherwise payable to PRODUCTIONS under this or any other agreement between the parties hereto a sum(s) equal to such loss, damage and liability (including anticipated and actual court costs and reasonable attorneys' fees).  COMPANY shall give PRODUCTIONS notice of any third party claim to which the foregoing indemnity applies and PRODUCTIONS shall have the right to participate in the defense of any such claim through counsel of PRODUCTIONS' own choice and at PRODUCTIONS' expense.  Pending the determination of any such claim, COMPANY may withhold payment of all monies under this or any other agreement between the parties hereto in any amount consistent with such claim.

18.   Wherever in this Agreement PRODUCTIONS' approval or consent is required, COMPANY may require PRODUCTIONS to formally give or withhold such approval or consent by giving PRODUCTIONS written notice requesting same and by furnishing PRODUCTIONS with the information or material in respect of which such approval or consent is sought.  PRODUCTIONS shall give COMPANY written notice of approval or disapproval within thirty (30) days after such notice.  PRODUCTIONS shall not hinder nor delay the scheduled release of any record hereunder.  In the event of disapproval or no consent, the reasons therefor shall be stated.  Failure to give such notice to COMPANY as aforesaid shall be deemed to be approval.

19.   During the Term, PRODUCTIONS warrants and represents that ARTIST shall become and remain a member in good standing of any labor unions with which the COMPANY may at any time have agreements lawfully requiring such union membership, but ARTIST shall not be required to become a member of any American labor union unless ARTIST shall so render ARTIST's services in the United States or otherwise so as to act as to lawfully require such union membership.  All masters subject hereto shall be produced in accordance with the rules and regulations of all unions having jurisdiction.

20.   Neither PRODUCTIONS nor ARTIST shall have the right within the Territory, so long as this Agreement is in effect, to assign ARTIST's professional name as mentioned on Page 1 hereof or any

- 21 -

(7-A-09882) 5270C/223C

other name(s) utilized by ARTIST in connection with recordings subject hereto or to permit the use of said name,(s) by any other individual or group of individuals without COMPANY's prior written consent, and any attempt to do so shall be null and void and shall convey no right or title.  PRODUCTIONS hereby warrants and represents that it and/or ARTIST is (are) and shall be the sole owner(s) of all such professional name(s), and that no other person, firm or corporation has the right to use said name(s) or to permit said name(s) to be used in connection with records, and that PRODUCTIONS has the authority to grant COMPANY the exclusive right to use said name(s) in the Territory in accordance with all of the terms and conditions of this Agreement and COMPANY shall have the exclusive right to use said professional name as aforesaid.

21.   PRODUCTIONS may prepare and deliver to COMPANY the background artwork for the album cover used in connection with each initial release in the United States during the Term of this Agreement of each newly-recorded LP required to be delivered hereunder (hereinafter, the "Artwork"), upon prior written notice to COMPANY and only upon all of the following conditions:

(a)   COMPANY hereby approves a budget of Twenty Thousand United States Dollars for the Artwork of each album cover hereunder for the First LP and the Second LP, and United States Dollars for the Artwork of each album cover hereunder for the Third LP and the Fourth LP, in all LP formats and configurations now known or hereafter devised, including without limitation twelve inch vinyl disc, which shall be inclusive of all Artwork costs, including costs of separations.

(b)   (i)   PRODUCTIONS will deliver all such Artwork prepared by PRODUCTIONS, together with all licenses, and consents (if any) required in connection therewith, to COMPANY s Art Department in New York City not less than sixty (60) days prior to COMPANY's projected release, date for the LP.  Time is of the essence of PRODUCTIONS' said delivery obligation.  If any of such material has not been delivered to COMPANY's Art Department within the time prescribed in the preceding sentence (or if PRODUCTIONS has otherwise advised COMPANY that PRODUCTIONS does not intend to prepare and deliver Artwork in respect of any specific Artwork LP), and further delay would hinder timely release of the LP, COMPANY shall have the right to prepare and use COMPANY's own however, subject to PRODUCTIONS' availability, COMPANY shall consult with PRODUCTIONS with respect thereto.  COMPANY shall not be obligated to make any payments to PRODUCTIONS or any other person in connection with any Artwork produced by COMPANY for the LP concerned.

(ii)   PRODUCTIONS will deliver to COMPANY, together with all such Artwork produced by PRODUCTIONS, an itemized statement of PRODUCTIONS' actual costs in connection therewith.  Following such delivery to COMPANY and its acceptance of such Artwork, COMPANY shall reimburse PRODUCTIONS in the amount of            percent of

- 22 -

(7-A-09882) 5270C/223C

said costs up to but not in excess of           percent of the
budget approved by COMPANY's Art Department.  Any costs incurred by
PRODUCTIONS in excess of           percent of said costs shall be
paid and borne solely by PRODUCTIONS.  In the event COMPANY agrees
to pay any such excess costs on PRODUCTIONS' behalf, PRODUCTIONS
shall, upon demand, reimburse COMPANY for such excess costs or in
lieu or requesting reimbursement, COMPANY may deduct such excess
costs from any and all monies due to PRODUCTIONS under this or any
other agreement between the parties hereto.  If the actual costs of
manufacture of the packaging (including without limitation any
inserts or special elements) concerned for any format or
configuration now known or hereafter devised exceed one hundred
           percent of COMPANY's normal costs for
manufacturing standard packaging for such format or configuration,
PRODUCTIONS shall, upon demand, promptly reimburse COMPANY for such
excess costs for all of such packaging (including without limitation
any inserts and special elements) manufactured or, in lieu of
requesting reimbursement, COMPANY may deduct such excess costs from
any and all monies due to PRODUCTIONS under this or any other
agreement between the parties hereto.

          (c)   COMPANY shall have the right to reject any Artwork
which is not in accord with the outline and plans approved by its
Art Department, which is not at least equivalent in quality to the
average Artwork prepared by COMPANY, or which COMPANY anticipates
would require it to incur album cover manufacturing costs in excess
of its standard manufacturing costs for album covers containing
Artwork prepared by it.  The Artwork and all other material
delivered to COMPANY will be subject to its approval in respect of
advocacy of illegal activity, patent offensiveness, potential
violation of any law or governmental regulation, and potential
violation of any personal, property or other rights of any person,
firm or corporation.  If COMPANY rejects any Artwork, PRODUCTIONS
shall have the right to revise and resubmit it for COMPANY's
approval, subject to all of the conditions above (including, without
limitation, the delivery deadline fixed in subparagraph 21(b)(i)
above), except that COMPANY shall have no obligation to make any
payments in connection with the revising of the Artwork.

          (d)   All Artwork and related material delivered hereunder
and all rights therein, including copyright and the right to secure
copyright and renewals and extensions thereof, shall be COMPANY's
property throughout the Territory in perpetuity.

          (e)   All matters relating to COMPANY's trademarks or any
elements of the album cover, other than the background Artwork shall
be determined in COMPANY's sole discretion, the location of which
shall be mutually determined by COMPANY and PRODUCTIONS.

          (f)   COMPANY shall have the right to affix to each record
or container hereunder an anti-counterfeiting or similar device
which shall be determined in COMPANY's sole discretion, the location
of which shall be mutually determined by COMPANY and PRODUCTIONS.

                            - 23 -

    (7-A-09882) 5270C/223C

(g)   COMPANY shall have the right to include or affix on each record or container hereunder UPC bar coding.

(h)   No Artwork will be deemed delivered until accepted by COMPANY and all requirements hereof have been fulfilled.

(i)   PRODUCTIONS shall have the right to prepare Artwork in respect of Singles and Maxi-singles subject to all of the terms and conditions of this Paragraph 21, upon budgets therefor mutually approved in advance by COMPANY and PRODUCTIONS.

(j)   COMPANY shall provide PRODUCTIONS with proofs of all Artwork separations and final color keys and shall make such changes and adjustments thereto as PRODUCTIONS may direct COMPANY in writing prior to manufacture of any packaging or promotional items derived from the Artwork.

22.   Anything to the contrary herein contained notwithstanding, ARTIST's performances may be included in one (1) or more original soundtrack albums of bona fide feature length dramatic theatrical motion pictures (excluding motion pictures comprising concert or personal appearance footage, and documentaries) to be released, distributed or sold, and advertised, promoted and marketed solely as an "original motion picture soundtrack album", and not conspicuously as an LP embodying the performances of ARTIST, by a company or party other than COMPANY, provided that PRODUCTIONS has exercised reasonable efforts to obtain for COMPANY the right to release, distribute and sell such album or albums.

23.   (a)   In the event that during the Term PRODUCTIONS, ARTIST or any person or entity furnishing the services or recordings of ARTIST, or their licensee(s) or designee(s) shall produce a Picture, as such term is hereinafter defined, prior to any exhibition, promotion, distribution, sale or other use or exploitation thereof, PRODUCTIONS shall provide to COMPANY a complete broadcast quality copy of such Picture for review, together with copies of invoices and all other documents evidencing the production costs incurred by PRODUCTIONS in respect of such Picture (the "Documented Production Costs"). COMPANY shall have the option, which may be exercised by notice to PRODUCTIONS at any time prior to the expiration of the Term, to acquire all rights, title and interests in and to said Picture(s) for the Territory subject to the terms and conditions of this Agreement by making payment to PRODUCTIONS in the amount of fifty (50%) percent of the Documented Production Costs incurred in respect of the applicable Picture(s). Each Picture for which COMPANY exercises such option shall hereinafter be referred to as an "Acquired Picture". It is understood that COMPANY shall have the right to accept or reject any Picture with or without regard to the cost thereof, and no person, firm or corporation other than COMPANY shall have the right to exploit Pictures in the Territory.

- 24 -

(7-A-09882) 5270C/223C

        (b)    (i)        Each Acquired Picture shall be owned by COMPANY in and for the Territory (including the copyrights therein and thereto and all extensions and, renewals thereof for the Territory) to the same extent as COMPANY's rights in master recordings made under this Agreement.  Notwithstanding the foregoing, COMPANY shall not commercially exploit Acquired Pictures or any other Pictures subject to this Agreement without the written consent of PRODUCTIONS.  PRODUCTIONS shall promptly deliver to COMPANY copies and elements of each Acquired Picture in such formats, configurations and standards as COMPANY may request, together with copies of all consents and permissions, and information, required by COMPANY to exercise its rights in such Acquired Picture hereunder.

        (ii)     COMPANY will have the unlimited right to exploit the Acquired Picture in the Territory by any means now or hereafter known or developed, or to refrain from any such exploitation.  Notwithstanding the foregoing, COMPANY shall not commercially exploit Acquired Pictures or any other Pictures subject to this Agreement without the written consent of PRODUCTIONS.

        (iii)   All sums paid by COMPANY in connection with each Acquired Picture shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to PRODUCTIONS pursuant to this or any other agreement between the parties hereto, provided that COMPANY shall not recoup more than           percent of such sums from royalties becoming payable to PRODUCTIONS pursuant to this or any other agreement.

        (iv)     Each of the following sums, if any, paid by COMPANY in connection with each Acquired Picture shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to PRODUCTIONS pursuant to this or any other agreement between the parties hereto, provided that COMPANY shall not recoup more than :        percent of such sums from royalties becoming payable to PRODUCTIONS pursuant to this or any other agreement:

        (A)    All expenses incurred by COMPANY in connection with the preparation and production of the Picture and the conversion of the Picture to Video Masters that are made to serve as prototypes for the duplication of the Videoshows of the Picture;

        (B)    All of COMPANY's direct out-of-pocket costs (such as for rights, artists (including ARTIST), other personnel, facilities, materials, services, and the use of equipment) in connection with all steps in the production of the Picture and the process leading to and including the production of such Video Masters (including, but not limited to, packaging costs and the costs of making and delivering duplicate copies of such Video Masters); and

        (C)    If in connection therewith COMPANY furnishes any of its own facilities, materials, services or

- 25 -

(7-A-09882) 5270C/223C

equipment for which COMPANY has a standard rate, the amount of such standard rate or if there is no standard rate, the market value for the services or thing furnished.

(v)     All sums that COMPANY in its sole discretion deems necessary or advisable to pay in connection with the production of Pictures and the exploitation of COMPANY's rights therein in order to clear rights or to make any contractual payments that are or may become due on the part of COMPANY, to PRODUCTIONS, ARTIST or any other person, firm or corporation by virtue of the exploitation of COMPANY's rights therein, in order to avoid, satisfy or make unnecessary any claims or demands by any person, firm or corporation claiming the right to payment therefor, including, but not limited to, any payment to an actual or alleged copyright owner, patent owner, union, union-related trust fund, pension plan or other entity, and any payment for an actual or alleged re-run fee, residual, royalty, license fee or otherwise shall constitute advances against and recoupable out of all royalties becoming payable to PRODUCTIONS pursuant to this or any other agreement between the parties hereto.  No payment pursuant to this subparagraph 23(c)(iii) shall constitute a waiver of any of PRODUCTIONS' express or implied warranties and representations.

(d)  Intentionally omitted.

(e)  COMPANY shall have the right to use and allow others to use each Picture for advertising and promotional purposes in or for the Territory with no payment to PRODUCTIONS or ARTIST.

(f)  Intentionally omitted.

24.  COMPANY shall make payment to or on behalf of PRODUCTIONS of monies to assist in defraying PRODUCTIONS' costs of special marketing, as may be mutually approved by COMPANY and PRODUCTIONS. All such payments shall constitute advances pursuant to subparagraph 7(f), provided, however, that only one-third (1/3), rather than                        percent, of such payments shall be recoupable from monies payable or becoming payable pursuant to this or any other agreement.             *Plant's 1982 K.*

25.  (a)  During the Term, following notice from PRODUCTIONS, COMPANY shall license to PRODUCTIONS the right to include up to five (5) masters acquired by COMPANY under the Superhype Agreement and mutually selected by COMPANY and PRODUCTIONS, solely in and as part of a "Best of Robert Plant" compilation LP to be exploited outside the Territory only.  COMPANY shall license more than five (5) masters if and as may be hereafter mutually agreed upon in writing by COMPANY and PRODUCTIONS.

(b)  (i)     In consideration of the foregoing, PRODUCTIONS shall pay or cause to be paid to COMPANY a royalty (the "License Royalty") in respect of such licensed Masters (the "Licensed Masters") for inclusion solely in and as part of said compilation LP (the "Compilation LP") as follows:

- 26 -

(7-A-09882) 5270C/223C

(ii)    Productions shall cause each "Distributing Company" (as hereinafter defined) to pay directly to COMPANY the License Royalty specified herein in respect of all records (in all formats, configurations and technologies now known or hereafter devised) comprising the Compilation LP sold or otherwise exploited. The License Royalty payable to COMPANY in respect of sales outside the Territory shall be the equivalent of            percent of one hundred (100%) percent of the retail list price (or the generally accepted retail price where no retail list price exists) in respect of one hundred (100%) percent of retail sales of the Compilation LP.   The Override Royalty payable to COMPANY hereunder with respect to any sale or use of the Compilation LP other than as a full-priced LP sold through normal retailer channels shall be adjusted, increased or reduced in the same proportions as the royalties payable to PRODUCTIONS (or ARTIST or any other person or entity furnishing the services or recordings of ARTIST, and their respective designees, all of the foregoing together with PRODUCTIONS being herein referred to for the purposes of this Paragraph 25 as "PRODUCTIONS") for such uses of the Compilation LP are adjusted, increased or reduced pursuant to agreements between PRODUCTIONS and each Distributing Company.  The royalties payable to COMPANY pursuant to this Agreement shall in all respects be computed, determined, calculated and paid in the same manner (i.e., "free goods", reserves, container charges, retail list price, escalations, etc.) as the royalties payable to PRODUCTIONS by the applicable Distributing Company are computed, determined, calculated and paid pursuant to the applicable agreement with each Distributing Company.  With respect to any use of the Compilation LP for which PRODUCTIONS is paid a royalty computed as a percentage of the Distributing Company's net receipts or net royalties from such use, the License Royalty in respect of such use shall be a fraction of the total receipts payable to PRODUCTIONS therefor, the numerator of which shall be the License Royalty for such records and the denominator of which shall be the aggregate applicable royalty, rate payable to PRODUCTIONS for such records (i.e., PRODUCTIONS' royalty rate inclusive of royalties payable to producers and other third parties).  It is understood that the License Royalty specified in this subparagraph 25(b) shall be paid to COMPANY directly by the Distributing Company.  The License Royalty payable to COMPANY hereunder shall be paid commencing with the first record sold by each Distributing Company without regard to recoupment of any kind, advances, recording costs, charges, set-offs or other sums whatsoever.  In the event that the Compilation LP contains masters in addition to the Licensed Masters, the rate of the License Royalty shall be the rate otherwise applicable multiplied by a fraction, the numerator of which is the number of Licensed Masters contained on the Compilation LP, and the denominator of which is the total number of masters contained on the Compilation LP.

(iii)   PRODUCTIONS shall notify each Distributing Company of the terms and conditions of this agreement and shall irrevocably authorize and direct each Distributing Company to make

- 27 -

(7-A-09882) 5270C/223C

all payments due to COMPANY hereunder.  PRODUCTIONS shall promptly furnish COMPANY with a letter signed by the applicable Distributing Company in which the applicable Distributing Company acknowledges PRODUCTIONS' and its obligations hereunder and agrees to account for and pay directly to COMPANY all License Royalty payments required hereunder.  PRODUCTIONS hereby authorizes COMPANY to request and to receive direct accounting and payment from each such Distributing Company, and PRODUCTIONS hereby authorizes and directs each such Distributing Company to make all accountings and payments due to COMPANY hereunder upon presentation to it of a redacted copy of this Agreement.

(iv)    Nothwithstanding subparagraphs 25(b)(ii) and (iii), PRODUCTIONS shall remain liable to COMPANY for all of the payments comprising the License Royalty which are due to COMPANY hereunder.  This agreement is intended to make COMPANY a third party beneficiary to each agreement which PRODUCTIONS has heretofore or may hereafter enter into with each Distributing Company in respect of the subject matter hereof and COMPANY may enforce COMPANY's rights hereunder in accordance with such intention.

(v)    Copies of all statements rendered to PRODUCTIONS by each Distributing Company relating to the subject matter hereof shall be sent to COMPANY at the address set forth above at the same time that such statements are rendered or are required to be rendered to PRODUCTIONS and all royalties becoming payable to COMPANY hereunder shall be paid to COMPANY concurrently with the rendition of such statements, but in no event less frequently than semi-annually.  COMPANY shall have the right to inspect the books and records of PRODUCTIONS realating to the subject matter hereof.  PRODUCTIONS shall exercise its best efforts to secure for COMPANY the right to inspect the books and records of each Distributing Company relating to the subject matter hereof.  In the event that PRODUCTIONS inspects the books and/or records of any such Distributing Company relating to the subject matter hereof, PRODUCTIONS will provide to COMPANY all related findings, documents or copies or extracts thereof, reports and conclusions.

(c)   PRODUCTIONS represents, warrants, covenants and agrees that PRODUCTIONS shall be solely responsible for payment to Superhype Tapes, Ltd., its successors and assigns, in respect of the reproduction, manufacture, distribution, sale and other exploitation of the Licensed Masters pursuant to this Paragraph 25, and that COMPANY shall not be obligated to make any payment of any kind to Superhype Tapes, Ltd., ARTIST, or to any other third party, under the Superhype Agreement or otherwise, by reason of such use of the Licensed Masters or by reason of the Compilation LP.  PRODUCTIONS further represents, warrants, covenants and agrees that PRODUCTIONS shall cause Superhype Tapes, Ltd. to execute and deliver to COMPANY at the time of execution of this Agreement an inducement agreement in the form annexed hereto as Exhibit "B".

- 28 -

(7-A-09882) 5270C/223C

26.   (a)   In the event that during the Term of this Agreement Douglas P. Morris shall, for any reason, no longer be in the employ of COMPANY, or Time Warner Inc. or any of its subsidiaries, affiliates or successors, in a major executive position with duties which include the active supervision of COMPANY's activities under this Agreement in the United States, then PRODUCTIONS shall have the right to terminate the Term of this Agreement and the same shall be deemed to have expired through the effluxion of time and without further obligation by PRODUCTIONS and ARTIST to produce, record or deliver any further masters to COMPANY, or by COMPANY to accept, release or pay for any further masters, subject to the following terms and conditions:

(b)   PRODUCTIONS may exercise said right of termination only by giving written notice to COMPANY no later than 45 days after the earlier of (i) the date that PRODUCTIONS notifies COMPANY in writing that it has learned of such occurrence, or (ii) the date that PRODUCTIONS is advised, in writing, of such occurrence.

(c)   (i)   Should PRODUCTIONS elect to exercise said right of termination then, as a condition precedent to such termination becoming effective, PRODUCTIONS shall pay or cause to be paid to COMPANY an amount equal to all advances paid by COMPANY pursuant to this Agreement which relate to masters for an LP or LPs not yet delivered to COMPANY, to the extent that such advances have not theretofore been recouped by COMPANY from royalties payable to PRODUCTIONS hereunder.

(ii)   In addition to the payment as set forth in subparagraph 26(c)(i), should PRODUCTIONS elect to exercise said right of termination after delivery to COMPANY of the First LP but before delivery to COMPANY of the Second LP, then, as a further condition precedent to such termination becoming effective, PRODUCTIONS shall pay or cause to be paid to COMPANY the entire amount of the debit balance (if any) in the account maintained by COMPANY for PRODUCTIONS under this Agreement at the end of the accounting period following the date COMPANY receives written notice from PRODUCTIONS as above set forth in subparagraph 26(b), or the sum of                           Dollars, whichever is less.

(iii)   In addition to the payment as set forth in subparagraph 26(c)(i), should PRODUCTIONS elect to exercise said right of termination after delivery to COMPANY of the Second LP but before delivery to COMPANY of the Third LP, then, as a further condition precedent to such termination becoming effective, PRODUCTIONS shall pay or cause to be paid to COMPANY the entire amount of the debit balance (if any) in the account maintained by COMPANY for PRODUCTIONS under this Agreement at the end of the accounting period following the date COMPANY receives written notice from PRODUCTIONS as above set forth in subparagraph 26(b), or the sum of                           Dollars, whichever is less.

- 29 -

(7-A-09882) 5270C/223C

(iv)    Payments to COMPANY pursuant to this subparagraph 26(c) shall be made by PRODUCTIONS by unendorsed certified check to the order of COMPANY, and shall be paid to COMPANY within ten (10) days after COMPANY's advising PRODUCTIONS of the amounts payable.

(d)    In the event that PRODUCTIONS terminates the Term of this Agreement pursuant to this Paragraph 26, then as a condition subsequent to such termination remaining effective, PRODUCTIONS, ARTIST and/or any person or entity furnishing the services or recordings of ARTIST shall enter into good faith negotiations exclusively with an affiliate or designee of COMPANY in respect of an agreement similar in subject matter to this Agreement, for a period of sixty (60) days following the date of such termination, during which period PRODUCTIONS, ARTIST and/or any person or entity furnishing the services or recordings of ARTIST shall not negotiate any similar agreement with any third party. If at the end of such sixty (60) day period, an agreement in principle has not been reached, PRODUCTIONS, ARTIST and/or any person or entity furnishing the services or recordings of ARTIST may negotiate such an agreement with any third party free of any further obligations to COMPANY under this Paragraph 26.

(e)    Should PRODUCTIONS fail for any reason to make payment to COMPANY as provided for in subparagraph 26(c) above, or to comply with the terms and conditions of subparagraph 26(d), PRODUCTIONS' termination notice shall not be effective and the Term of this Agreement shall continue without interruption.

27.    Notwithstanding any provision to the contrary herein, provided that neither PRODUCTIONS nor ARTIST are in breach of the terms and conditions of this Agreement, ARTIST shall have the right to perform for the purpose of making phonograph records for exploitation by or on behalf of a "Charitable Organization", as such term is hereinafter defined, but only upon the following conditions:

(a)    ARTIST may record one (1) master solely for inclusion in a "Charity LP", as such term is hereinafter defined, during the twenty-four (24) month period following PRODUCTIONS' timely delivery to COMPANY of each LP required to be delivered by PRODUCTIONS to COMPANY pursuant to this Agreement.

(b)    For the purposes of this Paragraph 27, the term "Charity LP" shall mean an LP containing only one (1) master embodying a performance by ARTIST and released and exploited solely by or for the direct benefit of a "Charitable Organization", as such term is hereinafter defined, and conspicuously packaged, marketed, promoted, distributed and sold specifically and solely for such purpose, and advertised, promoted and marketed solely as a charity LP and not conspicuously as an LP embodying the performances of ARTIST.

- 30 -

(7-A-09882) 5270C/223C

(c)   For the purposes of this Paragraph 27, the term "Charitable Organization" shall mean a bona fide not-for-profit organization formed and operated solely for charitable purposes within the meaning of the United States Internal Revenue Code and Regulations, and duly and officially instituted, formed, organized, recognized, approved, licensed, registered and operated pursuant to all laws and regulations applicable to charitable organizations in each country in which said organization is founded and functioning.

(d)   Neither PRODUCTIONS nor ARTIST, nor any designee, or person or entity on their behalf or affiliated with them or in which they have any interest, individually or jointly, shall directly or indirectly become entitled to, be credited with, or receive any payment or other remuneration or consideration of any kind or in any form whatsoever for or by reason of such performance, the musical composition(s) or other material performed, or such phonograph records or any derivatives thereof;

(e)   ARTIST's activities in this regard will not in any way interfere with the prompt and timely performance of the recording and delivery obligations provided in this Agreement;

(f)   PRODUCTIONS shall give COMPANY written notice thereof in advance and the compositions to be performed and recorded shall not be compositions delivered pursuant to this Agreement;

(g)   ARTIST shall not in any manner be restricted from thereafter performing the same compositions for COMPANY;

(h)   ARTIST's name may only be used on the cover of such Charity LP, and in related advertising, in no greater size or prominence, or more conspicuous type style, than the name of any other artist whose performance is embodied in said LP and COMPANY shall be given appropriate courtesy credit in conjunction with any use of ARTIST's name on the cover of such LP;

(i)   Except as otherwise provided above, ARTIST's name, likeness, or photograph shall not be used in any manner by any third party in connection with ARTIST's performances or in any advertising thereof.   ARTIST's visual performance may not be used in any manner in connection with "sight and sound" devices.   No Singles may be released embodying ARTIST's performances.

28.   Before any payments are made to PRODUCTIONS by COMPANY under this Agreement, and from time to time thereafter upon COMPANY's request, PRODUCTIONS will complete, execute and deliver to COMPANY a completed certificate (in the form then prescribed by the United States Internal Revenue Service) sufficient to permit PRODUCTIONS to claim the benefit of an exemption from withholding of United States income tax under the applicable income tax treaty.   If this certificate is not so completed, executed and delivered, or if the exemption is not available or ceases to be effective for any reason, it is understood and agreed that COMPANY will withhold

- 31 -

(7-A-09882) 5270C/223C

income taxes in accordance with the requirements of the laws of the United States.

29. For the purposes of this Agreement, the following definitions shall apply:

(a) "Master" - The equivalent of a recording of a single selection or medley of not less than 3-1/2 minutes of playing time intended for use in the manufacture and sale of records.

(b) "Single" - A record embodying thereon two (2) masters.

(c) "Maxi-single" - A record embodying thereon not more than four (4) masters.

(d) "EP" - A record embodying thereon either five (5) masters or six (6) masters, provided, however, that in the event that more than one (1) of such masters embody the same musical composition, such record shall be deemed to be a Maxi-single for the purposes of this Agreement.

(e) (i) "LP" - A record of not less than 35 minutes of playing time. Multiple sets which consist of more than one (1) LP intended to be released, packaged and sold together for a single overall price, shall be deemed to be the equivalent of one (1) LP for the purposes of this Agreement, but shall not be recorded or delivered hereunder without COMPANY's prior written consent.

(ii) COMPANY shall not release a multiple set "Best Of", "Greatest, Hits" or other compilation LP solely embodying ARTIST's recordings hereunder without PRODUCTIONS' consent provided, however, that in the event that at any time after the expiration or termination of the Term of this Agreement any account maintained by COMPANY for PRODUCTIONS, ARTIST, or any person or entity furnishing the services or recordings of ARTIST, individually or with others, has a debit balance, COMPANY may release a multiple set "Best Of", "Greatest Hits" or other compilation LP embodying in whole or in part ARTIST's recordings hereunder, with or without other recordings of ARTIST and/or recordings of other artists, in COMPANY's sole discretion.

(f) "Records", "phonograph records", "recordings" and "sound recordings" - All forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for home use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, magnetic recording tape, film, electronic video recordings and any other medium or device for the production of artistic performances manufactured or sold primarily for home use, juke box use or use on or in means of transportation, whether embodying (i) sound alone or (ii) sound synchronized with visual images, e.g. "sight and sound" devices.

- 32 -

(7-A-09882) 5270C/223C

(g)   "Delivery", "deliver" or "delivered" - The actual receipt by COMPANY at Atlantic Studios of completed, fully edited, mixed, leadered and equalized masters comprising the applicable minimum recording commitment, technically satisfactory in COMPANY's opinion and ready for COMPANY's manufacture of records, together with all materials, artwork, consents, approvals, licenses and permissions.

(h)   "Recording Costs" - Wages, fees, advances and payments of any nature to or in respect of all musicians, vocalists, conductors, arrangers, orchestrators, engineers, producers, copyists, etc.; payments to a trustee or fund based on wages to the extent required by any agreement between COMPANY and any labor organization or trustee; all studio, tape, editing, mixing, re-mixing, mastering (excluding manufacturing mastering) and engineering costs; all costs of travel, per diems, rehearsal halls, non-studio facilities and equipment, dubdown, rental and transportation of instruments; all costs occasioned by the cancellation of any scheduled recording session; and all other costs and expenses incurred in producing the master recordings hereunder which are then customarily recognized as recording costs in the recording industry.

(i)   "mid-priced record" - A record which bears a suggested retail list price in the applicable country of the Territory of at least Two ($2.00) Dollars but not more than Three ($3.00) Dollars (or the equivalent in the applicable foreign currency,) less than the suggested retail list price of COMPANY's or COMPANY's licensee's, as applicable, then-current newly-released top-line records in the same configuration or format.

(j)   "budget record" - A record which bears a suggested retail list price in the applicable country of the Territory which is more than Three ($3.00) Dollars (or the equivalent in the applicable foreign currency) less than the suggested retail list price of COMPANY's or COMPANY's licensee's, as applicable, then-current newly-released top-line records in the same configuration or format.

(k)   "Picture" and "Pictures" - motion pictures and other audiovisual works that have a soundtrack substantially featuring performances of ARTIST.

(l)   "Videoshows" - Videocassettes, Videodiscs or any other devices, now or hereafter known or developed, that enable the Picture to be perceived visually, with or without sound, when used in combination with or as part of a piece of electronic, mechanical or other apparatus.

(m)   "or any other agreement" or "any other agreement between the parties hereto" - means the Superhype Agreement.  In this respect, PRODUCTIONS represents, warrants, covenants and agrees that it will cause this Agreement and the Superhype Agreement to be

- 33 -

(7-A-09882) 5270C/223C

fully cross-collateralized, and PRODUCTIONS shall cause Superhype Tapes, Ltd. to execute and deliver to COMPANY at the time of execution of this Agreement an inducement agreement in the form annexed hereto as Exhibit "B". The terms "or any other agreement" and "or any other agreement between the parties hereto" shall not include agreements between COMPANY and ARTIST or any person or entity furnishing the services or recordings of ARTIST solely as a member of the group of artists collectively professionally known as "LED ZEPPELIN", nor shall they include licenses in respect of mechanical reproduction of Controlled Compositions hereunder.

(n)   "Distributing Company" - Any record company, or companies, with whom PRODUCTIONS, ARTIST or any entity or person furnishing the services or recordings of ARTIST, or any of their designees, enter(s) into an agreement for the manufacture, distribution, sale or other exploitation of the Compilation LP.

30.   COMPANY shall have the right without PRODUCTIONS' consent to assign this Agreement in whole or in part to any subsidiary, parent company, affiliate, or to any third party acquiring a substantial portion of COMPANY's assets or stock.

31.   This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon either party hereto unless confirmed by a written instrument signed by an officer of said party. A waiver by either party hereto of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All of COMPANY's and PRODUCTIONS' rights, options and remedies in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, option or right available to COMPANY or PRODUCTIONS. Should any provision of this Agreement be adjudicated by a court of competent jurisdiction as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein. It is agreed that all accountings and payments required herein, and all grants made herein, shall survive and continue beyond the expiration or earlier termination of this Agreement. No breach of this Agreement by COMPANY shall be deemed material unless within thirty (30) days after PRODUCTIONS learns of such breach, PRODUCTIONS serves written notice thereof on COMPANY specifying the nature thereof and COMPANY fails to cure such breach, if any, within sixty (60) days after receipt of such notice. No breach of this Agreement by PRODUCTIONS or ARTIST shall be deemed material unless within thirty (30) days after COMPANY learns of such breach, COMPANY serves written notice thereof on PRODUCTIONS specifying the nature thereof and PRODUCTIONS fails to cure such breach, if any, within sixty (60) days after PRODUCTIONS' receipt of such notice. The foregoing sentence shall not be applicable to any breach, alleged breach or threatened breach of the exclusivity

- 34 -

(7-A-09882) 5270C/223C

<u>EXHIBIT "A"</u>

Annexed To The Agreement Dated As Of ___12/6___, 1991 Between
Atlantic Recording Corporation and Trolcharm Limited
f/s/o Robert Plant

Atlantic Recording Corporation
75 Rockefeller Plaza
New York, New York 10019

Gentlemen:

Reference is made to the foregoing agreement between you and Trolcharm Limited (hereinafter called "PRODUCTIONS") relating to the delivery of master recordings of my performances ("said agreement").

In order to induce you to enter into said agreement and to pay a good and valuable consideration therefor, in respect of said agreement, I hereby confirm to you the following:

1.   I have read the said agreement and PRODUCTIONS has the right to furnish my services for sound recordings as set forth therein and except as otherwise provided below I will look solely to PRODUCTIONS for the payment of all monies payable to me in accordance with said agreement.

2.   To the extent that said agreement requires the performance of my personal services for PRODUCTIONS, I will perform those services.

3.   In the event that prior to the expiration of the said agreement PRODUCTIONS shall cease to exist or shall otherwise fail to honor its obligations thereunder then I agree personally to assume the obligations of PRODUCTIONS for the then unexpired term of said agreement provided that you thereafter accord me the benefits which would otherwise be due PRODUCTIONS thereunder.  In addition, in the event that at any time PRODUCTIONS shall cease to exist or shall otherwise fail to honor any of its obligations other than its obligations solely during the term of said agreement, I agree to indemnify you and hold you harmless from and against any liability, loss, damage, cost or expense including reasonable legal fees paid or incurred by you by reason of any breach or threatened breach by me or PRODUCTIONS or failure of the covenants, representations or warranties contained herein or in said agreement, respectively.  No breach of said agreement or this agreement shall be deemed material, unless within thirty (30) days after you learn of such breach, you serve written notice thereof on PRODUCTIONS and me specifying the nature thereof and PRODUCTIONS or I fail to cure such breach, if any, within sixty (60) days after receipt thereof.

4.   Without limiting any of the rights granted to you in the said agreement, I hereby grant you the right to use and publish and to permit others to use and publish my name, likeness and all

- 36 -

(7-A-09882) 5270C/223C

biographical material concerning me and to permit others to write and publish articles concerning me for advertising or trade purposes in connection with the sale and exploitation of records embodying my performances, subject to subparagraph 5(b) of said agreement.

5.    I agree that except as otherwise provided for in said agreement, for so long as said agreement shall be in effect I will as an individual artist exclusively render my performances for PRODUCTIONS in connection with the production of records for the Territory, and I will not perform as an individual artist for any other person, firm or corporation for the purpose of making records for the Territory.

6.    In the event of the breach or threatened breach of any term hereof by me or of said agreement by PRODUCTIONS, I agree that you shall be entitled to injunctive relief in addition to any other rights or remedies available to you.  It is agreed that my services for the purpose of recording records pursuant to said agreement and this agreement are of a special, unique and extraordinary character.

7.    (a)  In the event that I die or am permanently disabled or incapacitated at any time during the Term of said agreement prior to the delivery to you by PRODUCTIONS of the first LP required to be delivered to you by PRODUCTIONS under said agreement, pursuant to all of the terms and conditions of said agreement, and the account maintained for PRODUCTIONS under Paragraph 10 of said agreement has a debit balance at that time of
or more (inclusive of reserves), I agree that I or my estate, as the case may be, shall be responsible for and shall pay to you the full unrecouped balance of the advance paid pursuant to subparagraph 7(a) of said agreement, not to exceed One Million
, together with the full unrecouped balance of any advance(s) paid pursuant to subparagraphs 7(b) or (c), and subparagraph 7(d)(i), of said agreement in respect of any LP not delivered to you pursuant to all of the terms and conditions of said agreement prior to my death or permanent disability or incapacity less recording costs paid by PRODUCTIONS in respect of said LP following payment pursuant to subparagraph 7(d)(i) and prior to my death or permanent disability or incapacity.

(b)  In the event that I die or am permanently disabled or incapacitated at any time during the Term of said agreement after delivery to you by PRODUCTIONS of the first LP required to be delivered to you by PRODUCTIONS under said agreement, pursuant to all of the terms and conditions of said agreement, and the account maintained for PRODUCTIONS under Paragraph 10 of said agreement has a debit balance at that time of Five Hundred Thousand ($500,000.00) Dollars or more (inclusive of reserves), I agree that I or my estate, as the case may be, shall be responsible for and shall pay to you the full unrecouped balance of any advance(s) paid pursuant to subparagraphs 7(b) or (c), and subparagraph 7(d)(i), of said agreement in respect of any LP not delivered to you pursuant to all of the terms and conditions of said agreement prior to my death or

- 37 -

(7-A-09882) 5270C/223C

permanent disability or incapacity less recording costs paid by PRODUCTIONS in respect of said LP following payment pursuant to subparagraph 7(d)(i) and prior to my death or permanent disability or incapacity.

8.    This agreement and said agreement shall be deemed to have been made in the State of New York and the validity, construction, performance and breach of this agreement and said agreement shall be governed by the laws of the State of New York applicable to agreements made and to be wholly performed therein.  I agree to submit to the jurisdiction of the Federal or State courts located in New York City in any action which may arise out of said agreement or this Agreement and said courts shall have exclusive jurisdiction over all disputes between you and PRODUCTIONS and/or me pertaining to said agreement or this Agreement and all matters related thereto.  In this regard, any process in any action or proceeding commenced in the courts of the State of New York arising out of any claim, dispute or disagreement under this Agreement may, among other methods, be served upon me by delivering or mailing the same, via registered or certified mail, addressed to me at the following address: Joan Hudson & Co., 91 Tabernacle Street, London EC2A 4BA, England; any such delivery or mail service shall be deemed to have the same force and effect as personal service upon me within the State of New York.  Nothing contained in this Paragraph 8 shall constitute a waiver of any other remedies available to you or preclude you from joining PRODUCTIONS or me in an action brought by a third party against you in any jurisdiction, although your failure to join PRODUCTIONS or me in any such action in one instance shall not constitute a waiver of any of your rights with respect thereto, or with respect to any subsequent action brought by a third party against you.

Very truly yours,

_____
ROBERT PLANT

ACCEPTED AND AGREED TO:

ATLANTIC RECORDING CORPORATION

By:_____
          VICE CHAIRMAN
TROLCHARM LIMITED

By:_____

(7-A-09882) 527QC/223C

- 38 -

EXHIBIT "B"

Annexed To The Agreement Dated As Of ___12/6___, 1991 Between
Atlantic Recording Corporation and Trolcharm Limited
f/s/o Robert Plant


Atlantic Recording Corporation
75 Rockefeller Plaza
New York, New York 10019


Gentlemen:

Reference is hereby made to the agreement between you and us dated as of June 1, 1982, as amended, modified and/or extended (the "Superhype Agreement"), in respect of the services and recordings of Robert Plant ("Artist"). Reference is further hereby made to the foregoing agreement between you and Trolcharm Limited, (the "Trolcharm Agreement") in respect of the services and recordings of Artist.

In order to induce you to enter into the Trolcharm Agreement and to pay a good and valuable consideration therefor, we hereby agree as follows:

1.    You shall have the right to fully cross-collateralize the Superhype Agreement and the Trolcharm Agreement, in all respects and for all purposes, subject to your payments to Tim Palmer as producer of the LP entitled "NOW AND ZEN", and we acknowledge that we are aware that you intend to do so. The Superhype Agreement shall constitute an agreement refered to in the Trolcharm Agreement as "or any other agreement" as such term is therein defined in subparagraph 29(m) of said agreement.

2.    You shall not be required to make any payments to us or to Artist or any other third party by reason of the reproduction, manufacture, distribution, sale or any other exploitation of the Licensed Masters or the Compilation LP, as such terms are defined in the Trolcharm Agreement, pursuant to Paragraph 25 of the Trolcharm Agreement, under the Superhype Agreement or otherwise. We shall look solely to Trolcharm Limited, for any such payments which may be due by reason of such exploitation of the Licensed Masters.

- 39 -

(7-A-09882) 5270C/223C

3.   As hereby modified and amended, all of the terms and conditions of the Superhype Agreement are hereby ratified and confirmed, and remain in full force and effect.

Very truly yours,

SUPERHYPE TAPES, LIMITED

By: _____

ACCEPTED AND AGREED TO:

ATLANTIC RECORDING CORPORATION

By: _____
    VICE CHAIRMAN

TROLCHARM LIMITED

By: _____

- 40 -

(7-A-09882) 5270C/223C

biographical material concerning me and to permit others to write and publish articles concerning me for advertising or trade purposes in connection with the sale and exploitation of records embodying my performances, subject to subparagraph 5(b) of said agreement.

5. I agree that except as otherwise provided for in said agreement, for so long as said agreement shall be in effect I will as an individual artist exclusively render my performances for PRODUCTIONS in connection with the production of records for the Territory, and I will not perform as an individual artist for any other person, firm or corporation for the purpose of making records for the Territory.

6. In the event of the breach or threatened breach of any term hereof by me or of said agreement by PRODUCTIONS, I agree that you shall be entitled to injunctive relief in addition to any other rights or remedies available to you. It is agreed that my services for the purpose of recording records pursuant to said agreement and this agreement are of a special, unique and extraordinary character.

7. (a) In the event that I die or am permanently disabled or incapacitated at any time during the Term of said agreement prior to the delivery to you by PRODUCTIONS of the first LP required to be delivered to you by PRODUCTIONS under said agreement, pursuant to all of the terms and conditions of said agreement, and the account maintained for PRODUCTIONS under Paragraph 10 of said agreement has a debit balance at that time of Dollars or more (inclusive of reserves), I agree that I or my estate, as the case may be, shall be responsible for and shall pay to you the full unrecouped balance of the advance paid pursuant to subparagraph 7(a) of said agreement, not to exceed . together with the full unrecouped balance of any advance(s) paid pursuant to subparagraphs 7(b) or (c), and subparagraph 7(d)(i), of said agreement in respect of any LP not delivered to you pursuant to all of the terms and conditions of said agreement prior to my death or permanent disability or incapacity less recording costs paid by PRODUCTIONS in respect of said LP following payment pursuant to subparagraph 7(d)(i) and prior to my death or permanent disability or incapacity.

(b) In the event that I die or am permanently disabled or incapacitated at any time during the Term of said agreement after delivery to you by PRODUCTIONS of the first LP required to be delivered to you by PRODUCTIONS under said agreement, pursuant to all of the terms and conditions of said agreement, and the account maintained for PRODUCTIONS under Paragraph 10 of said agreement has a debit balance at that time of . Dollars or more (inclusive of reserves), I agree that I or my estate, as the case may be, shall be responsible for and shall pay to you the full unrecouped balance of any advance(s) paid pursuant to subparagraphs 7(b) or (c), and subparagraph 7(d)(i), of said agreement in respect of any LP not delivered to you pursuant to all of the terms and conditions of said agreement prior to my death or

- 37 -

(7-A-09882) 5270C/223C

permanent disability or incapacity less recording costs paid by PRODUCTIONS in respect of said LP following payment pursuant to subparagraph 7(d)(i) and prior to my death or permanent disability or incapacity.

8.   This agreement and said agreement shall be deemed to have been made in the State of New York and the validity, construction, performance and breach of this agreement and said agreement shall be governed by the laws of the State of New York applicable to agreements made and to be wholly performed therein.  I agree to submit to the jurisdiction of the Federal or State courts located in New York City in any action which may arise out of said agreement or this Agreement and said courts shall have exclusive jurisdiction over all disputes between you and PRODUCTIONS and/or me pertaining to said agreement or this Agreement and all matters related thereto.  In this regard, any process in any action or proceeding commenced in the courts of the State of New York arising out of any claim, dispute or disagreement under this Agreement may, among other methods, be served upon me by delivering or mailing the same, via registered or certified mail, addressed to me at the following address: Joan Hudson & Co., 91 Tabernacle Street, London EC2A 4BA, England; any such delivery or mail service shall be deemed to have the same force and effect as personal service upon me within the State of New York.  Nothing contained in this Paragraph 8 shall constitute a waiver of any other remedies available to you or preclude you from joining PRODUCTIONS or me in an action brought by a third party against you in any jurisdiction, although your failure to join PRODUCTIONS or me in any such action in one instance shall not constitute a waiver of any of your rights with respect thereto, or with respect to any subsequent action brought by a third party against you.

Very truly yours,

_____
ROBERT PLANT

ACCEPTED AND AGREED TO:

ATLANTIC RECORDING CORPORATION

By:_____
VICE CHAIRMAN

TROLCHARM LIMITED

By:_____

(7-A-09882)  5270C/223E

- 38 -

<u>EXHIBIT "B"</u>

Annexed To The Agreement Dated As Of _____, 1991 Between
Atlantic Recording Corporation and Trolcharm Limited
f/s/o Robert Plant


Atlantic Recording Corporation
75 Rockefeller Plaza
New York, New York 10019


Gentlemen:

     Reference is hereby made to the agreement between you and us
dated as of June 1, 1982, as amended, modified and/or extended (the
"Superhype Agreement"), in respect of the services and recordings of
Robert Plant ("Artist").   Reference is further hereby made to the
foregoing agreement between you and Trolcharm Limited, (the
"Trolcharm Agreement") in respect of the services and recordings of
Artist.

     In order to induce you to enter into the Trolcharm Agreement and
to pay a good and valuable consideration therefor, we hereby agree
as follows:

     1.   You shall have the right to fully cross-collateralize the
Superhype Agreement and the Trolcharm Agreement, in all respects and
for all purposes, subject to your payments to Tim Palmer as producer
of the LP entitled "NOW AND ZEN", and we acknowledge that we are
aware that you intend to do so.  The Superhype Agreement shall
constitute an agreement refered to in the Trolcharm Agreement as "or
any other agreement" as such term is therein defined in subparagraph
29(m) of said agreement.

     2.   You shall not be required to make any payments to us or to
Artist or any other third party by reason of the reproduction,
manufacture, distribution, sale or any other exploitation of the
Licensed Masters or the Compilation LP, as such terms are defined in
the Trolcharm Agreement, pursuant to Paragraph 25 of the Trolcharm
Agreement, under the Superhype Agreement or otherwise.  We shall
look solely to Trolcharm Limited, for any such payments which may be
due by reason of such exploitation of the Licensed Masters.


                              - 39 -

     (7-A-09882) 5270C/223C

3.    As hereby modified and amended, all of the terms and conditions of the Superhype Agreement are hereby ratified and confirmed, and remain in full force and effect.

Very truly yours,

SUPERHYPE TAPES, LIMITED

By: _____

ACCEPTED AND AGREED TO:

ATLANTIC RECORDING CORPORATION

By: _____
     VICE CHAIRMAN

TROLCHARM LIMITED

By: _____

- 40 -

(7-A-09882) 5270C/223C